UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(WEST PALM BEACH DIVISION)

| | | |
|---|---|---|
| NOBLE PRESTIGE LIMITED, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | CASE NO.: _____ |
| PAUL HORN, individually, CRAIG | : | |
| THOMAS GALLE, individually, and GALLE | : | |
| LAW GROUP, P.A., a Florida professional | : | |
| association, | : | |
| | : | |
| Respondents. | : | |
| _____/ | | |

### PETITION TO CONFIRM AND ENFORCE INTERNATIONAL ARBITRATION AWARDS AND FOR A TEMPORARY RESTRAINING ORDER

Petitioner, Noble Prestige Limited ("Noble"), a limited liability company incorporated under the laws of Hong Kong, moves to confirm and enforce the international arbitration awards entered in its favor on March 29, 2019 (the "Interim Award"), against Craig Thomas Galle ("Galle"), July 31, 2019 (the "Partial Award on Costs"), against Galle, and May 14, 2020 (the "Final Award"), against Respondent, Paul Horn ("Horn").[1] Noble further requests a temporary restraining order with respect to funds currently held by Respondent Galle Law Group, P.A. ("GLG"), on behalf of Horn and for the benefit of Noble, which GLG unlawfully refuses to release. This Petition should be granted for the reasons set forth below:

### I. INTRODUCTION

1.     Noble recently prevailed in an international commercial arbitration in Hong Kong. As set forth more fully herein, that arbitration was conducted pursuant to an international

---

[1]The Interim Award, Partial Award on Costs and the Final Award shall collectively be referred to as the "Awards."

agreement entered into between Noble and Horn, which contained a mandatory arbitration clause. Arbitrators appointed by the Hong Kong International Arbitration Centre (the "HKIAC") pursuant to the HKIAC's administered arbitration rules issued the Awards in Noble's favor, and those Awards are final and enforceable pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, commonly known as "the New York Convention."   The New York Convention is implemented in the United States pursuant to chapter 2 of the Federal Arbitration Act.  9 U.S.C. § 201, *et seq.*

2.      In accordance with the express mandate of Congress and the obligations assumed by the United States under the New York Convention, this Court must enforce the Awards "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  The grounds specified in the New York Convention for refusing recognition and enforcement of an award are extremely limited, even more limited than those available to oppose confirmation of a domestic arbitral award pursuant to Chapter 1 of the Federal Arbitration Act,  9 U.S.C. § 1, *et seq*.

3.      Additionally, as more fully set forth herein, the New York Convention establishes an even stronger presumption in favor of arbitration of international disputes than the already strong presumption built into the nearly century-old Federal Arbitration Act.  Moreover, unlike the original Federal Arbitration Act, the Convention's enabling legislation vests the federal courts with federal-question subject matter jurisdiction over disputes falling under the Convention. Furthermore, the Convention imposes a heavy burden indeed on Respondents, who have a herculean burden to *prove with actual proof* that at least one of the Convention's seven, exclusive defenses to confirmation on an international arbitral award applies.

4.      For these reasons, elaborated in the pages that follow, Noble respectfully requests

that the Court confirm the Awards and enter judgment thereon, as no ground for barring enforcement exists here, all conditions precedent have been met, satisfied, or waived, and the Awards are subject to immediate enforcement.

5.      In support of this Petition, Noble attaches as **Exhibit A** the Certification of Jonathan Paul Crompton, RPC Hong Kong pursuant to Article IV.1 of the New York Convention.

## II.  THE PARTIES

6.      Noble is a limited liability company incorporated under the laws of Hong Kong, with its registered address at 16/F, Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong.

7.      Upon information and belief, Horn is a citizen of the United States of America, who is last known to be a resident of Thailand.

8.      Upon information and belief, Galle is a citizen of the United States of America, a resident of Palm Beach County, Florida, and an attorney licensed to practice law in the State of Florida.

9.      Upon information and belief, GLG is a professional association organized under the laws of the State of Florida, with its principal place of business and mailing address located in Palm Beach County, Florida, and operating as a law firm in the State of Florida.

## III.  JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 203.  The latter provides that an action or proceeding "falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States [and] [t]he district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  9 U.S.C. § 203; *see also Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir.

1998) (the Convention "creates original federal subject-matter jurisdiction over any action arising under the Convention"); *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005) ( "a case covered by the Convention confers federal subject matter jurisdiction upon a district court because such a case is 'deemed to arise under the laws and treaties of the United States'"); *Sea Bowld Marine Group, LDC v. Oceanfast Pty, Ltd.*, 432 F. Supp.2d 1305, 1308-1309 (S.D. Fla. 2006) (the New York Convention provides independent federal question jurisdiction).

11. As to venue, 9 U.S.C. § 204 provides as follows:

> An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

9 U.S.C. § 204.

12. As alleged herein, Galle is a resident of the State of Florida.

13. The Loan Facility Agreement (the "Facility Agreement"), entered into by Noble and Horn on December 19, 2011, provides that "[p]ayment of the Loan shall be made to the attorney IOTA trust account of [GLG], maintained in accordance with the Florida Bar Association Rules." In accordance with Article IV.1(b) of the Convention, a duly certified copy of the Facility Agreement – which is the agreement referred to in Article II of the Convention, *i.e.,* the agreement in writing that includes an arbitral clause, signed by the parties – is attached to the accompanying Certification of Jonathan Crompton ("Certification") as **Exhibit 1**.

14. GLG is a professional association incorporated under the laws of the State of Florida and with principal place of business located in the State of Florida.

15. As further alleged herein, Respondent Horn dealt with Noble directly and through Galle and designated GLG to receive and keep, in its IOTA account, funds to be payed to Noble.

Furthermore, in Annex B of the Facility Agreement (Exh. 1 of the Certification), Horn gave Noble a security interest in such funds, and such funds should still be kept at GLG.

16.     The dispute giving rise to the Awards specifically concerns the funds kept at GLG, located in Palm Beach County, State of Florida.

17.     Given the foregoing, this district is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated… ."  28 U.S.C. § 1391(b)(2).  Accordingly, under 9 U.S.C. §204 (¶10, above), this district is the appropriate venue for this petition to confirm the Awards.

18.     Additionally, the Court has personal jurisdiction over Horn under the Florida Long Arm Statute, Fla. Stat. § 48.193, which provides, *inter alia*, that a non-resident of Florida who personally or through an agent (1) operates, conducts, engages in, or carries on a business in Florida or (2) breaches a contract in Florida by failing to perform acts required by the contract to be perform in Florida, submits himself to the jurisdiction of courts of Florida.  Fla. Stat. § 48.193(1), (7).

19.     By appointing as his agents Galle and GLG for the purposes of the Facility Agreement, as more fully described *infra*, Horn operated, conducted, engaged in, or carried on business in the State of Florida. Moreover, by failing to convey the funds owed to Noble under the Facility Agreement, Horn breached a contract in Florida by failing to perform an act required by the contract to be performed in Florida.  Therefore, Horn has subjected himself to the jurisdiction of Florida.

20.     This Court also has *in rem* jurisdiction to prevent the dissipation, transfer, use, and/or encumbering of the funds being held by GLG, located in the State of Florida.

## IV. BACKGROUND

### The Agreements

21.     By way of background, Horn held an interest in a cellular communications system called Colorado 3 ("Colorado 3"). In 1991, he sold that interest to McCaw Cellular Communications pursuant to an "Assignment Agreement" dated October 4, 1991 ("Assignment Agreement").  McCaw Cellular Communications sold its interests in the Assignment Agreement to AT&T Wireless Services, which subsequently became known as New Cingular ("AT&T Parties").

22.     In 2011, after several years of stalemate in respect of the valuation of Colorado 3, Horn planned to initiate communications with the AT&T Parties in an attempt to reach agreement with them on the value of Colorado 3 and therefore the sums due Horn in respect of his interest in it, characterized in the Assignment Agreement as his "Appreciated Value Interest."  Horn anticipated, however, that he and the AT&T Parties would be unable to reach agreement about the value of his Appreciated Value Interest, which would trigger a costly appraisal process under his Assignment Agreement.  Horn anticipated also that, in that appraisal process, he would have to pay the fees and expenses of his own appraiser and half the fees and expenses of a third appraiser, and as well as the costs of forensic discovery, in accordance with the appraisal procedure in the Assignment Agreement. Horn, therefore, sought and, under the Facility Agreement he and Noble signed on December 11, 2011, was given funding of US $500,000[2] from Noble to fund the appraisal as envisaged under the Assignment Agreement.

23.     Under the Facility Agreement, Horn agreed that he would pay Noble, within five (5) business days of payment to him of sums from the AT&T Parties in respect of his Appreciated

---

[2] All amounts set forth herein will be in U.S. dollars, unless it is specifically indicated that the amount is in Hong Kong dollars ("HK $").

Value Interest, the greater of $5 million or 5% of what the AT&T Parties paid him for his Appreciated Value Interest.   Payment of the valuation funding to Horn under the Facility Agreement was to be made to the attorney IOTA trust account of Respondent GLG, maintained in accordance with Rules Regulating the Florida Bar. GLG is located in Wellington, Florida.

24.     On the same date as the Facility Agreement, Horn and GLG gave Noble an Irrevocable Letter of Instruction (Annex A of the Facility Agreement), which provides in relevant part as follows:

1.     Horn irrevocably appoints [GLG] as the designated disbursing/closing agent ("Disbursing Agent") for the funds due Horn, Noble and some or all of the lawyers who have represented Horn in the pursuit of his [Appreciated Value Interest] from the ATT Parties. [GLG] has accepted its appointment as the Disbursing Agent as set forth above in this paragraph. [GLG] may not withdraw from its appointment as Disbursing Agent except under the circumstances set forth in paragraph 3 below.

2.     Horn irrevocably instructs [GLG] to disburse via wire transfer to Noble, at an account designated by Noble, those sums due Noble under the [Facility Agreement]. Horn further instructs [GLG] to initiate said transfer to Noble those sums due Noble under the [the Facility Agreement] no later than five (5) days after the ATT Parties fund to [GLG] the sums due Horn for his [Appreciated Value Interest]. [GLG] agrees to abide by and comply with the instructions set forth above in this paragraph unless Noble elects the option set forth in paragraph 3 below.
…

5.     [GLG] and Horn acknowledge that Noble is relying upon the provisions set forth in this Irrevocable Letter of Instruction and, but for these provisions, Noble would not have made the Loan to Horn.

6.     This Agreement shall be governed by the laws of Hong Kong. Noble shall be entitled to enforce this Agreement in accordance with all applicable laws in any jurisdiction that Noble deems appropriate.

7.     Horn appoints Christopher Lambert, Esq. [of Hong Kong] as his designated agent for purposes of accepting service of process in any dispute arising out of or related to this Agreement, the Loan and/or the [Facility Agreement].

While the Irrevocable Letter of Instruction is "Annex A" of the Facility Agreement and so is included in Exh. 1 of the Certification, for the Court's convenience a true and correct copy of the

7

Irrevocable Letter of Instruction is attached to the Certification as **Exhibit 2**.

25.     In conjunction with the Facility Agreement, Horn entered into a Security Agreement with Noble on December 19, 2011.  While the Security Agreement is "Annex B" of the Facility Agreement and so is included in Exh.1 of the Certification, for the Court's convenience a true and correct copy of the Security Agreement is attached to the Certification as **Exhibit 3**.

26.     The Security Agreement provided that it:

> granted [Noble] a security interest (lien) in the sums paid by the AT&T Parties to Horn on account of the Appreciated Value Interest, provided, however, that such security interest (lien) shall only attach to those portion of the funds that equal the sums due Noble under the [Facility Agreement].[3]

### The Arbitration and Arbitral Awards

27.     In the performance of its obligations under the Facility Agreement, Noble paid an aggregate sum of $500,624.26, as valuation funding, to Galle between December 20, 2011 and February 10, 2014.

28.     On March 7, 2017, the Denver Probate Court granted an order appointing Galle as Special Conservator over certain of Horn's assets.  On September 29, 2017, Galle informed Noble that, acting as Special Conservator on behalf of Horn, he had negotiated with the AT&T Parties and received a sum of US $57.5 million in respect of Horn's Appreciated Value Interest. Galle also provided Noble with a letter dated September 25, 2017, from James Britt, Esq. ("Britt") of the Britt Law Offices, LLC, the court-appointed guardian *ad litem* for Horn in respect of the proceedings before the Denver Probate Court. In this letter, Britt indicated that he objected to and would not approve the disbursement of $5,000,000 to Noble under the Facility Agreement. Instead, Britt indicated his view that the amount that should be paid to Noble was $2,000,000.

---

[3] Notably, Paragraphs 7 and 8 of the Security Agreement are *verbatim* of Paragraph 6 and 7 of the Irrevocable Letter of Instruction.

29.     By letter dated November 17, 2017, addressed to Horn and copied to Galle, Noble (acting through its Hong Kong lawyers) demanded that Horn pay, in full, the sum of $5,000,000 required under the Facility Agreement.  By letter dated November 17, 2017, Britt responded that no one was suggesting that Noble should not be paid nor that Noble did not provide a benefit to Horn. Nonetheless, Britt again indicated that Horn's estate was willing to pay Noble only $2,000,000. In that same letter, Britt indicated that other persons had been paid out of the proceeds received from AT&T ("[w]ith the exception of one other claimant that we anticipate will soon be resolved, all the other claims of Mr. Horn have been amicably resolved without the need for litigation").[4]

30.     On December 19, 2017, having not received payment of the sum demanded, Noble commenced HKIAC arbitration proceedings (the "Arbitration") against Horn by issuing the Notice of Arbitration.

**The Interim Award on the Preliminary Issue**

31.     On January 24, 2018, Galle filed an Answer to the Notice of Arbitration (the "Answer"), purportedly on behalf of Horn, alleging that Horn was and remained incapable of making decisions and giving instructions, including in relation to the Arbitration, citing among other things a psychiatric report dated December 18, 2014, as evidence thereof.  As the basis of his authority to represent Horn in the Arbitration, Galle cited an order entered by the Denver Probate Court in Denver, Colorado, on March 7, 2017, whereby Galle was appointed as the Special Conservator over Horn's interest in his dispute with the AT&T Parties and the proceeds of that dispute.[5]  The Answer further stated that Galle, as Special Conservator over those assets, was then

---

[4] Paragraphs 114 and 115, Final Award.
[5] Paragraphs 108 to 110, Interim Award.

appointed by the Denver Probate Court to defend the Arbitration.

32.     Noble raised issues with regard to the authority of Galle to act on behalf of Horn in the Arbitration, and proposed that the issue of Galle's authority to represent Horn be dealt with as a preliminary issue in the Arbitration.  On July 20, 2018, the arbitral tribunal decided to determine the issue of Galle's authority as a preliminary issue ("Preliminary Issue") and, on November 20, 2018, a hearing was held on the Preliminary Issue. Galle was represented at the hearing of the Preliminary Issue by a Hong Kong barrister and lawyers from Boase Cohen & Collins, a firm of Hong Kong solicitors.

33.     On March 29, 2019, the tribunal issued its Interim Award on the Preliminary Issue, which held that Galle was not properly authorized to represent Horn in the Arbitration proceeding and was prohibited by the arbitral tribunal to take any further action in the Arbitration *until proper authority was obtained and demonstrated to the tribunal*.  The arbitral tribunal was not satisfied that Galle had authority to represent Horn in the Arbitration because, amongst other things, Galle refused to place before the tribunal the papers filed with the Denver Probate Court, despite being provided with ample opportunity to do so.[6] Instead, Galle had "point-blank refused" to place these materials before the tribunal.[7]

34.     The tribunal also expressed concerns over the suitability of Galle to represent Horn in the Arbitration, since Galle had had no contact with Horn and had, to the concern of the arbitral tribunal, failed to take steps to advise Horn of the receipt of $57.5 million from AT&T in respect of Horn's Appreciated Value Interest.[8] The tribunal had further concerns about Galle's suitability to represent Horn because Galle made "apparent inaccurate, and false, statements" to Noble and

---

[6] Paragraphs 128 to 130, Interim Award.
[7] Paragraph 130, Interim Award.
[8]  Paragraphs 161 to 162, Interim Award.

the tribunal.[9]

35.     In accordance with Article IV.1(a) of the New York Convention, a duly certified copy of the Interim Award is attached to the Certification as **Exhibit 5**.

**The Partial Award on Costs**

36.     Subsequently, the tribunal directed Noble and Galle to provide written submissions on costs and expenses of the Arbitration up until the determination of the Preliminary Issue.

37.     After considering Noble's and Galle's submissions, the tribunal issued the Partial Award on Costs Relating to the Interim Award on July 31, 2019.  In accordance with Article IV.1(a) of the Convention, a duly certified copy of the Partial Award on Costs is attached to the Certification as **Exhibit 6**.

38.     In the Partial Award on Costs, the tribunal ordered Galle to pay Noble the sum of HK$3,250,000 and interest thereon at the rate of 8.125% per annum if Galle fails to pay within seven (7) days.[10]  The arbitral tribunal made it clear that this amount was to be paid by Galle in his personal capacity,[11] as respondent to the Preliminary Issue.[12] The tribunal also noted its further concerns about "a number of inaccurate and misleading comments" in Galle's submissions on costs as to the findings of the tribunal in the Interim Award.[13]  Galle has failed to pay the sums due to Noble under the Partial Award on Costs, within seven (7) days or at all.

**The Final Award**

39.     Following the Partial Award on Costs, one of the arbitrators withdrew and the HKIAC re-appointed the arbitral tribunal including a replacement for the withdrawing arbitrator.

---

[9]  Paragraph 165, Interim Award.
[10]  Paragraph 102, Partial Award on Costs.
[11]  Paragraph 89, Partial Award on Costs.
[12]  Paragraphs 39 to 40, Partial Award on Costs.
[13]  Paragraph 41, Partial Award on Costs.

The tribunal held a case management conference on October 17, 2019, which was attended by Noble, but not Horn. By this stage of the Arbitration, the tribunal had provided ample of opportunities for Horn to be heard, but he failed to appear.[14] Following the case management conference, the tribunal set out a timetable for the remainder of the proceedings. In particular, the arbitral tribunal requested Noble to address the issues raised in the Answer by Galle, purportedly acting on behalf of Horn, namely whether the Facility Agreement was invalid because: (i) Horn was mentally incapacitated at the time of signing the Facility Agreement ("Mental Incapacity Argument"); (ii) the Facility Agreement was unenforceable because it violated the rules of champerty and maintenance in Hong Kong as a litigation funding agreement ("Litigation Funding Argument"); and (iii) Noble violated the Money Lenders Ordinance (Chapter 163 Laws of Hong Kong) ("Usurious Loan Argument").[15]

40.     On November 14, 2019, Noble submitted its Statement of Claim, and with it addressed the issues raised by Galle in the Answer, including the Galle Unenforceability Arguments.[16]

41.     Horn was provided an opportunity to file his Statement of Defense by November 28, 2019, but he failed to do so.[17]

42.     On December 20, 2019, the Substantive Hearing of the Arbitration was held in Hong Kong.  The tribunal attended the Substantive Hearing in person.  Neither Horn nor any of his representatives attended the Substantive Hearing.[18]   After the Substantive Hearing, Noble

---

[14] Paragraph 27, Final Award.
[15] Paragraph, 76, Final Award. The Mental Incapacity Argument, the Litigation Funding Argument and the Usurious Loan Argument shall collectively be referred to as the "Galle Unenforceability Arguments".
[16] Paragraph 77, Final Award.
[17] Paragraph 34 to 35, Final Award.
[18] Paragraph 37, Final Award.

submitted its costs submissions on February 28, 2020.

43.     On May 14, 2020, the tribunal issued its Final Award (the "Final Award"), which held that: (i) Horn was not mentally incapacitated at the time when the Facility Agreement was entered into; (ii) the Facility Agreement did not violate the rules of Champerty and Maintenance; and (iii) Noble did not violate the Money Lenders Ordinance (Chapter 163 Laws of Hong Kong).[19]

44.     In the Final Award, the Tribunal ordered: (i) Horn to pay a sum of $5,000,000 as debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement; (ii) interest on the sum of $5,000,000 at a rate of HSBC Prime Rate +1%, from September 1, 2017 to May 14, 2020 [being a sum of $817,761.90]); (iii) the sum of HK$3,800,530.05 in respect of Noble's costs and expenses incurred in the Arbitration (exclusive of costs previously awarded in the Partial Award on Costs); and (iv) interest on the above sums at the same rate as the Hong Kong judgment rate from May 14, 2020 until the such sums are paid.[20]   In accordance with Article IV.1(a) of the Convention, a duly certified copy of the Final Award is attached to the Certification as **Exhibit 7**.

### **Authority of the tribunal**

45.     The tribunal was duly constituted pursuant to Articles 9.1 and 9.2(a) of the 2013 HKIAC Administered Arbitration Rules ("2013 HKIAC Rules").[21] Similarly, the re-appointed tribunal was also duly constituted pursuant to Articles 7, 8, 9.2 and 10.2 of the 2013 HKIAC Rules.[22] During the course of re-appointing the tribunal, the HKIAC afforded Horn an opportunity

---

[19] Paragraphs 136 to 179, Final Award.
[20] Paragraph 226, Final Award.
[21] Paragraphs 9 to 11, Interim Award.  The 2013 HKIAC Rules can be found at: https://www.hkiac.org/sites/default/files/ck_filebrowser/PDF/arbitration/2013_hkiac_rules.pdf.
[22] Paragraphs 15 to 18, Final Award.

to designate an arbitrator, but failed to do so.[23]

46.     The tribunal had power and authority under the 2013 HKIAC Rules to consider Galle's authority to represent Horn as a preliminary issue in the Arbitration.[24] The tribunal heard full submissions from both Galle and his lawyers in relation to the preliminary issue and Galle accepted that the tribunal was duly constituted in accordance with the 2013 HKIAC Rules.[25]

47.     Notwithstanding that the tribunal found that Galle had no authority to represent Horn in the arbitration, the tribunal had been asked by Galle in the Answer to consider the enforceability of the Facility Agreement.[26] The tribunal asked Noble to address the matters raised by Galle in the Answer including the Galle Unenforceability Arguments and Noble did address those issues in its pleadings and submission in the arbitration.[27]

48.     The tribunal had power and authority to render the Awards, Section 70(1) of the Arbitration Ordinance (Cap. 609, Laws of Hong Kong) ("*an arbitral tribunal may, in deciding a dispute, award any remedy or relief that could have been the subject of civil proceedings in the court*").[28] In addition, the tribunal had power and authority to issue awards in respect of the costs of the arbitral proceedings, Article 33.1(e) of the HKIAC Rules and Section 74 of the Arbitration Ordinance.[29]

---

[23] Paragraphs 10 and 12, Final Award.
[24] Paragraphs 74 and 180, Interim Award.
[25] Paragraph 180, Interim Award.
[26] Paragraphs 73 to 74, Final Award.
[27] Paragraphs 76 to 77, Final Award.
[28] Section 70(1), Arbitration Ordinance (Cap. 609, Laws of Hong Kong).
[29] Paragraphs 45 to 46, Interim Award, and Paragraphs 208 to 210, Final Award.

## V. COUNT I

## THE COURT SHOULD CONFIRM AND ENFORCE
## THE AWARDS UNDER THE NEW YORK CONVENTION

### Overview

49.     The New York Convention is an international treaty drafted under the auspices of

the United Nations and opened for signature on June 10, 1958. 21 U.S.T. 2517, T.I.A.S. No. 6997,

330 U.N.T.S. 3.  In 1970, the United States acceded to the treaty and Chapter 2 of the Federal

Arbitration Act, 9 U.S.C. § 201, *et seq.*, the Convention's enabling legislation, became law. *See*

*Indus. Risk Insurers*, 141 F.3d 1434, 1440. Article III of the New York Convention provides that,

"[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in

accordance with the rules of procedure with the territory where the award is relied upon."

50.     It is long-established that 9 U.S.C. § 201 *et seq.* "mandates the enforcement of the

New York Convention in United States courts [and] … generally establishes a strong presumption

in favor of arbitration of international commercial disputes." *Indus. Risk Insurers*, 141 F.3d at

1440, *citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985).

51.     The Eleventh Circuit has described the purpose of the New York Convention, and

the intention of the United States in enacting it into law, as follows:

> to "encourage the recognition and enforcement of international arbitral awards,"
> *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir.1983), to "relieve
> congestion in the courts and to provide parties with an alternative method for
> dispute resolution that [is] speedier and less costly than litigation." *Ultracashmere*
> *House, Ltd. v. Meyer*, 664 F.2d 1176, 1179 (11th Cir.1981). *See also generally*
> Leonard V. Quigley, "Accession by the United States to the United Nations
> Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 70
> Yale L.J. 1049 (1961) (recounting the deliberations of the New York Convention
> and describing accession's benefits for the U.S.). The Convention, and American
> enforcement of it through the FAA, "provide[] businesses with a widely used
> system through which to obtain domestic enforcement of international commercial
> arbitration awards resolving contract and other transactional disputes, subject only
> to minimal standards of domestic judicial review for basic fairness and consistency

with national public policy." G. Richard Shell, "Trade Legalism and International Relations Theory: An Analysis of the World Trade Organization," 44 Duke L.J. 829, 888 (1995).

*Indus. Risk Insurers,* 141 F.3d at 1440.

52.    As the Eleventh Circuit added in 2019,

By encouraging the recognition and enforcement of international arbitration agreements and awards, the Convention "relieve[s] congestion in the courts and … provide[s] parties with an alternative method for dispute resolution that [is] speedier and less costly than litigation." *Indus. Risk Insurers*, 141 F.3d at 1440 (quotation omitted) (final alteration in original). In that vein, the Supreme Court has emphasized that *the United States has a "federal policy in favor of arbitral dispute resolution" which "appl[ies] with special force in the field of international commerce."* *Mitsubishi Motors*, 473 U.S. at 631, 105 S. Ct. at 3356.

*Cvoro v. Carnival Corp.*, 941 F.3d 487, 495 (11th Cir. 2019) (emphasis added). *See also Lindo v. NCL (Bahamas), Ltd*., 652 F.3d 1257, 1262 (11th Cir. 2011) ("[t]he goal of the convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements and international contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries").

53.    Furthermore, Section 207 of the Convention's enabling legislation provides:

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The court <u>shall</u> confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said convention.

9 U.S.C. § 207 (emphasis added).   Additionally, the Awards clearly fall under the terms of the New York Convention.  Article I(1) of the Convention provides that the Convention applies "to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."  In implementing the Convention, Congress defined agreements or awards falling under the Convention as those "arising out of a legal relationship, whether

contractual or not, which is considered as commercial, including a transaction, contract, or agreement. . ." 9 U.S.C. § 202. Here, the Awards and underlying agreement (the Facility Agreement) satisfy the definition of awards falling under the Convention.

54.     The Awards are also subject to enforcement under the New York Convention because they involve parties domiciled or having their principal place of business outside of the U.S. *See, e.g., Indus. Risk Insurers*, 141 F.3d at 1441 ("arbitration agreements and awards not considered as domestic in the United States are those agreements and awards which are subject to the Convention not because [they were] made abroad, but because [they were] made within the legal framework of another country, *e.g.,* pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction").

Here, the Facility Agreement provides that:

> 19.1     This [Facility Agreement] and any dispute or claim arising out of, or in connection with it, or its subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the laws of Hong Kong.

> 19.2     Any dispute, controversy or claim arising out of or in relation to this [Facility Agreement], or the breach, termination or invalidity thereof, will be settled by arbitration in accordance with the Hong Kong International Arbitration Centre rules presently in force.

> 19. 3     The number of arbitrators will be 3 (three), each party to appoint 1 (one) arbitrator and the arbitrators so appointed to appoint the third.

> 19.4     The place of arbitration will be Hong Kong and the language to be used in the arbitral proceedings shall be English.

> 19.5     [Horn] appoints RobSec. Limited 5705, 57/F The Center, 99 Queen's Road, Central, Hong Kong as his duly authorised representative to accept service of process on his behalf for any dispute arising out of or related to this [Facility Agreement].

55.     Therefore, although Respondent Galle is a citizen of the United States, here, the "relationship [between Noble and Horn on the one hand, and between Noble and Galle on the

other] involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states," as contemplated by 9 U.S.C. § 202. The Facility Agreement provides, *inter alia*, that it shall be governed under the laws of Hong Kong, and the arbitration was conducted in Hong Kong, pursuant to the 2013 HKIAC Rules under the agreement to arbitrate contained in the Facility Agreement.

<u>**Standard of Review Under the New York Convention**</u>

56.     The New York Convention provides that covered awards must be enforced, except on very specific and limited grounds. "Section 207 provides that confirmation is mandatory 'unless [a court] finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention.'" *Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 524 (D. Del. 2003), *order clarified,* CIV.A. 98-401 (KAJ), 2003 WL 22999543, 2003 U.S. Dist. LEXIS 18014 (D. Del. 2003) (quoting 9 U.S.C. § 207); *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976).

57.     Proceedings to enforce awards under the Convention, such as this one, are summary in nature. *See Empresa De Telecommunicaciones De Bogota S.A. E.S.P. v. Mercury Telco Group, Inc.*, 670 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009). Such proceedings are "not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm." *Zeiler v. Deitsch,* 500 F.3d 157, 169 (2d Cir. 2007) ("Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm.").

58.     Furthermore, under the Convention, the showing required to avoid summary confirmation is high, and the burden of establishing the requisite factual predicate to deny

confirmation of an arbitral award rests with the party resisting confirmation. *See Imperial Ethiopian Gov't*, 535 F.2d at 336 (the Convention "clearly shifted the burden of proof to the party defending against enforcement"); *see also* New York Convention, Art. V ("Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes [proof] to the competent authority where the recognition and enforcement is sought. . .").

59.     The principal purpose underlying the Convention is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which . . . arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15 (1974).

60.     In accordance with this principal purpose, an international arbitration award under the Convention is "subject only to minimal standards of domestic judicial review for basic fairness." *Indus. Risk Insurers*, 141 F.3d 1434, 1440; *see also Fla. Power Corp. v. Int'l Broth. of Elec. Workers*, 847 F.2d 680 (11th Cir. 1988) (reversing district court that had exceeded limited authority to review arbitral award); *Costa v. Celebrity Cruises, Inc.*, 768 F.Supp.2d 1237, 1240-41 (S.D. Fla. 2011) (refusing to vacate award on public policy grounds under New York Convention) *citing Indus. Risk Insurers,* 141 F.3d at 1445–46.  And, any additional grounds for vacating an arbitration award as may be contained in the FAA, which entails a lower burden requiring a showing of "evident partiality," are strictly inapplicable.

61.     Indeed, when reviewing an arbitration award, "[c]onfirmation under the Convention is . . . not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmations or grounds for refusal to confirm." *Chelsea Football Club Ltd. v. Mutu*, 10-24028-CIV, 2012 WL 463932, 2012 U.S. Dist

LEXIS 17354 (S.D. Fla. 2012) (confirming award of Court of Arbitration for Sport seated in Switzerland in favor of Chelsea Football Club) (citing *Zeiler*, 500 F.3d 157, 169 (citation omitted)). "Absent extraordinary circumstances, a confirming court is not to reconsider the arbitrator's findings. A mistake in fact or law is insufficient to refuse confirmation of an arbitral award." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 190 F. Supp. 2d 936, 943 (S.D. Tex. 2001), *judgment entered*, CIV.A. H01-0634, 2002 WL 32107930, 2001 U.S. Dist. LEXIS 23079 (S.D. Tex. 2002), *and aff'd,* 364 F.3d 274 (5th Cir. 2004) (citation omitted).

62.    Respondents bear both the burden of proof and the burden of persuasion to make a convincing showing that at least one of the limited grounds for not enforcing the Award applies. *See Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974) (party seeking to vacate an arbitration award bears the burden of proof to set forth specific grounds for doing so); *TMR Energy Ltd. v. State Prop. Fund*, 411 F.3d 296, 304 (D.C. Cir. 2005) (Convention "assigns the burden of persuasion to the party opposing enforcement").

63.    Moreover, "[o]bjections to confirmation of an arbitral award are construed narrowly to encourage the recognition and enforcement of commercial arbitration agreements in international contracts, *Karaha Bodas Co.*, 364 F.3d 274, 290, and this Court's review of the award thus is extremely limited." *Rintin Corp., S.A. v. Domar., Ltd.*, 374 F. Supp. 2d 1165, 1169 (S.D. Fla. 2005) (citation omitted), *aff'd*, 476 F.3d 1254 (11th Cir. 2007). "This is particularly true in the context of international arbitrations, in which context there is a 'general pro-enforcement bias.'" *Id.* Importantly, "[a]bsent 'a *convincing showing*' that one of the narrow exceptions to the general policy of enforcement applies, the arbitral award will be confirmed." *In re Trans Chem.*

*Ltd. & China Nat'l Mach. Import & Exp. Corp.,* 978 F. Supp. 266, 309 (S.D. Tex. 1997) (emphasis added) (citation omitted).

64.     It is within this legal context that this Court must examine any objections to confirmation.

**None of the Specified Grounds Exists for Refusal
or Deferral of Confirmation Under the New York Convention**

65.     Federal law strongly encourages arbitration of such disputes and the recognition of resulting awards. *See e.g. Mitsubishi Motors, Inc.*, 473 U.S. 614, 631 (noting strong "federal policy applies with special force in the field of international commerce"); *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24 (1983) (discussing "liberal federal policy favoring arbitration"); *Olsher Metals Corp. v. Olsher*, No. 03-12184, 2004 WL 5394012, * 2, 2003 U.S. App. LEXIS 27211 (11th Cir. 2004) ("[t]he Federal Arbitration Act evinces a 'liberal federal policy favoring arbitration agreements[],' and this presumption in favor or arbitration 'applies with special force in the field of international commerce'") (internal citations omitted).

66.     This policy favoring arbitration applies with even more force where, as here, the agreement to arbitrate is a broad one. *See In re Managed Care Litigation,* 132 F. Supp. 2d 989, 993 (S.D. Fla. 2000) ("If the plaintiffs' allegations 'touch matters' covered by the arbitration agreement, then those claims must be arbitrated, irrespective of how the allegations are labeled. This approach furthers the Act's strong presumption in favor of arbitration"), *aff'd,* 285 F.3d 971 (11th Cir. 2002), *certiorari granted on unrelated issues, Pacificare Health Systems, Inc. v. Book,* 537 U.S. 946 (2002).  Section 19.2 of the Facility Agreement provides as follows: "Any dispute, controversy or claim arising out of or in relation to this agreement, or the breach, termination or invalidity thereof, will be settled by arbitration in accordance with the Hong Kong International Arbitration Centre rules presently in force."  It is well-established also that

21

agreements to arbitrate that use language similar to that found in the Facility Agreement, section 19, are broad arbitration agreements.  *See Olsher Metals Corp. v. Olsher*, No. 01-3212-CIV-JORDAN, No. 01-3212, 2003 U.S. Dist. LEXIS 27516, at *14-16 (S.D. Fla. Mar. 25, 2003) ("The Eleventh Circuit has held that clauses like this one are broad") citing *Gregory v. Electro-Mechanical Corp.,* 83 F.3d 382, 385-86 (11th Cir. 1996) (clause providing that "any dispute ... which may arise hereunder" is a broad provision); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 758 (11th Cir. 1993) (tort claims are cognizable under arbitration clause providing that "any controversy or claim arising out of or relating to this Agreement or the breach thereof..."); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., Inc.,* 741 F.2d 342, 343-344 (11th Cir. 1984) (language that "any controversy arising out of or relating to this [contract] or the breach thereof" evidences a broad arbitration clause).

66.     The New York Convention is a treaty and, as set forth in relevant part in Article VI, Clause 2:

> …all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., Art. VI, Cl. 2.  *See, e.g.*, *Indus. Risk Insurers,* 141 F. 3d at 1440 ("As an exercise of the Congress' treaty power and as federal law, 'the Convention must be enforced according to its terms over all prior inconsistent rules of law'") citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex),* 767 F.2d 1140, 1145 (5th Cir. 1985).

67.     Accordingly, the only possible grounds for vacating the Awards are the seven defenses enumerated in Article V of the New York Convention.  *Earth Sci. Tech, Inc. v. Impact UA, Inc*., 809 F. App'x 600, 605 (11th Cir. 2020) ("the defenses enumerated by the New York Convention provide the exclusive grounds for vacating an award subject to the Convention");

*Indus. Risk Insurers*, 141 F.3d at 1441-42 ("[an] abitral award must be confirmed unless appellants can successfully assert one of the seven defenses against enforcement of the award enumerated in Article V of the New York Convention.").

67.     Importantly, the party opposing confirmation of an award "bears the burden of proving that any of these seven defenses is applicable." *Indus. Risk Insurers*, 141 F.3d at 1441. That burden is a heavy one indeed: "Because arbitration is an alternative to litigation, judicial review of arbitration decisions is 'among the narrowest known to the law.'" *Bamberger Rosenheim, Ltd. (Isr.) v. OA Dev., Inc. (United States)*, 862 F.3d 1284, 1286 (11th Cir. 2017), *quoting AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.,* 508 F.3d 995, 1001 (11th Cir. 2007).

68.     In fact, the standard of review of an arbitral award is so narrow that the Eleventh Circuit observed just a few months ago that,

> [a]rbitrators do not exceed their powers when they make errors, even "a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp*., 559 U.S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010). That means, however difficult it may be, "we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is." *Wiregrass*, 837 F.3d at 1087; *see also Inversiones y Procesadora Tropical INPROTSA, S.A. v. Del Monte Int'l GmbH*, 921 F.3d 1291, 1303 (11th Cir. 2019). In fact, under our current scheme, an arbitrator's actual reasoning is of such little importance to our review that it need not be explained – the decision itself is enough. *See O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc*., 857 F.2d 742, 747 (11th Cir. 1988).

*Gherardi v. Citigroup Global Mkts., Inc*., 975 F.3d 1232, 1237 (11th Cir. 2020).

69.     As more fully set forth in its text, Article V.1 of the Convention allows a State Party to refuse enforcement if the party against which enforcement is sought proves one of the following procedural objections: incapacity of the contracting parties or invalidity of the arbitration agreement; failure of notice; inapplicability of the arbitration agreement to the particular dispute being arbitrated; irregularity in the formation of the arbitral tribunal; or that the award is not yet

binding or has been set aside or superseded by a competent authority.

70.     None of those procedural grounds applies here, and in any event, the burden is upon the party resisting enforcement to prove the existence of such grounds. "The proponent of the award is required only to supply the original or a certified copy of the award and the arbitral agreement.  These establish a prima facie case, and the burden shifts to the defendant to establish the invalidity of the award on one of the grounds specified in Article V 1." *Czarina LLC  v. WF Poe Syndicate*, 358 F. 3d 1286, 1292 n. 3 (11th Cir. 2004) (*quoting* Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 YALE L.J. 1049, 1066 (1961)); *see also Four Seasons Hotels and Resorts B.V. v. Consorcio Barr, S.A.*, 613 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2009) (party resisting enforcement failed to meet burden under Article V(1); "[t]here is a general pro-enforcement bias manifested in the Convention") (citation omitted).

71.     In addition to the five exceptions listed on Article V.1, Article V.2 states two further grounds for refusal to enforce an arbitral award:  if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country;" or if the "recognition or enforcement of the award would be contrary to the public policy of that country." New York Convention, Art. V(2).  Neither exception is applicable here.

72.     Noble's first observation is that the "public policy of th[e] country" in which recognition and enforcement are sought means, here, the public policy of the United States of America, not the public policy of any one state, even the state in which venue lies or the state whose law may arguably apply to the parties' dispute. *See Hartford Fire Ins. Co. v. Lloyd's Syndicate 0056 Ash*, No. 3:97CV00009, 1997 U.S. Dist. LEXIS 10858, at *15-18, 1997 WL 33491787 (D. Conn. June 30, 1997).

73.     Additionally, the national public policy defense of Article V.2(b) is not some catch-all, pig-in-a-poke defense.  In 2019, the Eleventh Circuit described just how exceedingly difficult it is to prove a defense of violation of a national public policy of the United States that supports setting aside an international arbitral award:

> "[T]he public-policy defense under the Convention is very narrow and is likewise to be construed narrowly in light of the presumption favoring enforcement of international arbitral awards. *Inversiones y Procesadora*, 921 F.3d at 1306; *Indus. Risk Insurers*, 141 F.3d at 1445. The defense applies to only violations of an "explicit public policy" that is "well-defined and dominant" and is ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Indus. Risk Insurers*, 141 F.3d at 1445 (internal quotation marks omitted) (*citing Drummond Coal Co. v. United Mine Workers, Dist. 20*, 748 F.2d 1495, 1499 (11th Cir. 1984)).
>
> Moreover, the public-policy defense "applies only when confirmation or enforcement of a foreign arbitration award would violate the forum state's most basic notions of morality and justice." *Inversiones y Procesadora*, 921 F.3d at 1306 (internal quotation marks omitted) (*quoting Bamberger Rosenheim, Ltd., (Israel) v. OA Dev., Inc., (United States)*, 862 F.3d 1284, 1289 n.4 (11th Cir. 2017). Consequently, "[a]lthough this defense is frequently raised, it 'has rarely been successful.'" *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc*., 665 F.3d 1091, 1097 (9th Cir. 2011) (quoting Andrew M. Campbell, Annotation, Refusal to Enforce Foreign Arbitration Awards on Public Policy Grounds, 144 A.L.R. Fed. 481 (1998 & supp.)); *see, e.g., Indus. Risk Insurers*, 141 F.3d at 1444-45 (rejecting a party's public-policy defense against enforcement of an arbitral award because the violation alleged – the side-switching of an expert witness during arbitration –was not so "well-defined and dominant" to rise to the level of a "public policy of the sort required to sustain a defense under article V(b)(2) of the New York Convention").

*See Cvoro*, 941 F.3d at 495-96.

74.     *Cvoro* shows that even if a court agrees that there is an explicit, well-defined, and dominant national public policy, that does not necessarily overcome the explicit, well-defined, and dominant national public policy in favor of arbitration, particularly in international transactions. Plaintiff had signed aboard as a waitress on Carnival Cruise Lines' "Carnival Dream" pursuant to a "seafarer's employment agreement." That agreement required arbitration of disputes in

"'London, England, Monaco, Panama City, Panama or Manila, Philippines whichever is closer to the Seafarer's home country'" as well as the application of the law of the flag of the vessel, in that case Panama.  In the course of her work, plaintiff developed severe pain to her left wrist and, ultimately, suffered permanent disability to her entire arm. She filed an arbitration proceeding against Carnival in Monaco, asserting claims for her injuries and disability pursuant to the Jones Act, 46 U.S.C. § 30104, and the general maritime law of maintenance and cure.  The arbitration went unfavorably for her and she sought vacatur of the award in this Court.  The Eleventh Circuit affirmed this Court's decision refusing to vacate the award despite the nation's explicit, well-defined, and dominant public policy, expressed in the Jones Act and the general maritime law, extending special solicitude to seamen, who are considered wards of admiralty.  *Id.*, at 498-504.

75.    An example from abroad of just how difficult it is to establish the national public policy defense under the Convention is the decision of English Court of Appeal in *Sinocore International Co Ltd v. RBRG Trading (UK) Ltd.*, [2017] EWHC 251 (Comm). There, the English appellate court held, effectively, that an English court should not refuse recognition and enforcement of an award based on the national public policy defense even if that defense is factually grounded on a crime – in that case, fraud and bribery – if the arbitrators considered the crime and disregarded it.  Noble respectfully submits that, as an appellate decision of a common law jurisdiction concerning the same treaty, the decision in *Sinocore* is of particularly persuasive force.[30]  *See Sinocore International Co Ltd v. RBRG Trading (UK) Ltd.*, [2017] EWHC 251

---

[30] *A fortiori* for controversies involving matters that involve determination under Hong Kong law, since English Court decisions have highly persuasive authority in Hong Kong. *See Acada Development Co Ltd v Gold Way Trading Co Ltd* [1989] 2 HKLR 65 (Hong Kong Court of Appeal: "*this Court always regards any decision of the English Court of Appeal as persuasive authority which it would be slow to depart from*" (at page 70)); *Golden Garden Management Ltd v Grand T G Gold Holdings Ltd* [2012] 3 HKC 228 ("*decisions of the English Court of Appeal are highly persuasive authorities…*" (at paragraph 24)).

(Comm).

76.     Very recently, the Singapore Court of Appeal rejected an application to set aside an arbitral award on the basis of public policy where the arbitral tribunal had refused one party the ability to present a case on the grounds of *res judicata* / issue estoppel (that party having previously failed to present its case in separate but related Malaysian court proceedings). *See BTN and another v BTP and another* [2020] SGCA 105 ("[t]he merits of a tribunal's decision are ordinarily irrelevant to whether its award should be set aside").[31]

77.     Hong Kong Courts themselves require that the public policy ground for refusing enforcement be construed and applied narrowly, and that such ground should not be used to deal with every conceivable type of procedural error or shortcoming.[32] *See A v R* [2010] 3 HKC 67 ("*[i]f the public policy ground is to be raised, there must be… a substantial injustice arising out of an award which is so shocking to the Court's conscience as to render enforcement repugnant*").[33]

78.     Moreover, for the national public policy exception under the Convention to apply, Respondents must make a convincing showing that any issue with the Awards was so severe and pervasive that it "would violate the forum state's most basic notions of morality and justice." *Costa,* 768 F.Supp.2d 1237, 1240-41. The public policy exception is reserved for the most extreme circumstances:

> The public policy defense is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice. The general pro-enforcement bias informing the convention . . . points to a narrow reading of the public policy defense.

---

[31] *See* Paragraphs 5, 7 to 8, 12 to 14, Singapore Supreme Court summary (available at: https://www.supremecourt.gov.sg/news/case-summaries/btn-and-another-v-btp-and-another-2020-sgca-105).

[32] Hong Kong Civil Procedure 2021, Volume 3, at U1/89/19.

[33] *A v R* [2010] 3 HKC 67 (at paragraph 23).

*Karaha Bodas Co.*, 364 F.3d 274, 305 (citation omitted).

79.     Based on the foregoing, Noble is entitled to immediate confirmation of the Awards, the entry of judgment thereon, and enforcement under the New York Convention.

## VI.  COUNT II

### THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER

80.     Noble hereby does apply, on an *ex parte* basis, for entry of a temporary restraining order ("TRO") and an order restraining transfer of assets, and upon expiration of the TRO, a preliminary injunction against Respondents, pursuant to Fed. R. Civ. P 65.  In support thereof Noble states as follows:

81.     Horn and his agents, including Galle, knowingly and intentionally violated the Final Award by failing to pay Noble: (i) $5,000,000 as the debt owed under the Facility Agreement, and, alternatively as damages for breach of the Facility Agreement; (ii) $817,761.90, being interest on the sum of $5,000,000 at a rate of HSBC Prime Rate +1%, from 1 September 1, 2017 to May 14, 2020; (iii) HK$3,800,530.05 in respect of Noble's costs and expenses incurred in the Arbitration; and (iv) interest thereon at the same rate as the Hong Kong judgment rate[34] from May 14, 2020 until the such sums are paid.

82.     Additionally, Galle knowingly and intentionally violated the Partial Award on Costs rendered against Galle by failing to pay Noble the sum of HK$3,250,000, and interest thereon at the rate of 8.125% per annum, in respect of Noble's costs and expenses incurred in the Arbitration (exclusive of costs awarded in the Final Award).

83.     Upon information and belief, the funds Horn received from the AT&T Parties, in respect of his Appreciated Value Interest, were deposited into the trust account of GLG, for the

---

[34] The interest rate payable on judgments and arbitral awards issued in Hong Kong, available at: https://www.judiciary.hk/en/court_services_facilities/interest_rate.html.

benefit of Noble under the Irrevocable Letter of Instruction and Facility Agreement, which funds have been ordered to be paid to Noble under the Awards.

84.     Rule 65(b), Fed. R. Civ. P., provides, in part, that a TRO may be granted without written or oral notice to the opposing party's counsel where "specific facts in an affidavit ... clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b).  This is such a case.

85.     Absent a TRO without notice, Respondents can significantly alter the *status quo* before the Court can determine the parties' respective rights, *e.g.,* Respondents can use, transfer, or encumber the funds in GLG's possession which, under the Awards, shall be disbursed to Noble.

86.     Respondents can also easily electronically transfer and secret the funds sought to be restrained if they obtained advance notice of Noble's Application for TRO and thereby thwart the Court's ability to grant meaningful relief and can completely erase the status quo.

87.     As Respondents continue to violate the tribunal's orders set forth in the Awards, Noble has no reason to believe Respondents will make the funds available for recovery or adhere to the authority of this Court any more than they have adhered to the tribunal's authority. As indicated above,[35] Britt has already indicated that other third parties have been paid out of the proceeds received from AT&T.

88.     Therefore, this Court should prevent an injustice from occurring by issuing an *ex parte* TRO that precludes Respondents from transferring, using, or otherwise encumbering such funds. Only such an order will prevent ongoing irreparable harm and maintain the status quo.

89.     In this Circuit, the standard for obtaining a TRO and the standard for obtaining a preliminary injunction are the same.  *See Emerging Vision, Inc. v. Glachman*, Case No. 10-cv-

---

[35] At paragraph 28.

80734, 2010 WL 3293346, at *3, 2010 U.S. Dist. LEXIS 81165 (S.D. Fla. June 29, 2010) (*citing Siegel v. LePore*, 120 F. Supp. 2d 1041 (S.D. Fla. 2000), *aff'd* 234 F.3d 1163 (11th Cir. 2000)).  In order to obtain a temporary restraining order or a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non- movant; and (4) that entry of the relief would serve the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets).  Noble is able to establish all of the relevant factors.

90.     As set forth herein, Noble is likely to succeed in the confirmation and enforcement of the Awards, as under the New York Convention the grounds not to confirm an international award are exceedingly narrow and the burden of proof, extremely high.  Based on the arguments set forth in Count I, Noble has therefore shown not merely a probability but, rather, a virtual certainty of success on the merits of its claim for confirmation of the Awards.  Thus, because Noble has established the merits of its claim for enforcement of the Awards, a likelihood of success is also shown as to Noble's claim.

91.     Noble will suffer irreparable injury if the relief is not granted because, at any time, Respondents may transfer, use, or otherwise encumber the funds that, pursuant to the Awards, are to be disbursed to Noble.

92.     In particular, Respondents can easily electronically transfer and secret the funds sought to be restrained if they obtained advance notice of Noble's Application for TRO and thereby thwart the Court's ability to grant meaningful relief and can completely erase the status quo.

93.     Therefore, Noble will suffer irreparable injury if the relief is not granted.

94.     The balance of hardship also tips sharply in Noble's favor, as Noble has expended substantial time, money and other resources seeking the entry of the Awards mandating the transfer of funds to Noble, as fully set forth herein.  Should Respondents be permitted to spend, use, transfer, or otherwise incumber such funds, Noble will suffer substantial loss and damage in case the funds are no longer available at the conclusion of this proceeding.  However, Respondents will suffer no legitimate hardship in the event a temporary restraining order is issued, because Respondents have no right to spend, use, transfer or otherwise incumber such funds as the Tribunal has already order such funds to be paid to Noble.

95.     Respondents are currently violating the Awards by refusing to transfer the funds to Noble. The public has an interest in having arbitration parties complying with arbitration proceeding and orders.

96.     Therefore, Plaintiff respectfully requests this Court grant *ex parte* relief by restraining the transfer of all monies held or received by Respondents, or other financial institutions, for the benefit of any or more of the Respondents, and any financial accounts tied thereto, up to the following amounts: (i) under the Final Award ($5,000,000 as debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement, plus $817,761.90 (being interest on the sum of $5,000,000 at a rate of HSBC Prime Rate +1%, from 1 September 1, 2017 to May 14, 2020), plus HK$3,800,530.05 in respect of Noble's costs and expenses incurred in the Arbitration (exclusive of costs previously awarded in the Partial Award on Costs), plus interest thereon at the same rate as the Hong Kong judgment rate from May 14, 2020 until the such sums are paid); and (ii) under the Partial Award on Costs (the sum of HK$3,250,000 in respect of Noble's costs and expenses incurred in the Arbitration - exclusive of costs awarded in the Final Award - and interest thereon at the rate of 8.125% per annum until the

such sums are paid).

97.     This Court has broad authority to grant such an order: federal district courts have the power to grant preliminary injunctions to prevent a defendant from transferring assets in cases where an equitable interest is claimed. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).

98.     Moreover, almost every Circuit has interpreted Rule 65 of the Federal Rules of Civil Procedure to grant authority to courts to restrain assets *pendente lite. See Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95CIV9341, 1997 WL 223077, 1997 U.S. Dist. LEXIS 5931 (S.D.N.Y. May 6, 1997) (acknowledging that "[a]lmost all the Circuit Courts have held that Rule 65 is available to freeze assets *pendente lite* under some set of circumstances").

99.     Importantly, in *Reebok v. Marnatech*, the District Court granted Reebok a limited restraint of the defendants' assets for the purpose of preserving those assets, thus ensuring the availability of a meaningful accounting after trial. *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521, 1526 (S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992). In affirming the decision, the Ninth Circuit determined that the plaintiff met its burden of demonstrating: (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' conduct; and (3) that defendants might hide their allegedly ill-gotten profits if their assets were not frozen. *Reebok Int'l Ltd.*, 970 F.2d 552, 563 (9th Cir. 1992); *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988), cert. denied, 490 U.S. 1035 (1989) ("[a] court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies").

100.    Moreover, to provide complete equitable relief, courts have granted such orders without providing notice to the defendants. Specifically, federal courts have held that where

advance notice of an asset restraint is likely to cause a party to alienate the assets sought to be restrained, a TRO may be issued *ex parte. See F.T. Int'l Ltd v. Mason*, 2000 WL 1514881 *3, 2000 U.S. Dist. LEXIS 14979 (E.D. Pa. 2000) (granting *ex parte* TRO restraining defendants' bank accounts upon finding that advance notice would likely have caused the defendants to secret or alienate funds); *CSC Holdings, Inc. v. Greenleaf Elec., Inc.*, 2000 WL 715601, 2000 U.S. Dist. LEXIS 7576 (N.D. Ill. 2000) (granting *ex parte* TRO enjoining cable television pirates and restraining pirates' assets).

101.    In this case, Respondents' ongoing violations of the Awards, and Britt's indications that sums have already been dispersed from the proceeds received from the AT&T Parties, warrant an *ex parte* order restraining the transfer of the wrongfully retained funds.

102.    Because of the strong and unequivocal nature of Noble's claims, Noble respectfully requests this Court require it to post a bond of no more than ten thousand dollars ($10,000.00), subject to increase at the Court's discretion should an application be made in the interest of justice. The posting of security upon issuance of a temporary or preliminary injunction is vested in the Court's sound discretion. Fed. R. Civ. P. 65(c).

103.    In view of the foregoing, Noble respectfully requests this Court to grant its *Ex Parte* application and enter a temporary restraining order as to Respondents in the form submitted herewith and schedule a hearing on Petitioner's Motion for a Preliminary Injunction before the expiration of the temporary restraining order.  Moreover, in the event the application is granted, Noble respectfully requests, most especially in view of the worldwide pandemic, that the Court permit the parties, including witnesses, to appear and testify as necessary telephonically at the hearing on Petitioner's Motion for a Preliminary Injunction, in accordance with Administrative Order 2020-41.  Furthermore, due to the time provisions of a temporary restraining order, in the

event the application is granted, Noble respectfully requests that the Court provide a copy of the temporary restraining order to Noble's counsel via e-mail at RJurman@hinshawlaw.com so that Noble may immediately effectuate any relief ordered therein and provide Respondents proper notice of the order and any subsequent hearing date.

WHEREFORE, Noble requests, pursuant to the New York Convention and its enabling legislation, that this Court enter a judgment:

- Confirming the Interim Award;

- Confirming and enforcing the Partial Award on Costs rendered against Galle;

- Confirming and enforcing the Final Award rendered against Horn;

- Awarding Noble the following sums as awarded in the Awards that remain unpaid:

  As against Horn under the Final Award

  - $5,000,000 as debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement;

  - $817,761.90 as interest on the sum of $5,000,000 at a rate of HSBC Prime Rate +1%, from 1 September 1, 2017 to May 14, 2020;

  - the sum of HK$3,800,530.05 in respect of Noble's costs and expenses incurred in the Arbitration (exclusive of costs previously awarded in the Partial Award on Costs);

  - interest on the above sums at the same rate as the Hong Kong judgment rate from May 14, 2020 until the such sums are paid;

  As against Galle under the Partial Award on Costs

  - the sum of HK$3,250,000 (or the equivalent in $) in respect of Noble's costs and expenses incurred in the Arbitration (exclusive of costs awarded in the Final Award); and

  - interest on the above sum at the rate of 8.125% per annum.

- Retaining jurisdiction to enforce satisfaction of the judgment as may be necessary;

- Granting Noble's Application for TRO in the form to be submitted to the Court; and

- Awarding Noble with such other relief as this Court deems just and proper, including costs.

Dated December 18, 2020.          Respectfully submitted,

                                  HINSHAW & CULBERTSON LLP
                                  *Attorneys for Petitioner*


                                  /s/ Rory Eric Jurman
                                  Rory Eric Jurman
                                  Fla. Bar No. 194646
                                  Email:  rjurman@hinshawlaw.com
                                          dsmellie@hinshawlaw.com
                                          rejeserve@hinshawlaw.com

                                  Janelle E. La Chuisa
                                  Fla. Bar No. 0539988
                                  Email: jlachuisa@hinshawlaw.com
                                          vharris@hinshawlaw.com

                                  One East Broward Boulevard, Suite 1010
                                  Ft. Lauderdale, Florida 33301
                                  Telephone: (954) 467-7900
                                  Facsimile: (954) 467-1024

                                          -and-

                                  Edward K. Lenci (admission *pro hac vice* requested)
                                  800 Third Avenue, 13th Floor
                                  New York, New York 10022
                                  Telephone: (212) 471-6200
                                  Facsimile: (212) 935-1166
                                  Email: elenci@hinshawlaw.com
                                          dbrito@hinshawlaw.com