# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NOBLE PRESTIGE LIMITED,                    :
                                           :
        Petitioner,                        :
                                           :
        v.                                 :     Case No. _____
                                           :
PAUL HORN, individually, CRAIG             :
THOMAS GALLE, individually, and GALLE      :
LAW GROUP, P.A., a Florida professional    :
association,                               :
                                           :
        Respondents.                       :

## CERTIFICATION OF JONATHAN PAUL CROMPTON, RPC HONG KONG

I, Jonathan Paul Crompton, am a partner in the Hong Kong office of Reynolds Porter Chamberlain (known as RPC), attorneys for Petitioner Noble Prestige Limited ("Noble") in the arbitration that is the subject of Noble's Petition to this Court.  I respectfully submit this Certification pursuant Article IV.1 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 1958 (the "New York Convention").  I certify the following:

**Exhibit 1** hereto is a true and correct copy of the Loan Facility Agreement (the "Facility Agreement"), entered into on 19 December 2011, by Noble and Respondent Paul Horn ("Horn"). As required by Article IV.1(a) of the Convention, the Facility Agreement is the agreement referred to in Article II of the Convention, *i.e.,* the agreement in writing that includes an arbitral clause, signed by the parties.  The arbitral provisions of the Facility Agreement are section 19 thereof.

**Exhibit 2** hereto is a true and correct copy of the Irrevocable Letter of Instruction, dated 19 December 2011, which is Annex A of the Facility Agreement (Exh. 1). It was given by Horn and Respondents Craig Thomas Galle, Esq., and Galle Law Group, P.A., to Noble as part of the commercial dealings related to the Facility Agreement. While the Irrevocable Letter of Instruction

is already included in Exh. 1 as Annex 1, I am submitting it as a separate exhibit for the Court's convenience.

**Exhibit 3** hereto is a true and correct copy of the Security Agreement, also dated 19 December 2011, which is Annex B of the Facility Agreement (Exh. 1). It was entered into by Noble and Horn as part of the commercial dealings related to the Facility Agreement (Exh. 1). While the Security Agreement is already included in Exh. 1 as Annex B, I am submitting it, too, as a separate exhibit for the Court's convenience.

**Exhibits 4-7** are submitted in compliance Article IV.1(b) of the Convention.  **Exhibit 4** hereto is a copy of a letter, dated 16 December 2020, addressed to and received by my colleagues and me, from the Hong Kong International Arbitration Centre ("HKIAC"), to which were attached **Exhibits 5-7** hereto.  Per section 19.2 of the Facility Agreement (Exh. 1), the HKIAC administered the arbitration that is the subject of Noble's petition to this Court. HKIAC's letter confirms as follows:

> The enclosed documents are true and genuine copies of (i) the Interim Award on Preliminary Issue dated 29 March 2019 [**Exhibit 5** hereto]; (ii) the Partial Award on Costs Relating to the Interim Award on the Preliminary Issue dated 31 July 2019 [**Exhibit 6** hereto], each of which is issued by the arbitral tribunal comprising of Mr. Simon Powell as the presiding arbitrator, Mr. Gavin Denton and Mr. Yuen Chuen Lee as the co-arbitrators; and (iii) the Final Award dated 14 May 2020 [**Exhibit 7** hereto], issued by the arbitral tribunal, comprising of Mr. Simon Powell as the presiding arbitrator, Mr. Gavin Denton, and Mr. John P. Bang.

Certified on December 18, 2020

By:  /s/ _____
          Jonathan Paul Crompton
RPC
38/F One Taikoo Place
979 King's Road
Quarry Bay
Hong Kong
T +852 2216 7000
F +852 2216 7001

From:                                                    16/12/2011 18:06       #614 P.002/021

— ORIGINALS SIGNED BY PAUL HORN

— COPY SENT TO          Execution Version
CRAIG GALLE ON 5/7/13

**DATED** 19th **DECEMBER 2011**

## LOAN FACILITY AGREEMENT

between

### PAUL HORN

and

### NOBLE PRESTIGE LIMITED

**CdB and JC & Co**
**2702, 27/F, The Centrium**
**60 Wyndham Street**
**Central, Hong Kong**

**Our Ref: JC/00589-001**

O:\Clients\Client A\Atkinson, Rick\Loan Facility\Loan Facility Agreement v5.docx



Execution Version

**THIS AGREEMENT** is dated 19 December 2011

**PARTIES**

(1)    **PAUL HORN** whose residential address is at *Enclosure 49 w/4 Hand. Klong Toei* (the "**Borrower**").

(2)    **NOBLE PRESTIGE LIMITED** a company incorporated under the laws of Hong Kong with company number 1667008 whose registered office is at 16/F Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong (the "**Lender**").

**BACKGROUND**

The Lender has agreed to provide the Borrower with an unsecured term loan facility of an amount not exceeding US$500,000.

**AGREED TERMS**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

**Assignment Agreement:** the Assignment Agreement dated 4 October 1991 entered into between Independence Day 1988 Cellular Partnership (1), the Borrower and others (2), RSA 350 Cellular, Inc. (3), and McCaw Cellular Communications, Inc. (4).

**Appreciated Value Interest:** shall have the meaning given to such expression in the Assignment Agreement.

**Availability Period:** the period from and including the date of this agreement to and including 1 July 2012.

**Business Day:** a day (other than a Saturday or a Sunday) on which commercial banks are open for general business in Hong Kong.

**Colorado 3 System:** the non-wireline cellular telephone system inter alia referred to in the Assignment Agreement.

**Event of Default:** any event or circumstance listed in clause 12.

**Facility:** the term loan facility made available under this agreement.

**Indebtedness:** any obligation to pay or repay money, present or future, whether actual or contingent, sole or joint.

**Irrevocable Letter of Instruction:** the irrevocable letter of instruction of even date entered into between The Galle Law Group P.A., and the Borrower, and given to the Lender, a copy of which is attached as **Annex A.**

**Loan:** the principal amount of the loan made or to be made by the Lender to the Borrower under this agreement or (as the context requires) the principal amount outstanding for the time being of that loan.

**Potential Event of Default:** any event or circumstance specified in clause 12 which would (with the expiry of a grace period, the giving of notice, the making of any determination under this agreement or any combination thereof) be an Event of Default.

1



Execution Version

**Repayment Amount:** shall have the meaning given to such expression in Schedule 1.

**Repayment Date:** shall have the meaning given to such expression in Schedule 1.

**Security:** any mortgage, charge (whether fixed or floating, legal or equitable), pledge, lien, assignment by way of security or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Security Agreement:** the security agreement entered into between the Borrower and the Lender a copy of which is attached as **Annex B**.

**US$:** the lawful currency for the time being of the United States of America.

**Total Facility Amount:** the maximum principal amount of the Facility referred to in clause 2.

1.2     A reference to **this agreement** (or any provision of it) or any other document shall be construed as a reference to this agreement, that provision or that document as it is in force for the time being and as amended, varied or supplemented from time to time in accordance with its terms, or with the agreement of the relevant parties.

1.3     A reference to a **person** shall include a reference to an individual, firm, company, corporation, unincorporated body of persons, or any state or any agency of any person.

1.4     A reference to **writing** or **written** includes faxes but not e-mail.

1.5     Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.6     References to a **certified copy** of a document mean a copy certified to be a true, complete and up-to-date copy of the original document, in writing and signed by Borrower or his duly authorised legal counsel.

1.7     A reference to the **Borrower** and the **Lender** shall include their respective successors, permitted transferees and permitted assigns.

1.8     A reference to a clause or Schedule is to a clause of, or Schedule to, this agreement unless the context requires otherwise.

1.9     A reference to **continuing** in relation to an Event of Default means an Event of Default which has not been remedied or waived.

2.     **THE FACILITY**

The Lender grants to the Borrower an unsecured US$ term loan facility of a total principal amount not exceeding US$500,000 (US$ five hundred thousand) on the terms, and subject to the conditions, of this agreement.

Execution Version

3.    **PURPOSE**

3.1    The Borrower shall use all money borrowed under this agreement:

(i)    up to the maximum drawdown amounts detailed in column I of Schedule 2; and

(ii)    for the specific purposes for each of the drawdown amounts detailed in column II of Schedule 2;

Provided Always that:

(iii)    the Borrower's nominated appraisers will advise the Borrower and his counsel of their opinion of whether or not a forensics investigation would be beneficial for the appraiser to determine the fair value of the Colorado 3 System. After considering the views of the appraisers, the Borrower and his counsel will determine whether or not to seek a court order to mandate AT&T to undergo a forensics investigation. Thus, subject to the other terms and conditions of this Agreement, it is in the discretion of the Borrower whether to retain and incur the fees of a forensic accountant;

(iv)    the fees for the third appraiser may be less than the amount budgeted, and such fees will be paid accordingly; and

(v)    the Borrower has the discretion to allocate and drawdown any excess funds not used to settle the fees of the forensic accountant, Mr Perry Walker, or the third appraiser for the other purposes related to the valuation process, including but not limited to examining data and documents supplied by independent sources, consultation fees and advisors fees.

3.2    The Lender is permitted to monitor and the Borrower is obliged to verify how any amount advanced under this agreement is used. The Borrower shall provide all such assistance as the Lender reasonably requires to enable the Lender to carry out such monitoring.

4.    **DRAWING**

4.1    The Borrower shall give the Lender at least three Business Day's prior notice of the date on which the Borrower wants to draw down any amount of the Loan detailed in column I of Schedule 2 specifying:

(i)    the amount of the proposed Loan (which shall not exceed the amount detailed in column I of Schedule 2); and

(ii)    the Business Day on which it is to be made (which shall not be later than 1 July 2012);

Provided that the amount of the Loan shall not exceed the Total Facility Amount.

4.2    Payment of the Loan shall be made to the attorney IOTA trust account of The Galle Law Group, P.A., maintained in accordance with Florida Bar Association Rules.

3

Execution Version

4.3    Any notice given under clause 4.1 will be irrevocable.

4.4    Any amount of the Facility not drawn down on or before 1 July 2012 will unless otherwise agreed in writing by the Lender, automatically be cancelled and no longer available. Under no circumstances may any amount of the Facility so cancelled be drawn down after the expiry of the Availability Period.

5.    **CONDITIONS PRECEDENT**

5.1    This clause 5 is inserted solely for the benefit of the Lender.

5.2    The Borrower may not give notice to draw down any amount of the Loan except for the purposes and on the basis set out in clause 3.1 and Schedule 2. The Lender recognises the need for a certain amount of flexibility in fund allocation to complete the valuation process (as contemplated inter alia in clause 3.1(iii)). The Lender is not obliged to lend, until the Lender has confirmed to the Borrower that it has received:

(i)    in respect of the current drawdown, the relevant Condition Precedent documents detailed in column III of Schedule 2; and

(ii)    in respect of all drawdowns already made, the relevant Condition Precedent documents and Condition Subsequent documents detailed in columns III and IV of Schedule 2;

in each case in the form and containing the information, that the Lender reasonably requires.

5.3    Subject to clause 5.2, the Lender will only be obliged to make the Loan available if, on both the date of the notice to draw down the Loan and the proposed drawdown date of the Loan (specified in clause 4.1):

(i)    no Event of Default or Potential Event of Default is continuing or would result from the proposed Loan; and

(ii)    the representations and warranties in clause 10 are true in all material respects.

6.    **INTEREST**

The Borrower shall not be required to pay interest on the Loan.

7.    **COSTS**

7.1    Each of the Borrower and the Lender shall pay their own costs and expenses incurred in connection with the negotiation and preparation of this agreement.

7.2    Following the occurrence of an Event of Default (which is not remedied by the Borrower in the manner contemplated in clause 12.1) the Borrower shall pay on demand to the

4



Execution Version

Lender by way of full reimbursement, all costs and expenses that the Lender incurs in connection with the preservation and enforcement of the Loan and/or this agreement.

**8.     REPAYMENT**

The Borrower shall repay the Loan by way of payment to the Lender of the Repayment Amount on the Repayment Date.

**9.     PAYMENTS**

9.1     Subject always to the provisions of the Irrevocable Letter of Instruction, all payments made by the Borrower under this agreement shall be in US$ and in immediately available cleared funds to the Lender to such account as the Lender shall notify the Borrower in writing.

9.2     If any payment becomes due on a day that is not a Business Day, the due date of such payment will be extended to the next succeeding Business Day, or, if that Business Day falls in the following calendar month, such due date shall be the immediately preceding Business Day.

9.3     All payments made by the Borrower under this agreement shall be made in full, without set-off, counterclaim or condition, and free and clear of, and without any deduction or withholding, provided that, if the Borrower is required by law or regulation to make such deduction or withholding, it shall pay to the Lender such additional amount as is necessary to ensure that the net full amount received by the Lender after the required deduction or withholding is equal to the amount that the Lender would have received had no such deduction or withholding been made.

**10.    REPRESENTATIONS AND WARRANTIES**

10.1    The Borrower represents and warrants on the date of this agreement:

10.2    He has the power and authority to execute, deliver and perform his obligations under this agreement and the transactions contemplated by it.

10.3    His obligations under this agreement are legal, valid, binding and enforceable in accordance with its terms.

10.4    It is not necessary to file, record or enroll this agreement with any court or other authority or pay any stamp, registration or similar taxes in relation to this agreement or the transactions contemplated by this agreement.

10.5    No Event of Default or Potential Event of Default has occurred or is continuing or is reasonably likely to result from making the Loan or the entry into, the performance of, or any transaction contemplated by this agreement.

5



Execution Version

10.6   Save for the lawsuit styled as *Paul Horn v. ATT Wireless et al.,* filed in the State Court of Colorado, Denver Division, no litigation, arbitration or administrative proceedings are taking place, pending or, to the Borrower's knowledge, threatened against him, which, if adversely determined, might reasonably be expected to have a material adverse effect on his ability to perform his obligations under this agreement.

10.7   The information, in written or electronic format, supplied by, or on his behalf, to the Lender in connection with the Facility and this agreement was, at the time it was supplied or at the date it was stated to be given (as the case may be), to the best of his knowledge and belief, complete, true and accurate in all material respects.

10.8   Each of the representations and warranties in this clause 10 is deemed to be repeated by the Borrower:

(i)     on the date of each request to draw down the Loan; and

(ii)    on the date that the Loan is actually drawn down;

by reference to the facts and circumstances existing on each such date.

11.   COVENANTS

11.1   The Borrower covenants with the Lender that, as from the date of this agreement until all his liabilities under this agreement have been discharged:

11.2   He will promptly, after becoming aware of them, notify the Lender of any litigation, arbitration or administrative proceedings or claim of the kind described in clause 10.6.

11.3   He shall procure that any of his unsecured and unsubordinated obligations and liabilities under this agreement rank, and will rank, at least pari passu in right and priority of payments with all his other unsecured and unsubordinated obligations and liabilities, present or future, actual or contingent, except for those obligations and liabilities mandatorily preferred by law.

11.4   He shall promptly notify the Lender of any Potential Event of Default or Event of Default (and the steps, if any, being taken to remedy it) promptly on becoming aware of its occurrence.

11.5   He shall not:

(i)     create, or permit to subsist, any Security (other than in favour of the Lender) on or over any of his Appreciated Value Interest;

(ii)    sell, transfer or otherwise dispose of any of his Appreciated Value Interest;

(iii)   save with the prior written consent of the Lender accept any settlement or other sum which is less than 90% of the sum that is otherwise due to be paid to him for his Appreciated Value Interest; or

6



Execution Version

  (iv) save with the prior written consent of the Lender, accept payment of the sum that is due to be paid to him for his Appreciated Value Interest otherwise than by a single payment.

**12.** **EVENTS OF DEFAULT**

12.1 Each of the events or circumstances set out in this clause 12 (other than this clause 12.1) is an Event of Default Provided Always that (if the Lender considers, acting reasonably, that such default is capable of remedy) such default is not remedied within fourteen (14) Business Days of the Lender notifying the Borrow of the Default and of the remedy required .

12.2 The Borrower fails to pay any sum payable under this agreement, unless his failure to pay is caused solely by an administrative error or technical problem and payment is made within three Business Days of its due date.

12.3 The Borrower fails to comply with any provision of:

  (i) this agreement;

  (ii) the Irrevocable Letter of Instruction; and/or

  (iii) the Security Agreement.

12.4 Any representation, warranty or statement made, repeated or deemed made by the Borrower in, or pursuant to, this agreement is (or proves to have been) incomplete, untrue, incorrect or misleading in any material respect when made, repeated or deemed made.

12.5 The Borrower stops or suspends payment of any of his debts, or is unable to, or admits his inability to, pay his debts as they fall due.

12.6 The Borrower commences negotiations, or enters into any composition, compromise, assignment or arrangement, with one or more of his creditors with a view to rescheduling any of his Indebtedness (because of actual or anticipated financial difficulties).

12.7 Any event occurs in relation to the Borrower similar to those in clauses 12.5 and 12.6 under the laws of any applicable jurisdiction.

12.8 A distress, attachment, execution, expropriation, sequestration or another analagous legal process is levied, enforced or sued out on, or against, the Borrower's assets or any of them.

12.9 At any time after an Event of Default has occurred which is continuing, the Lender may, by notice to the Borrower:

  (i) cancel all outstanding obligations of the Lender under this agreement whereupon they shall be immediately be cancelled; and/or



Execution Version

    (ii)    declare that the amount of the Loan then drawn down by the Borrower (and all accrued interest and all other amounts outstanding under this agreement) is immediately due and payable, whereupon they shall become immediately due and payable; and/or

    (iii)    declare that the Repayment Amount if then due and payable in accordance with the provisions hereof (and all accrued interest and all other amounts outstanding under this agreement) is immediately due and payable, whereupon they shall become immediately due and payable; and/or

    (iv)    declare that the amount of the Loan then drawn down and/or the Repayment Amount be payable on demand, whereupon it shall become immediately payable on demand by the Lender.

## 13.   CALCULATIONS, ACCOUNTS AND CERTIFICATES

13.1   The Lender shall maintain accounts evidencing the amounts owed to it by the Borrower, in accordance with its usual practice. Entries in those accounts shall be prima facie evidence of the existence and amount of the Borrower's obligations as recorded in them.

13.2   If the Lender issues any certificate, determination or notification of a rate or any amount payable under this agreement, it shall be (in the absence of manifest error) conclusive evidence of the matter to which it relates and shall contain reasonable details of the basis of determination.

## 14.   REMEDIES, WAIVERS, AMENDMENTS AND CONSENTS

14.1   Any amendment to this agreement shall be in writing and signed by, or on behalf of, each party.

14.2   Any waiver of any right or remedy or any consent given under this agreement is only effective if it is in writing and signed by the waiving or consenting party. It shall apply only in the circumstances for which it is given and shall not prevent the party giving it from subsequently relying on the relevant provision.

14.3   No delay or failure to exercise any right or remedy under this agreement on the part of the Lender shall operate as a waiver of any such right or remedy.

14.4   No single or partial exercise of any right or remedy under this agreement by the Lender shall prevent any further or other exercise or the exercise of any other right or remedy under this agreement.

14.5   Rights and remedies under this agreement are cumulative and do not exclude any other rights or remedies provided by law or otherwise.

8




**15.   SEVERANCE**

15.1   The invalidity, unenforceability or illegality of any provision (or part of a provision) of this agreement under the laws of any jurisdiction shall not affect the validity, enforceability or legality of the other provisions.

15.2   If any invalid, unenforceable or illegal provision would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with whatever modification as is necessary to give effect to the commercial intention of the parties.

**16.   ASSIGNMENT**

16.1   The Lender may assign any of its rights under this agreement or transfer all its rights or obligations by novation.

16.2   The Borrower may not assign any of his rights or transfer any of his rights or obligations under this agreement.

**17.   COUNTERPARTS**

This agreement may be executed and delivered in any number of counterparts, each of which is an original and which, together, have the same effect as if each party had signed the same document.

**18.   NOTICES**

18.1   Each notice or other communication required to be given under, or in connection with, this agreement shall be:

(i)      in writing, delivered personally or sent by pre-paid first-class letter or fax; and

(ii)     sent:

    (i)      to the Borrower at:

    c/o The Galle Law Group, P.A.
    13501 South Shore Boulevard, Suite 103
    Wellington, Florida 33414, USA

    Fax: + 1 561 798 1809

    Attention: Craig T. Galle, Esq.

    (ii)     to the Lender at:

    16/F Shun Ho Tower
    24-30 Ice House Street
    Central, Hong Kong



Execution Version

Fax: +852 2110 9521

Attention: Rick Adkinson, Esq.

or to any other addresses or fax numbers that are notified in writing by one party to the other from time to time.

18.2   Any notice or other communication given by the Lender shall be deemed to have been received:

   (i)   if sent by fax, when received in legible form;

   (ii)   if given by hand, at the time of actual delivery; and

   (iii)   if posted, on the second Business Day following the day on which it was despatched by pre-paid first-class post, airmail if overseas.

18.3   A notice or other communication given as described in clause 18.2(i) or clause 18.2(ii) on a day which is not a Business Day, or after normal business hours in the place of receipt, shall be deemed to have been received on the next Business Day.

18.4   Any notice or other communication given to the Lender shall be deemed to have been received only on actual receipt.

19.   **GOVERNING LAW AND JURISDICTION**

19.1   This agreement and any dispute or claim arising out of, or in connection with it, or its subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the laws of Hong Kong.

19.2   Any dispute, controversy or claim arising out of or in relation to this agreement, or the breach, termination or invalidity thereof, will be settled by arbitration in accordance with the Hong Kong International Arbitration Centre rules presently in force.

19.3   The number of arbitrators will be 3 (three), each party to appoint 1 (one) arbitrator and the arbitrators so appointed to appoint the third.

19.4   The place of arbitration will be Hong Kong and the language to be used in the arbitral proceedings shall be English.



19.5   The Borrower appoints ~~Christopher Lambert, Esq., of Messrs Robertsons Solicitors~~, 57/F ~~RobSec Limited~~ ~~57105~~ The Center, 99 Queen's Road, Central, Hong Kong as his duly authorised representative to accept service of process on his behalf for any dispute arising out of or related to this Agreement.

This agreement has been entered into on the date stated at the beginning of it.

10




Execution Version

### Schedule 1 Repayment Amount and Repayment Date

**Repayment Amount**

The amount repayable to the Lender by the Borrower shall be:

1.  US$5,000,000; or

2.  5% of the gross amount (including all interest payments and without any deductions whatsoever) paid to the Borrower by ATT (or any of its affiliated, associated or group companies) for the Borrower's Appreciated Value Interest;

whichever shall be the greater.

By way of example only, if the amount paid to the Borrower as aforesaid for the Borrower's Appreciated Value Interest is US$150,000,000 (US$ one hundred and fifty million), then the Repayment Amount will be:

US$7,500,000 (US$ seven million five hundred thousand)

All sums payable by the Borrower to the Lender under this Agreement shall be paid free and clear of all deductions or withholdings whatsoever unless the deduction or withholding is required by law. If any deductions or withholdings are required by law to be made from any of the sums payable under this Agreement, the Borrower shall pay to the Lender such sum as will, after the deduction or withholding has been made, leave the Lender with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

**Repayment Date**

The day falling five (5) Business Days after the gross amount is paid to the Borrower as aforesaid for the Borrower's Appreciated Value Interest.

11



From:                                         16/12/2011 18:10      #614 P.014/021

Execution Version

**Schedule 2**

| I | II | III | IV |
|---|---|---|---|
| Amount of drawdown US$ | Purpose of drawdown | Condition Precedent documents | Condition Subsequent documents |
| 25,000 | Advance payment to Mr Perry Walker | Certified copy signed retainer letter issued by Mr Perry Walker | Certified copy receipt of Mr Perry Walker |
| 66,000 to 80,000 | Payment of balance of retainer to Mr Perry Walker | | Certified copy receipt of Mr Perry Walker<br><br>Certified copy of shortlist of appraisers, together with working documents |
| 25,000 to 50,000 | Payment of initial retainer of appraiser | Certified copy signed retainer letter issued by appraiser | Certified copy receipt of appraiser |
| 100,000 | Payment of bonus to appraiser | | Certified copy receipt of appraiser<br><br>Certified copy of valuation |
| 75,000 to 100,000 | Payment of 50% of fees of 3rd appraiser | Certified copy of court order appointing 3rd appraiser<br><br>Certified copy signed retainer letter issued by 3rd appraiser | Certified copy receipt of 3rd appraiser<br><br>Certified copy of valuation |
| 35,000 to 75,000 | Payment of fees of forensic accountant | Certified copy signed retainer letter of forensic accountant | Certified copy receipt of forensic accountant<br><br>Certified copy of forensic accountant's report |
| 70,000 | Contingency reserve- as mutually agreed | as required and as mutually agreed | as required and as mutually agreed |
| TBD* | Data Document Acquisition | TBD* | TBD* |

12



From:

16/12/2011 18:11     #614 P.015/021

Execution Version

| I | II | III | IV |
|---|---|---|---|
| Amount of drawdown US$ | Purpose of drawdown | Condition Precedent documents | Condition Subsequent documents |
| TDB* | Consultants and advisors | TBD* | TBD* |
|  | The maximum total amount of facility US$500,000 |  |  |

*Note: To be mutually agreed by the Borrower and the Lender.

13



From:                                          16/12/2011 18:11        #614 P.016/021

Execution Version

Signed by the said
**Paul Horn**
in the presence of:

Witness name: Poramaporn Sornjit
Witness address: Sheraton Hotel

............................

Signed by Rick Adkinson
for and on behalf of
**Noble Prestige Limited**
in the presence of:

Director

Witness name:
Witness address:

............................                JASON CARMICHAEL
                                             CdB and JC & Co
                                        Solicitor, Hong Kong SAR

14

### IRREVOCABLE LETTER OF INSTRUCTION

This Irrevocable Letter of Instruction is given by The Galle Law Group, P.A. ("GLG") and Paul Horn ("Horn") to Noble Prestige Limited ("Noble") on this 19th day of December, 2011.

#### Witnesseth:

WHEREAS, pursuant to that certain Loan Facility Agreement dated December 19th, 2011 (the "Loan Agreement"), Noble has made available to Horn the sum of $500,000 USD (the "Loan") which sums are to be utilized by Horn to pay the fees of certain expert appraisers and related costs necessary to value Horn's Appreciated Value Interest ("AVI") in the *Colorado 3* cellular communications system (the "System");

WHEREAS, after the expert appraisers value the System, AT&T Wireless Services k/n/a New Cingular (the "ATT Parties") shall be obligated to pay Horn his AVI pursuant to the Assignment Agreement dated October 4, 1001 by and between Horn and the ATT Parties;
1981 ~~1001~~

WHEREAS, pursuant to the Loan Agreement and that certain Security Agreement of even date, Horn is required to repay the Repayment Amount (as defined in the Loan Agreement) to Noble within five (5) days of the ATT Parties' payment of the sums due Horn for his AVI; and

WHEREAS, it is anticipated that GLG will act as the disbursing/closing agent for the funds due Horn, Noble and some or all of the lawyers who have represented Horn in the pursuit of his AVI from the ATT Parties.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed to as follows:

1.      Horn irrevocably appoints GLG as the designated disbursing/closing agent ("Disbursing Agent") for the funds due Horn, Noble and some or all of the lawyers who have represented Horn in the pursuit of his AVI from the ATT Parties. GLG has accepted its appointment as the Disbursing Agent as set forth above in this paragraph. GLG may not withdraw from its appointment as Disbursing Agent except under the circumstances set forth in paragraph 3 below.

2.      Horn irrevocably instructs GLG to disburse *via* wire transfer to Noble, at an account designated by Noble, those sums due Noble under the Loan Agreement. Horn further instructs GLG to initiate said transfer to Noble those sums due Noble under the Loan Agreement no later than five (5) days after the ATT Parties fund to GLG the sums due Horn for his AVI. GLG agrees to abide by and comply with the instructions set forth above in this paragraph unless Noble elects the option set forth in paragraph 3 below.

3.      Should Noble elect, prior to the payment by the ATT Parties to GLG of the funds due Horn for his API, that Noble desires to establish a joint escrow account with GLG and CdB and JC & Co. (acting through Jason Carmichael or in default, its other partners), then such an

1



account shall be established at a mutually acceptable bank and the funds due Noble under the Loan Agreement shall be deposited directly in the escrow account and promptly disbursed by the joint escrow agents to Noble.

4.      GLG and Horn acknowledge that Noble is relying upon the provisions set forth in this Irrevocable Letter of Instruction and, but for these provisions, Noble would not have made the Loan to Horn.

5.      Each of Horn and Noble will from time to time provide all such information as may be reasonably required by CdB and JC & Co. to enable them to comply with applicable anti-money laundering and client requirements in Hong Kong, and arising from the transactions set out in this Agreement.

6.      This Agreement shall be governed by the laws of Hong Kong. Noble shall be entitled to enforce this Agreement in accordance with all applicable laws in any jurisdiction that Noble deems appropriate.

7.      Horn appoints Christopher Lambert, Esq. as his designated agent for purposes of accepting service of process in any dispute arising out of or related to this Agreement, the Loan and/or the Loan Agreement.

        Entered into the date first set forth above.


_____                    _____
PAUL HORN                                  THE GALLE LAW GROUP, P.A.
                                           By: Craig T. Galle, President


Acknowledged and Agreed:

_____
Rick Adkinson
For Noble Prestige Limited

2

account shall be established at a mutually acceptable bank and the funds due Noble under the Loan Agreement shall be deposited directly in the escrow account and promptly disbursed by the joint escrow agents to Noble.

4.      GLG and Horn acknowledge that Noble is relying upon the provisions set forth in this Irrevocable Letter of Instruction and, but for these provisions, Noble would not have made the Loan to Horn.

5.      Each of Horn and Noble will from time to time provide all such information as may be reasonably required by CdB and JC & Co. to enable them to comply with applicable anti-money laundering and client requirements in Hong Kong, and arising from the transactions set out in this Agreement.

6.      This Agreement shall be governed by the laws of Hong Kong. Noble shall be entitled to enforce this Agreement in accordance with all applicable laws in any jurisdiction that Noble deems appropriate.

7.      Horn appoints Christopher Lambert, Esq. as his designated agent for purposes of accepting service of process in any dispute arising out of or related to this Agreement, the Loan and/or the Loan Agreement.

Entered into the date first set forth above.

_____          _____
PAUL HORN                                THE GALLE LAW GROUP, P.A.
                                         By: Craig T. Galle, President

Acknowledged and Agreed:

_____
Rick Adkinson
For Noble Prestige Limited

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is entered into by and between Paul Horn ("Horn") and Noble Prestige Limited ("Noble") on this _15__ day of December, 2011.

### Witnesseth:

WHEREAS, Horn holds an interest in a certain cellular communications system known as *Colorado 3* (the "System");

WHEREAS, Horn sold, assigned and transferred his interest in the System to McCaw Cellular Communications ("McCaw") pursuant to a written Assignment Agreement dated October 4, 1991 (the "Assignment Agreement");

WHEREAS, McCaw sold, transferred and/or assigned its interest in the Assignment Agreement to AT&T Wireless Services k/n/a New Cingular (collectively, the "ATT Parties");

WHEREAS, pursuant to the Assignment Agreement, Horn shall shortly initiate communications with the ATT Parties in an attempt to reach agreement on the value of the System and the resulting sums due Horn for his Appreciated Value Interest;

WHEREAS, it is anticipated that Horn and the ATT Parties will be unable to reach agreement on the value of the System and Horn's Appreciated Value Interest and, thus, pursuant to the Assignment Agreement, the appraisal process will be triggered;

WHEREAS, as a part of the appraisal process, both Horn and the ATT Parties shall designate their respective third party appraisers and those appraisers (or more likely the Court) shall select the third appraiser;

WHEREAS, in connection with the appraisal process Horn shall be required to pay for the services of his designated appraiser, one-half (1/2) of the third appraiser, Perry Walter (Horn's expert appraiser consultant) and possibly forensic discovery methods and costs associated therewith (collectively, the "Valuation Costs");

WHEREAS, Horn has sought a $500,000.00 USD loan (the "Loan") from Noble to fund the Valuation Costs and simultaneously with the execution of this Agreement, Horn and Noble have executed a Loan Facility Agreement (the "Loan Agreement");

WHEREAS, pursuant to the Loan Agreement, the Repayment Amount (as defined in the Loan Agreement) shall be repaid to Noble no later than five (5) days after the ATT Parties pay Horn the sums due Horn for his Appreciated Value Interest;

12-15-11;11:57AM;                                                    ;                    # 5/ 6

WHEREAS, to induce Noble to enter into the Loan Agreement and to fund the Loan, Noble seeks additional security for the repayment of the Repayment Amount (as defined in the Loan Agreement) as set forth herein.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed as follow:

1.      The above referenced Recitals are incorporated herein and made an integral part of this Agreement.

2.      Noble is hereby granted a security interest (lien) in the sums paid by the ATT Parties to Horn on account of the Appreciated Value Interest provided, however, that such security interest (lien) shall only attach to those portion of the funds that equal the sums due Noble under the Loan Agreement. By way of illustration, if the sums payable to Horn by the ATT Parties for the Appreciated Value Interest equal $150,000,000.00 USD, under the Loan Agreement Noble would be entitled to $7,500,000.00 USD and Noble's security interest in the sums remitted by the ATT Parties to Horn shall only be on $7,500,000.00 USD, not the full amount of the remittance; to wit $150,000,000.00 USD.

3.      As a means of protecting Noble's security interest (lien), Horn shall be required to inform Noble, in writing, within seventy-two (72) hours of the occurrence of the following events:

A.      a court adjudication and/or agreement with the ATT Parties as to the amount due Horn on the Appreciated Value Interest;

B.      the date, time and manner in which payment and/or disbursement of the sums equaling the Appreciated Value Interest will be made (the "Funding"); and/or

C.      the identity of the party making the payment and/or disbursement of the sums equaling the Appreciated Value Interest (the "Disbursing Agent").

4.      At or before Funding, Noble and Horn shall give the Disbursing Agent joint written instructions identifying a joint escrow account where Noble's funds due under the Loan Agreement shall be wire transferred. If for whatever reason, Noble and Horn cannot form an acceptable escrow account or cannot agree on its form, Newco shall be entitled to give written instructions to the Disbursing Agent directing that the specific funds due Noble under the Loan Agreement be wire transferred directly to the client account of CdB and JC & Co in Hong Kong. If Noble gives the above referenced written instructions to the Disbursing Agent, to maintain the confidentiality of the Loan and Loan Agreement, Jason Carmichael (or in default another partner of CdB and JC & Co.) shall give those instructions on law firm letterhead on behalf of Noble and in said

2



instructions there shall be no specific reference to the repayment of the Loan as the reason for the payment instructions. If required, Horn agrees to countersign the written instructions to the Disbursing Agent.

5.   It is the intention of the parties to this Agreement that Noble shall receive its funds due under the Loan Agreement either earlier than or simultaneously with Horn's receipt of the funds due him on Appreciated Value Interest and Horn's lawyers' receipt of funds due them for legal services.

6.   Each of Horn and Noble will from time to time provide all such information as may be reasonably required by CdB and JC & Co. to enable them to comply with applicable anti-money laundering and client requirements in Hong Kong, and arising from the transactions set out in this Agreement.

7.   This Agreement shall be governed by the laws of Hong Kong. Noble shall be entitled to enforce this Agreement in accordance with all applicable laws in any jurisdiction that Noble deems appropriate.

8.   Horn appoints Christopher Lambert, Esq. as his designated agent for purposes of accepting service of process in any dispute arising out of or related to this Agreement, the Loan and/or the Loan Agreement.

Entered into on the date first set forth above.

PAUL HORN

NOBLE PRESTIGE LIMITED

By: RICK ADKINSON

Its: DIRECTOR

3



IN THE MATTER OF AN ARBITRATION

UNDER THE ARBITRATION ORDINANCE OF HONG KONG (CAP. 609)

UNDER THE HONG KONG INTERNATIONAL ARBITRATION CENTRE

ADMINISTERED ARBITRATION RULES

HKIAC CASE NO. HKIAC/A17251

BETWEEN

**NOBLE PRESTIGE LIMITED**

Claimant

**and**

**MR. PAUL HORN**

Respondent

_____

**INTERIM AWARD ON PRELIMINARY ISSUE**

_____

**Gavin Denton**
**Yuen Chuen Lee**
**Simon Powell**
**-Presiding Arbitrator-**

**29 March 2019**

I.      PARTIES AND ARBITRAL TRIBUNAL ........................................................ 3

II.     ARBITRATION AGREEMENT .................................................................... 5

III.    APPLICABLE LAW, PLACE AND LANGUAGE OF ARBITRATION...................... 5

IV.     PROCEDURAL HISTORY ......................................................................... 6

V.      BACKGROUND TO THE DISPUTE ............................................................. 9

VI.     SUMMARY OF THE PARTIES' POSITIONS ................................................. 12

VII.    THE PARTIES' REQUESTS FOR RELIEF .................................................. 13

VIII.   APPLICABLE HKIAC RULES ................................................................ 14

IX.     TRIBUNAL'S DECISIONS...................................................................... 16
        A.   Representation of a respondent in an arbitration in Hong Kong ................... 16
        B.   Galle's appointment as Special Conservator .......................................... 21
        C.   Second and Third Denver Probate Orders .............................................. 25
        D.   Additional issues .......................................................................... 29
             1.   Evidence of Respondent's current incapacity ................................... 30
             2.   Galle's suitability to act as Respondent's representative in this arbitration........ 35
        E.   Claimant's application for a freezing order ............................................ 37

X.      TRIBUNAL'S JURISDICTION TO HEAR PRELIMINARY ISSUE ...................... 40

XI.     COSTS ............................................................................................. 40

XII.    TRIBUNAL'S ORDERS........................................................................... 40

## I.     PARTIES AND ARBITRAL TRIBUNAL

1.     Claimant in these proceedings is as follows:

**Noble Prestige (Claimant)**

Noble Prestige is a limited liability company incorporated in Hong Kong with companies registration number 1667008. Claimant's contact details are as follows: 16/F, Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong. Telephone: +852 2869 1996. Facsimile: +852 2110 9521. Email: adkinson@private-capital.com.hk.

2.     Respondent in these proceedings is as follows:

**Mr. Paul Horn (Respondent)**

Mr. Paul Horn is a citizen of the United States of America who is last known to be a resident of Thailand. Respondent's contact details as provided in the Facility Agreement (as defined below) are as follows: c/o The Galle Law Group, P.A., 13501 South Shore Boulevard, Suite 103, Wellington, Florida, 33414, U.S.A. Facsimile: +1 561 798 1809. Attention: Craig T. Galle, Esq.

3.     Claimant's legal representatives in these proceedings are Reynolds Porter Chamberlain (**RPC**) whose contact details are as follows:

> Attn: Jonathan Crompton / Jason Carmichael
> **Reynolds Porter Chamberlain (RPC)**
> 38/F, One Taikoo Place, 979 King's Rd, Quarry Bay
> Email: jonathan.crompton@rpc.com.hk / jason.carmichael@rpc.om.hk
> Tel: +852 2216 7000. Fax: +852 2216 7001.

4.     The issue of Respondent's legal representation is the subject of these preliminary proceedings, and is set out in further detail below. Respondent's longstanding lawyer, Mr. Craig Galle (**Galle**) has appeared on the record in these proceedings on Respondent's behalf as Special Conservator. Galle's contact details are as follows: c/o The Galle Law Group, P.A., 13501 South Shore Boulevard, Suite 103, Wellington, Florida, 33414, U.S.A.

5.     The legal representative appointed by Galle in these proceedings is Bose Cohen & Collins (**BCC**), whose contact details are as follows:

> Attn: Colin Cohen
> **Boase Cohen & Collins (BCC)**
> 2303-7 Dominion Centre
> 43-45 Queen's Road East
> Wanchai, Hong Kong
> Email: colin@boasecohencollins.com
> Tel: +852 3416 1771. Fax: +852 2529 5035.

6.     For clarity, the references in **bold** above shall be used throughout this Interim Award to refer to each respective individual or organization. As they are the parties to the question presented

3

to the Tribunal which is the subject of this Interim Award (*i.e.*, the Preliminary Issue, as defined below), for convenience the Claimant and Galle are referred to herein as the "**Parties**"[1].

7.      In its Notice of Arbitration dated 19 December 2017 (**Notice**), Claimant proposed that this matter be heard by a sole arbitrator. Claimant also applied for this matter to be administered under the Expedited Procedures in Article 41 of the 2013 HKIAC Administered Arbitration Rules (**HKIAC Rules**).[2]

8.      Galle submitted an Answer to the Notice of Arbitration dated 24 January 2018 (**Answer**), stating that the Answer is being submitted on behalf of Respondent. In the Answer, Galle objected to the appointment of a sole arbitrator, and requested that the matter be submitted to three arbitrators in accordance with the Facility Agreement (as defined below).

9.      By letter dated 7 February 2018, Claimant noted Galle's refusal to agree to the appointment of a sole tribunal, and nominated Mr. Gavin Denton as its party-designated arbitrator. The HKIAC informed the parties on 9 April 2018 that Mr. Denton was confirmed as the first co-arbitrator pursuant to Articles 9.1 and 9.2(a) of the HKIAC Rules. Mr. Denton's details are as follows:

>       Mr. Gavin Denton
>       **Arbitration Chambers**
>       Chinachem Hollywood Centre
>       Suite 803, 1 Hollywood Road, Central
>       Hong Kong
>       Email: gavin.denton@arbchambers.com

10.     By letter dated 13 March 2018, Galle nominated Mr. Yuen Chuen Lee as Respondent's party-designated arbitrator. The HKIAC informed the parties on 27 April 2018 that Mr. Lee was confirmed as the second co-arbitrator pursuant to Articles 9.1 and 9.2(a) of the HKIAC Rules. Mr. Lee's details are as follows:

>       Mr. Yuen Chuen Lee
>       **Messrs. Lee Solicitors**
>       5/F, Des Voeux Commercial Centre
>       212 Des Voeux Road, Central
>       Hong Kong
>       Email: jl@leesolicitors.com

11.     On 27 April 2018, the HKIAC invited the co-arbitrators to designate jointly the third and presiding arbitrator. Following consultation with the Parties, on 14 May 2018 the co-arbitrators jointly designated Mr. Simon Powell as the presiding arbitrator. On 30 May 2018, the HKIAC informed the Parties that it had confirmed the designation of Mr. Powell as the third and presiding arbitrator in accordance with Article 9.1 and 9.2(a) of the HKIAC Rules. Mr. Powell's details are as follows:

---

[1] The Claimant's concerns at referencing Galle as "Respondent" are noted (see, for example, the Transcript at page 5, line 12 to page 6, line 5), but the Tribunal proceeds on the basis that it is accepted that Galle is respondent to the Preliminary Issue, *i.e.*, the determination of whether Galle has authority to represent Respondent in this arbitration. The Tribunal's reference to Galle as a Party in this Interim Award reflects this, and is not to be taken as indicating that Galle is a party to the substantive arbitration.

[2] Claimant and Galle expressly agreed to the application of the 2013 version of the HKIAC Rules by correspondence dated 5 January and 11 January 2018, respectively.

Mr. Simon Powell
**c/o Powell Arbitration Limited**
14/F., Chun Wo Commercial Centre,
23-29 Wing Wo Street,
Central, Hong Kong
Email: sdp@powellarbitration.com

## II.    ARBITRATION AGREEMENT

12.    The present dispute arises out of a Loan Facility Agreement between Claimant and Respondent dated 19 December 2011 (**Facility Agreement**).

13.    The dispute resolution procedures are contained in Clause 19 of the Facility Agreement:

> *"19.    GOVERNING LAW AND JURISDICTION*
>
> *19.1    This agreement and any dispute or claim arising out of, or in connection with it, or its subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the laws of Hong Kong.*
>
> *19.2    Any dispute, controversy or claim arising out of or in relation to this agreement, or the breach, termination or invalidity thereof, will be settled by arbitration in accordance with the Hong Kong International Arbitration Centre rules presently in force.*
>
> *19.3    The number of arbitrators will be 3 (three), each party to appoint 1 (one) arbitrator and the arbitrators so appointed to appoint the third.*
>
> *19.4    The place of arbitration will be Hong Kong and the language to be used in the arbitral proceedings shall be English.*
>
> *19.5    The [Respondent] appoints RobSec. Limited 5705, 57/F The Centre, 99 Queen's Road, Central, Hong Kong as his duly authorised representative to accept service of process on his behalf for any dispute arising out of or related to this Agreement."[3]*

## III.    APPLICABLE LAW, PLACE AND LANGUAGE OF ARBITRATION

14.    In accordance with Article 19 of the Facility Agreement:

(a)    Hong Kong is the place of the arbitration (Article 19.4);

(b)    the arbitration shall be conducted in accordance with the HKIAC Rules (Article 19.2);

---

[3] Clause 19.5 has been amended by hand. The typed version states that "*The Borrower appoints Christopher Lambert, Esq., of Messrs Robertsons Solicitors, 57/F The Centre, 99 Queen's Road, Central, Hong Kong as his duly authorised representative to accept service of process on his behalf for any dispute arising out of or related to this Agreement.*" No objections have been raised or issues taken as of the date of this Interim Award with regard to this amendment.

(c)     the arbitration shall be conducted in English (Article 19.4); and

(d)     the governing law of the Facility Agreement is the law of Hong Kong (Article 19.1).

## IV.     PROCEDURAL HISTORY

15.     On 19 December 2017, Claimant served its Notice on Respondent in accordance with the notice provisions in the Facility Agreement.

16.     On 21 December 2017, the HKIAC wrote to RPC and Galle noting that Claimant had commenced this arbitration, and inviting the parties to comment on the applicable rules for the arbitration.

17.     On 3 January 2018, BCC replied to the HKIAC (copy to RPC) to indicate that it had received instructions to act for Galle "the court appointed special conservator for the Respondent".

18.     On 5 January 2018, RPC replied to the HKIAC (copy to BCC) commenting on the issue raised by the HKIAC regarding which version of the rules is applicable to this arbitration.

19.     On 11 January 2018, BCC replied to the HKIAC (copy to RPC) commenting on the issue raised by the HKIAC regarding the applicable rules.

20.     On 23 January 2018, the HKIAC replied to the Parties correspondence of 3, 5 and 11 January confirming that the arbitration would be administered under the 2013 Rules, and raised various other issues.

21.     On 24 January 2018, Galle filed an Answer purportedly on behalf of Respondent. In the Answer, Galle indicated that Respondent had been diagnosed with "Chronic Conversion Disorder with Multiple Motor Symptoms", citing a psychiatric report dated 18 December 2014 as evidence of this. Galle submitted that Respondent was and remains incapable of making decisions and giving instructions, including in relation to these proceedings. As the basis of his authority to represent Respondent in these proceedings, Galle cited an order made by the District Court of the Denver Probate Court in the City and County of Denver, Colorado (**Denver Probate Court**) on 7 March 2017, whereby Galle was appointed as the Special Conservator for Respondent (**First Probate Order**). The Answer further stated that Galle, as Special Conservator, was then appointed by the Denver Probate Court to defend these proceedings on 18 January 2018 (**Second Probate Order**).[4]

22.     On 7 February 2018 RPC responded to the HKIAC's letter of 23 January 2018 (copying BCC). In its letter, RPC noted that the Answer had been submitted by BCC "purportedly acting on behalf of Mr. Galle as special conservator for the Respondent".

23.     On 8 February 2018, BCC responded to RPC's letter of 7 February 2018, noting that RPC was still asserting that BCC is *"purportedly acting on behalf of Mr. Galle as special conservator for the Respondent"*, and taking exception to the same. BCC indicated that in its view this was an issue that needed to be resolved immediately, noting that it did not intend to deal with any other matters until this particular issue was resolved.

---

[4] Answer at paragraphs 5-6.

24.     On 20 February 2018, RPC responded to BCC's letter of 8 February 2018, raising issues with regard to the authority of Galle to act for Respondent in these proceedings, and reserved Claimant's right to challenge Galle and BCC's entitlement to defend these proceedings on Respondent's behalf.

25.     On 27 February 2018, Galle, through his counsel BCC's letter in response to RPC's letter of 20 February 2018, dismissed Claimant's assertions and required that Claimant accept Galle's and BCC's authority to represent Respondent before Galle would deal with the appointment of an arbitrator.

26.     On 6 March 2018, the HKIAC wrote to the Parties stating the following:

> "*We wish to inform the parties that having considered the circumstances of this case, including the comments and documents submitted by the parties, we will proceed on the basis that Boase Cohen & Collins represents Respondent in the captioned case.*
>
> *We also wish to inform the parties that under the 2013 HKIAC Administered Arbitration Rules (the "Rules"), any issue relating to the authority of a party's representative is a matter to be finally determined by the arbitral tribunal, once constituted, and that HKIAC's decision to proceed is without prejudice to any future decision by the arbitral tribunal.*"

27.     On 30 May 2018, the HKIAC wrote to RPC and BCC notifying the Parties of the constitution of the Tribunal.

28.     On 11 June 2018, the Tribunal wrote to RPC and BCC enclosing a draft Procedural Order No. 1, and requesting that the Parties representatives consult with one another and to the extent possible agree a timetable for the proceedings, and jointly propose a procedural schedule based on the draft provided, for the Tribunal's consideration.

29.     On 19 June 2018, BCC wrote to the Tribunal to provide input on draft Procedural Order No. 1.

30.     On 6 July 2018, RPC wrote to the Tribunal to raise its concerns once again regarding Galle's and BCC's representation of Respondent in these proceedings. Claimant proposed that the issue of Galle's and BCC's authority to represent Respondent be dealt with as a preliminary issue (**Preliminary Issue**), noting that until such time as the Preliminary Issue is determined it is unable to provide any meaningful comments on draft Procedural Order No. 1.

31.     Following an exchange of correspondence between the Parties and the Tribunal (on 12, 17 and 20 July), the Tribunal wrote to RPC and BCC on 20 July 2018 to inform the Parties that it had decided to determine the authority issue as a preliminary issue, and asked BCC to comment on the timetable for the determination of the same that had been proposed by RPC in its letter of 6 July 2018.

32.     Following further exchanges of correspondence between the Parties and the Tribunal (on 25 and 26 July 2018), BCC wrote to the Tribunal on 1 August 2018 to provide its comments on the timetable for the determination of the Preliminary Issue proposed by RPC in its letter of 6 July 2018.

33.     On 1 August 2018, the Tribunal issued directions in relation to the manner in which the Preliminary Issue (and any other preliminary issues the Parties wish to address) are to be formally addressed in this arbitration.

34.     On 22 August 2018, Claimant submitted its Statement of Position with regard to the Preliminary Issue (**Claimant's Statement**).

35.     On 12 September 2018, Galle (via his solicitors, BCC) submitted his Statement of Position (**Galle's Statement**).

36.     On 28 September 2018, Claimant submitted its Statement in Reply (**Claimant's Reply**).

37.     On 13 November, Claimant and Galle respectively submitted their Skeleton Submissions on the Preliminary Issue (**Claimant's Skeleton** and **Galle's Skeleton** respectively).

38.     On 19 November 2018, an agreed chronology, dated 19 November 2018, was submitted to the Tribunal (**Agreed Chronology**).

39.     On 20 November 2018, a hearing was held on the Preliminary Issue at the offices of RPC, which was agreed by the Parties as the venue in order to reduce costs (**Preliminary Issue Hearing**). Mr. Jonathan Crompton of RPC appeared on behalf of Claimant, assisted by Ms. Jessica Wong and Mr. Lorcan Treacy, also of RPC, and Mr. Robin d'Souza of Dennis Chang's Chambers appeared on behalf of Galle and BCC, assisted by Mr. Patrick Chan and Mr. Joshua Tong of BCC.

40.     On 23 January 2019, Claimant submitted a post-hearing brief on certain matters arising during the course of the Preliminary Issue Hearing (**Claimant's Post-Hearing Brief**).

41.     On 24 January 2019, BCC objected to Claimant's Post-Hearing Brief, save for the matters raised in respect of the missing page from the affidavit of Thomas Overton and Galle's authority to act as Special Conservator/Conservator.

42.     On 26 January 2019, the Tribunal indicated that (save for the matters raised in respect of the missing page from the affidavit of Thomas Overton and Galle's authority to act as Special Conservator/Conservator) it will consider whether to admit Claimant's Post-Hearing Brief into evidence as a part of its consideration of the matter as a whole and will deal with this issue in its Interim Award.

43.     On 30 January 2019, following further correspondence from the Parties' representatives, the Tribunal directed BCC to respond in respect of the missing page from the affidavit of Thomas Overton and Galle's authority to act as Special Conservator/Conservator by 4 February 2019, and on all other issues by 15 February 2019.

44.     On 31 January 2019, BCC provided its response in respect of the missing page from the affidavit of Thomas Overton and Galle's authority to act as Special Conservator/Conservator, and submitted:

        (a) a full copy of the affidavit of Thomas Overton (including the missing page); and

        (b) a copy of an order of the Denver Probate Court dated 31 July 2018 extending Galle's authority to act as Special Conservator/Conservator to 31 August 2019.

45.     On 15 February 2019, BCC submitted its post-hearing brief in respect of the other issues raised in Claimant's Post-Hearing Brief (**Galle's Post-Hearing Brief**).

8

46.     On 18 February 2019, Claimant objected to Galle's Post-Hearing Brief submitted, on the basis that it contained substantive submissions, rather than merely summarising or reporting on previous relevant cases, asking this Tribunal to disregard all parts of Galle's Post-Hearing Brief that exceeded this and contained substantive submissions, including paragraphs 9 to 11 (all), 12 (final sentence) to 13, 18 (all), 21 (final sentence), 22 (all), 23 (final sentence), 24 (final sentence), 25 (all), 26 (final two sentences) 27 to 28 (all). Claimant also indicated that it would not object if the Tribunal chose to "*completely disregard*" both Claimant's Post-Hearing Brief (as BCC requested in its email of 24 January 2019) and Galle's Post-Hearing Brief.

47.     On 22 February 2019, the Tribunal wrote to the Parties to indicate that it will consider the issues raised by the Parties in their emails relating to Claimant's Post-Hearing Brief and Galle's Post-Hearing Brief, and revert. The Tribunal also indicated that it wished to consider the Motions and any other documents (if any) submitted to the Denver Probate Court, which resulted in the Denver Probate Court issuing the Second and Third Probate Orders (dated 18 January 2018 and 28 September 2018 respectively, and defined below). The Tribunal further indicated that it will consider any papers produced by BCC in relation to the granting of the Second and Third Probate Orders that are produced to it on or before 1 March 2019, that no documents will be accepted that are not produced within this time, and that it will then proceed to issue its Interim Award on the basis of the documents it has, and any further documents produced on or before 1 March 2019. The Tribunal advised the Parties that it would not accept any submissions from either party in relation to the same, unless it asked for the same and/or leave is granted for such submissions to be made.

48.     On 1 March 2019, BCC replied to the Tribunal's correspondence of 22 February 2019. BCC responded to the Tribunal's invitation to produce the papers submitted to the Denver Probate Court in relation to the granting of the Second and Third Probate Orders by indicating that they had been "instructed not to produce any documents or Motions submitted to the Denver Court, which resulted in the Denver Court issuing the Second and Third Probate Orders".

## V.     BACKGROUND TO THE DISPUTE

49.     The underlying dispute arises out of the Facility Agreement between Claimant and Respondent dated 19 December 2011. Claimant submits that the Facility Agreement required Respondent to pay various costs for the appointment of appraisers and others to value his "Appreciated Value Interest" (**AVI**) pursuant to a valuation clause in an assignment agreement between Respondent and McGaw Cellular Communications Inc. (and others) dated 4 October 1991 (**Assignment Agreement**).

50.     Pursuant to the terms of the Facility Agreement, Claimant submits that it agreed to, and did, provide funds to Respondent for the purposes of paying various costs associated with the appraisal ("**Funding Amount**"). Claimant further submits that, pursuant to the terms of the Facility Agreement, Respondent was required under the Facility Agreement to pay the sum of at least US$5,000,000 to Claimant within five business days of Respondent receiving payment for his AVI. Claimant also submits that, by virtue of the terms of the Facility Agreement, Respondent was not entitled to accept any settlement or other sum which was less than 90% of the sum otherwise due to be paid to Respondent for his AVI.[5] Claimant is seeking, *inter alia*,

---

[5] Claimant's Statement at paragraphs 7-9.

payment of the sum of US$5,000,000, damages and interest.[6] Galle, purportedly on behalf of Respondent, has rejected Claimant's claims, and requested that the Tribunal dismiss Claimant's claims and issue a declaration that the Facility Agreement is void and unenforceable.[7] These claims are the subject of the substantive relief sought in this arbitration. The Tribunal has not, at this stage, considered the merits, or otherwise, of the Parties' underlying claims, and has not come to a view - preliminary or otherwise - on the same. These claims do not need to, will not be considered or determined in this Interim Award.

51.   On 19 December 2011, Respondent entered into an irrevocable letter of instruction with Galle Law Group PA (**GLG**) and Claimant. The letter was signed by Galle on behalf of GLG, and provided that GLG was "*to initiate said transfer to [Claimant] those sums due [to Claimant] under the Loan Agreement no later than five (5) days after the ATT Parties fund to GLG the sums due [Respondent] for his AVI. GLG agree[d] to abide by and comply with the instructions set forth above in this paragraph...*".[8]

52.   On 21 December 2011, Respondent engaged one of Galle's companies, Brunelleschi Advisors LLC (**Brunelleschi**), to advise and represent Respondent in respect of the AVI.[9]

53.   On 6 January 2012, Claimant transferred US$35,000 to Brunelleschi in respect of Brunelleschi's initial retainer.[10]

54.   On 27 November 2013, Claimant transferred a further sum of US$65,000 to Brunelleschi, following a request by Galle on behalf of Brunelleschi for further funds from Claimant including "US$65,000 representing Brunelleschi Advisors fees".[11]

55.   On 18 December 2014, Dr. Vasu Chantarasak issued a psychiatric report relating to Respondent (**2014 Psychiatric Report**). According to the 2014 Psychiatric Report, Respondent had been seeing Dr. Chantarasak for psychiatric evaluation since May 2007. In the 2014 Psychiatric Report, Dr. Chantarasak made a "final diagnosis" of Respondent's condition as "*chronic conversion disorder with multiple motor symptoms*" noting that all of his symptoms are "*the result of the pressure from a continuing stressful situation*", being "*the process of the sale of his interests in his company in Colorado.*" Dr. Chantarasak issued a "*strong recommendation*" that Respondent no longer participate in the sale of his AVI.[12]

56.   On 26 February 2015, Dr. Apichart Pisarnpong issued a neurology report relating to Respondent (**2015 Neurology Report**). Dr. Pisarnpong agreed with Respondent's "*psychiatrists of*

---

[6] Notice at paragraph 5.2.

[7] Answer at paragraph 32-33.

[8] Agreed Chronology.

[9] Agreed Chronology.

[10] Agreed Chronology.

[11] Agreed Chronology.

[12] Agreed Chronology.

*conversion disorder and recommend[ed] that due to no abnormal neurological examination and no abnormal investigation he should follow recommendations from his psychiatrists.*"[13]

57.   On 19 January 2017, an application was made to the Denver Probate Court (**Denver Appointment Petition**) to appoint Galle as Respondent's "Special Conservator" over certain assets of Respondent arising out a civil action against AT&T Wireless Services k/n/a New Cingular in Denver County, Colorado, USA (**AT&T Action**).[14] Respondent's claims in the AT&T Action involved sums due to Respondent from AT&T in respect of Respondent's AVI. Claimant alleges, citing the affidavits filed in support of the Denver Appointment Petition (by Galle, at paragraph 10 and by Thomas J. Overton, at paragraph 25), that at the date of the Denver Appointment Petition Respondent's AVI was *"believed to be valued in excess of [US]$100 million."*[15]

58.   On 7 March 2017, the Denver Probate Court issued the First Probate Order, which appointed Galle as "Special Conservator" over certain assets of Respondent arising out of the AT&T Action and granted Galle authority to represent Respondent in respect of the AT&T Action. The First Probate Order provided that the Letters of Conservatorship were to expire on 31 March 2018 unless extended or sooner terminated by further order of the Denver Probate Court.[16]

59.   On 8 August 2017, AT&T and Galle, on behalf of Respondent, agreed to settle the AT&T Action for US$57.5 million.[17]

60.   On 23 August 2017, the Denver Probate Court approved this settlement.[18]

61.   On 17 November 2017, Claimant sent a letter to Respondent demanding payment of the sum of US$5,000,000 claimed under the Facility Agreement. On the same date, on behalf of Respondent, James W. Britt in his capacity as Respondent's Guardian *ad Litem* (**Britt**) wrote to Claimant, refusing to pay the amounts claimed, but - accepting that Claimant should receive some payment - offered US$2 million.[19]

62.   On 19 December 2017, Claimant commenced this arbitration by filing the Notice.

---

[13] Agreed Chronology.

[14] Agreed Chronology.

[15] Claimant's Statement at paragraphs 20-22.

[16] Agreed Chronology. The Tribunal notes that, on 31 July 2018, the Denver Probate Court issued a further order by which Galle's conservatorship per the First Probate Order was extended to 31 August 2019. The Tribunal further notes that although this order actually *predates* the Third Probate Order, it was only produced in this arbitration subsequent to the Preliminary Issue Hearing and after the Denver Probate Court order of 28 September 2018 had been defined and consistently referred to in these proceedings by all Parties as the "Third Probate Order". To avoid confusion, therefore, this order (*i.e.*, that dated 31 July 2018) is defined and referred to in this Interim Award as the "Fourth Probate Order" (see below), and the later order of 28 September 2018 remains the "Third Probate Order".

[17] Agreed Chronology.

[18] Agreed Chronology.

[19] Agreed Chronology.

63.     On 18 January 2018, the Denver Probate Court issued an order that Galle, as Special Conservator for Respondent: (i) has full right, power and authority to represent Respondent's interests in this arbitration and; (ii) be authorised to engage Mr. Cohen of BCC to represent Respondent (**Second Probate Order**).[20]

64.     On 12 March 2018, the Denver Probate Court issued "Amended Letters of Conservatorship – Adult" (**Amended Letters of Conservatorship**), which evidenced the extension of Galle's term as Special Conservator until 31 December 2018.[21]

65.     On 28 September 2018, the Denver Probate Court issued a further order approving Galle's engagement of BCC, Mr. Cohen and any other lawyer at BCC as Respondent's legal representative in this arbitration (**Third Probate Order**, together with the First Probate Order and the Second Probate Order, the **Denver Probate Orders**).[22]

## VI.     SUMMARY OF THE PARTIES' POSITIONS

66.     The following is a summary of the Parties' positions and is not intended as a comprehensive restatement of every argument or allegation made by the Parties. The Tribunal has considered all arguments and evidence that formed a part of the record in this matter as to the Preliminary Issue, and addresses the contentions made by the Parties, and the evidence on the record, only to the extent relevant to its decisions. The Tribunal's decisions are based on the entire record in this matter, and the Tribunal has taken into account all statements, submissions, evidence and arguments both oral and written, made by the Parties.

*Claimant's position*

67.     Claimant submits that neither Galle nor BCC are properly authorised to represent Respondent in this arbitration. Claimant summarises its position at paragraph 147 of Claimant's Statement as follows:

> "*147.1  [Galle] (and through him BCC) is not entitled to rely as of right on the Denver Probate Orders as the basis for this authority to represent the Respondent in these arbitral proceedings;*
>
> *147.2  [Galle] and BCC have taken no other steps to obtain a proper authorisation to represent the Respondent in this arbitration;*
>
> *147.3  [Galle] and BCC have provided no evidence at all that the Respondent is in fact mentally incapacitated or that even if he were [Galle] is an appropriate person to act as his next friend or guardian ad litem for the purpose of this arbitration.*"

*Galle's position*

68.     Galle invites the Tribunal to recognise and accept the Denver Probate Orders as conferring upon Galle the full right and authority to represent the interests of Respondent in this arbitration; that,

---

[20] Agreed Chronology.

[21] Agreed Chronology.

[22] Agreed Chronology.

in turn, Galle was authorized and empowered to engage Mr. Cohen of BCC by virtue of the Second Probate Order; and that this is sufficient evidence for the purposes of proving the authority given to Galle and BCC to act for Respondent.

69. Galle summarises his position in paragraph 41 of Galle's Statement, as follows:

> "41.1   The matter of representation by [Galle] and BCC is simple and straightforward, and the production of the [First Probate Order and Second Probate Order] are sufficient to demonstrate to the Tribunal that [Galle] and BCC have the authority to act for the Respondent in these arbitral proceedings; and
>
> 41.2   The Claimant is overcomplicating the matter by making bare assertions without providing any supporting evidence and seeks to bypass the Denver Court on the issues of mental incapacity of the Respondent and the appropriateness of [Galle] to represent the Respondent."

## VII.   THE PARTIES' REQUESTS FOR RELIEF

70. Claimant seeks an interim award (and for such interim award to be included in the final award):

   (a)   that on the basis of the present facts Galle and BCC are not properly authorised to represent Respondent and are therefore prohibited from taking any further steps in this arbitration;

   (b)   that the costs of all steps taken in this arbitration from the date of the Answer to the date of the award are payable to Claimant forthwith, in a sum and against such persons to be determined by the Tribunal following further representation by Claimant, Galle and BCC; and

   (c)   for such further or other relief as the Tribunal deems appropriate.

71. In Claimant's Reply, Claimant seeks further relief in the form of an interim award freezing Respondent's assets up to the value of US$5,000,000, in the following terms:

   (a)   Respondent, whether through his agent, servant or himself, be restrained from dealing with his assets up to the amount of US$5 million. Such award to cover all of Respondent's assets wherever they are located, including the Settlement Sum described in the Notice, or any other assets controlled by Galle on behalf of Respondent.

72. Galle seeks an interim award (and for such interim award to be included in the final award):

   (a)   that Galle do act as Respondent's Guardian *ad litem* to represent Respondent in this arbitration and BCC be recognised as Respondent's legal representative;

   (b)   for the costs of all steps taken in this arbitration in respect of the Preliminary Issue to be to Respondent and/or Galle to be paid forthwith; and

   (c)   for such further or other relief as the Tribunal deems appropriate.

73. With regard to the request for a freezing order, Galle submits that there has been no actual application for a freezing order, which should be accompanied by supporting evidence. Further,

Galle and BCC have been given no proper opportunity to respond to the request for a freezing order.

## VIII.   APPLICABLE HKIAC RULES

74.   Article 13 (General Provisions) and Article 23 (Interim Measures of Protection and Relief) of the HKIAC Rules are set out below. The Tribunal takes note that the provisions found in Article 35 of the Arbitration Ordinance Cap. 609 (which gives force to Article 17 of the UNCITRAL Model Law on International Commercial Arbitration) contain substantially the same provisions on interim relief as Article 23 of the HKIAC rules.

### *Article 13 – General Provisions*

*13.1 Subject to these Rules, the arbitral tribunal shall adopt suitable procedures for the conduct of the arbitration in order to avoid unnecessary delay or expense, having regard to the complexity of the issues and the amount in dispute, and provided that such procedures ensure equal treatment of the parties and afford the parties a reasonable opportunity to present their case.*

*13.2 At an early stage of the arbitration and in consultation with the parties, the arbitral tribunal shall prepare a provisional timetable for the arbitration, which shall be provided to the parties and HKIAC.*

*13.3 Subject to Article 11.5, all documents or information supplied to the arbitral tribunal by one party shall at the same time be communicated by that party to the other parties and HKIAC.*

*13.4 The arbitral tribunal may, after consulting with the parties, appoint a secretary. The secretary shall remain at all times impartial and independent of the parties, and shall disclose any circumstances likely to give rise to justifiable doubts as to his or her impartiality or independence prior to his or her appointment. A secretary, once appointed and throughout the arbitration, shall disclose without delay any such circumstances to the parties unless they have already been informed by him or her of these circumstances.*

*13.5 The arbitral tribunal and the parties shall do everything necessary to ensure the fair and efficient conduct of the arbitration.*

*13.6 The parties may be represented by persons of their choice, subject to Article 13.5. The names, addresses, telephone and fax numbers, and email addresses of party representatives shall be communicated in writing to the other parties and HKIAC. The arbitral tribunal or HKIAC may require proof of authority of any party representatives.*

*13.7 In all matters not expressly provided for in these Rules, HKIAC, the arbitral tribunal and the parties shall act in the spirit of these Rules.*

*13.8 The arbitral tribunal shall make every reasonable effort to ensure that an award is valid.*

...

14

***Article 23 – Interim Measures of Protection and Emergency Relief***

*23.1 A party may apply for urgent interim or conservatory relief (the "Emergency Relief") prior to the constitution of the arbitral tribunal pursuant to the procedures set out in Schedule 4 (the "Emergency Arbitrator Procedures").*

*23.2 At the request of either party, the arbitral tribunal may order any interim measures it deems necessary or appropriate.*

*23.3 An interim measure, whether in the form of an order or award or in another form, is any temporary measure ordered by the arbitral tribunal at any time prior to the issuance of the award by which the dispute is finally decided, that a party, for example and without limitation:*

> *a.  maintain or restore the status quo pending determination of the dispute;*
> *b.  take action that would prevent, or refrain from taking action that is likely to cause, current or imminent harm or prejudice to the arbitral process itself;*
> *c.  provide a means of preserving assets out of which a subsequent award may be satisfied; or*
> *d.  preserve evidence that may be relevant and material to the resolution of the dispute.*

*23.4 When deciding a party's request for an interim measure under Article 23.2, the arbitral tribunal shall take into account the circumstances of the case. Relevant factors may include, but are not limited to:*

> *a.  harm not adequately reparable by an award of damages is likely to result if the measure is not ordered, and such harm substantially outweighs the harm that is likely to result to the party against whom the measure is directed if the measure is granted; and*
> *b.  there is a reasonable possibility that the requesting party will succeed on the merits of the claim. The determination on this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination.*

*23.5 The arbitral tribunal may modify, suspend or terminate an interim measure it has granted, upon application of any party or, in exceptional circumstances and upon prior notice to the parties, on the arbitral tribunal's own initiative.*

*23.6 The arbitral tribunal may require the party requesting an interim measure to provide appropriate security in connection with the measure.*

*23.7 The arbitral tribunal may require any party promptly to disclose any material change in the circumstances on the basis of which an interim measure was requested or granted.*

*23.8 The party requesting an interim measure may be liable for any costs and damages caused by the measure to any party if the arbitral tribunal later determines that, in the circumstances then prevailing, the measure should not have been granted. The arbitral tribunal may award such costs and damages at any point during the arbitration.*

*23.9 A request for interim measures addressed by any party to a competent judicial authority shall not be deemed incompatible with the arbitration agreement(s), or as a waiver thereof.*

## IX.   TRIBUNAL'S DECISIONS

75.    The Tribunal will first deal with the admissibility (or otherwise) of Claimant's Post Hearing Brief and Galle's Post Hearing Brief submitted on 23 January 2019 (for Claimant) and 15 February 2019 (for Galle).

76.    In this regard, the Tribunal first notes that, at the Preliminary Issue Hearing, it requested Claimant's counsel to assist by producing authorities on the sources/basis of challenge - when it is a respondent (as here) as opposed to a claimant who is alleged to be under a disability - under Order 80, rule 3 of the Rules of the High Court[23].

77.    Secondly, the Tribunal notes that all but two of the cases produced to the Tribunal by Claimant under cover of its counsel's email of 23 January 2019 were referred to in, and appended to, the Parties' Statements of Position and/or Skeletons submitted for the Preliminary Issue Hearing. Of those two cases, one (*Moral Luck Finance Ltd v Law Kin Leung* (2015) 18 HKCFAR 343) was cited in *Ng Kong Yeam by his next friend Ng Chung San v Farlim Group (China) Ltd & Ors* [2016] unrep. HKCU 1930, which was discussed extensively at the Preliminary Issue Hearing. The only new case produced by Claimant therefore was *Ever Long Finance Ltd v Yeung Wah Lung by his guardian ad litem* [2017] 1 HKLRD 500.

78.    For the reasons which will become clear from what follows, whilst arguably both Parties have gone further than the Tribunal intended they ought, and have strayed into making submissions, post-hearing, which were not called for by the Tribunal and to which objection has been taken by the other Party, the Tribunal does not intend to make a definitive determination of this issue. The Tribunal has the authorities, is fully able to consider those authorities for themselves, and has no need to consider any additional post-hearing submissions made by the Parties. The Tribunal also notes that Claimant has indicated that, in light of Galle's objection, it is content for the Tribunal to wholly ignore Claimant's Post-Hearing Brief; in which case, there are no submissions to which Galle might respond, such that, as a consequence, this Tribunal might also ignore Galle's Post-Hearing Brief made in response to Claimant's Post-Hearing Brief.

79.    In the circumstances, this is the course the Tribunal has determined to follow. It will consider the two further authorities provided by Claimant post-hearing in response to its express request for clarification on the position of challenges under Order 80, rule 3, but need not, and will have no regard to any of the submissions made by either Party post-hearing by way of the emails and papers submitted on 23 January 2019 (by Claimant) and 31 January 2019 (by Galle).

80.    Turning next to the to the substantive issues before this Tribunal, the Tribunal makes the decisions which follow in this section.

### A.   *Representation of a respondent in an arbitration in Hong Kong*

81.    Claimant issued these proceedings for payment of a debt and/or damages for breach of contract against Respondent, and for related relief. On Claimant's case these are claims against Respondent *in personam*. The Tribunal agrees. The subject matter of this arbitration is not an *in rem* claim against the sums recovered for Respondent pursuant to the AT&T Action. The Claimant (if it ultimately prevails in its claims in this arbitration, as to which the Tribunal takes no position at this stage of the proceedings, having not heard full arguments on the underlying

---

[23] See the exchanges at page 243, line 4 to page 245, line 9 of the Transcript.

substantive claim, and having no need to come to a view on this in order to determine the Preliminary Issue) might well look to enforce any award in its favour against those assets being administered under the jurisdiction of the Denver Probate Court[24]; but equally it may look to assets belonging to Respondent other than those being administered under the jurisdiction of the Denver Probate Court, located in other jurisdictions across the globe, to satisfy any award that might ultimately be made in its favour (if Respondent has such other assets).

82. Claimant served the Notice on Respondent using the arrangements contractually agreed between the Parties. There is no dispute that service was properly effected. Respondent himself has made no appearance in this arbitration. However, Galle, through BCC, did file the Answer purportedly on Respondent's behalf and purports to represent Respondent in this arbitration, including in relation to the determination of the Preliminary Issue.

83. Galle does not deny that Respondent has not chosen Galle (or BCC) to represent him in this arbitration for the purposes of Article 13.6 of the HKIAC Rules[25]. However, Galle relies on the Denver Probate Orders for his authority to represent Respondent, and to instruct BCC to represent Respondent in this arbitration[26]. Galle puts this in a number of different ways in Galle's Statement (and elsewhere), but perhaps Galle's position on this is best summed up in paragraph 41.1 of Galle's Statement where he says: "*The matter of representation by [Galle] and BCC is simple and straightforward, and the production of the Denver Probate Orders are sufficient to demonstrate to the Tribunal that [Galle] and BCC have the authority to act for Respondent in these arbitral proceedings.*" Galle relies on the Denver Probate Orders for his authority to represent Respondent in this arbitration, and nothing more, and asserts that nothing more is needed.

84. Claimant's case is that Galle has not taken sufficient steps nor provided sufficient evidence to prove that he (and through him BCC) have authority to represent Respondent in this arbitration. That is, in this case (which Claimant says is not an "ordinary case involving the representation of a person under a mental disability"[27]) the Denver Probate Orders are not enough to vest authority in Galle to represent Respondent in this arbitration[28]. Claimant raises a number of points as to why this is an important question for Claimant to have resolved now, as a preliminary issue, and not at the conclusion of the substantive hearing, including the important issue of the confidential nature of arbitration and difficult issues that might arise on enforcement if it were to turn out that Galle did not have authority to represent Respondent in this

---

[24] In coming to its determination of the Preliminary Issue in the present arbitration, the Tribunal wishes to make it very clear that it does not question in any way the jurisdiction of the Denver Probate Court *over assets located within its territorial jurisdiction*, and that it fully respects and has due regard for the Denver Probate Court's jurisdiction and orders in this regard.

[25] Article 13.6 of the HKIAC Rules states: "*The parties may be represented by persons of their choice, subject to Article 13.5 .... The arbitral tribunal or HKIAC may require proof of authority of any party representatives.*"

[26] In addition, subsequent to the Hearing, on 31 January 2019, BCC produced the Denver Probate Court's Order Extending Conservatorship For Adult dated 31 July 2018 (**Fourth Probate Order**) by which Galle's conservatorship per the First Probate Order was extended to 31 August 2019.

[27] Paragraph 3 of Claimant's Statement.

[28] The Tribunal notes that Claimant accepts the Denver Probate Court has issued orders that - as far as the Denver Probate Court is concerned - grant authority to Galle to represent Respondent in this arbitration (see, for example, Transcript, page 6, lines 6-11).

arbitration[29]. In short, if Galle is not properly authorised to represent Respondent then (i) he really has no place participating in the confidential process of an arbitration between Claimant and Respondent; and (ii) Claimant may have a difficult time enforcing any award it might ultimately obtain against Respondent, who might well complain that he was not given an opportunity to participate in the underlying arbitration which led to the award against him. The Tribunal agrees that it is important for this issue to be resolved at the outset, and it was for this reason that it informed the Parties - by correspondence dated 20 July 2018 - that it had decided to determine the authority issue as a preliminary issue. Indeed, given the potential hazards for a representative, and their appointed solicitors, in terms of costs if it is ultimately determined that they are not properly authorised to act for a party, in the Tribunal's view it is also in the best interests of the representative (*i.e.*, Galle) and those he instructs to act for him (*i.e.*, BCC) for this matter to be resolved at the earliest possible stage. Last, and certainly by no means least, it is clearly in the best interests of the represented party (in this case Respondent) for the issue of representation to be resolved at an early stage.

85.     The issue therefore centres on whether, and how, a third person (in this case Galle) can properly be authorised to represent a party (in this case Respondent) in Hong Kong arbitral proceedings (in this case the arbitration) where that party is alleged to be under a mental disability. Claimant says that, as it stands, Galle (and through him, BCC) is not properly authorised to represent Respondent in this arbitration as a matter of Hong Kong law[30]. Claimant submits it is not sufficient simply to rely on the Denver Probate Orders (as Galle/BCC seek to do).

86.     Galle, says Claimant, has the burden of proving that he has proper authority because he is the one claiming that Respondent is mentally incapacitated - the burden of proof (says Claimant) rests on those asserting incapacity, with all adults being presumed to be competent to manage their property and affairs until the contrary is proved (*Master-Lister v Burton (Nos. 1 and 2) (EWCA) at 17*).[31] The Tribunal agrees - the burden lies on Galle to prove that he has proper authority to represent Respondent in this arbitration.

87.     For Galle, BCC notes that had this matter been before the Hong Kong courts, the matter would have been relatively straightforward[32]. Under the provisions of Order 80 of the RHC, all that would be required is for Galle to file a written consent to act as next friend or guardian *ad litem*, and for BCC, as the solicitor acting for the mentally incapacitated person, to produce a certificate certifying their belief that Respondent is a mentally incapacitated person, giving grounds for their belief.

88.     The Tribunal notes that this matter is not before the Hong Kong courts but rather is an arbitration administered under the HKIAC Rules, as Galle readily accepts. Galle notes that there is no specific mechanism available under the HKIAC Rules for the appointment of a guardian

---

[29] Claimant's Statement, paragraphs 44-46; Transcript, page 8, line 15 to page 9, line 3 and page 11, line 13 to page 12, line 3.

[30] The Tribunal notes that although, in correspondence preceding this arbitration, Galle originally claimed that Colorado conflicts of laws principles would negate Parties' agreement as to governing law and forum [1/7/195], there is now no dispute that Hong Kong law is the procedural and substantive law for the determination of the Preliminary Issue [see paragraph 16 of Galle's Statement where Galle states: "It is not disputed that the procedural and substantive law in the present matter is the laws of Hong Kong"].

[31] Hearing Bundle, 1/8/348.

[32] Paragraph 19 of Galle's Statement.

*ad litem* for a respondent[33] (Claimant does not gainsay this proposition). Galle suggests that the procedural requirement for the appointment of a guardian *ad litem* under the HKIAC Rules *ought to be* simpler and more straightforward than under the RHC because the objective of arbitration generally is to facilitate the fair and speedy resolution of disputes without unnecessary expense (citing section 3 of the Arbitration Ordinance, Cap. 609)[34].

89.    Accepting that it is not an express requirement under the HKIAC Rules, the Tribunal does however note for the record that - in this arbitration - Galle has <u>not</u> produced a written consent to act as next friend or guardian *ad litem*, nor has BCC produced a certificate certifying their belief that Respondent is a mentally incapacitated person, giving grounds for their belief.

90.    This, Galle/BCC suggest, is unnecessary because the statements contained in the Answer to the effect that (i) Respondent has a mental disorder and is and was incapable of making decisions and giving instructions for the current arbitration; and (ii) Galle has been appointed as "Special Conservator" to defend this arbitration, already cover the contents of the written consent and solicitors' certificate required under Hong Kong law[35]. To the extent it is submitted by Galle that the statements in the Answer suffice, in and of themselves, to provide him with authority to represent Respondent in this arbitration, the Tribunal disagrees. This cannot be enough, in and of itself. However, Galle does not, in actuality, rely on these statements as the foundational basis for his authority, but on the Denver Probate Orders. The real question in issue for this Tribunal is whether the Denver Probate Orders suffice to provide Galle with authority to represent Respondent in this arbitration. If they do not, then the statements in the Answer do not assist (the statements in the Answer refer directly back to the Denver Probate Orders as the basis on which Galle has authority to represent Respondent in this arbitration).

91.    Galle accepts that this Tribunal may require proof of authority of any party representatives[36]. Galle suggests such proof of authority is satisfied by the Denver Probate Orders, which (amongst other things) purport to grant authority to him and BCC to act on behalf of Respondent in this arbitration (at least the Second and Third Probate Orders provide for this). Galle argues that the Tribunal ought to 'recognise' the Denver Probate Orders, much as, he submits, the Hong Kong court would normally do as a matter of judicial comity. There is, suggests Galle, no grounds on which recognition ought not to be afforded to the Denver Probate Orders (such as those listed in chapter 9 of the Conflict of Laws of Hong Kong).

92.    The Parties disagree on the application of the principles enunciated in chapter 9 of the Conflict of Law of Hong Kong. Claimant says they do not apply because Claimant was not a party in the proceedings before the Denver Probate Court, whereas Galle relies on the principles in chapter 9, suggesting that Claimant ought to have identified a basis on which recognition should not be granted to the Denver Probate Orders by reference to these principles, but that it has failed to do so.

93.    Dealing with this matter first, the Tribunal takes the view that the principles espoused in chapter 9 apply to foreign judgments which operate as between particular parties; by contrast, where the foreign judgment has broader effects, binding non-parties, as regards property or personal

---

[33] Paragraph 20 of Galle's Statement.

[34] Paragraph 21 of Galle's Statement.

[35] Paragraph 8 of Galle's Skeleton.

[36] Paragraph 22 of Galle's Statement.

status, the principles in chapter 9 do not apply. Accordingly, the Tribunal agrees with Claimant and determines that the principles set out in chapter 9 are not applicable to the determination of this matter - Claimant was not a party to the proceedings before the Denver Probate Court; further, Galle seeks to rely on the Denver Probate Orders to establish his personal status as Respondent's representative for the purposes of this arbitration and his (and through him BCC's) authority to represent Respondent in this arbitration. As such, the Tribunal determines that instead, chapter 7 of the Conflict of Laws of Hong Kong applies.

94.   Chapter 7 of the Conflict of Laws notes (at paragraph 7.147) that, whilst not devoid of controversy, it has been held at first instance in Hong Kong that the Hong Kong court has jurisdiction in respect of property in Hong Kong of an incapacitated person who is outside Hong Kong. That jurisdiction is exercisable by the Hong Kong court appointing a committee of the estate (the term used in the Mental Health Ordinance for the person or persons given control over an incapacitated person's property) of the person who is outside Hong Kong but has property within Hong Kong. That order will be limited ordinarily to the Hong Kong property. It has also been held that the court may in its discretion decline to exercise jurisdiction on *forum non conveniens* grounds. In exercising that discretion, the incapacitated person's interests must be paramount.

95.   The Tribunal notes that no such order (*i.e.*, one appointing a committee of the estate) has been applied for or granted by the Hong Kong court. The question here is whether this (or something else) is necessary where, as here, an equivalent to Hong Kong's committee of the estate (*i.e.*, Galle, as Conservator or Special Conservator) has been appointed under foreign law (*i.e.*, by the Denver Probate Court) to take care of the person and/or property of the incapacitated individual (*i.e.*, Respondent) located in that foreign jurisdiction. Claimant suggests that something else is necessary in the circumstances of this case, whereas those purportedly representing Respondent insist nothing more is required.

96.   In this respect, chapter 7 of the Conflict of Laws also considers the position of what it terms "foreign guardians and committees" at paragraph 7.149. The Conflict of Laws opines that "the Hong Kong court will recognise the role of such foreign officers in respect of property … *[p]rovided that the foreign court made the appointment with proper jurisdiction (in the eyes of the Hong Kong court)*, a foreign curator or similar officer who is duly authorised under foreign law to do so has authority recognised under Hong Kong law to demand *movable* property of the incapacitated person from those holding it in Hong Kong, to the extent that a Hong Kong guardian could do so. Thus, such a person can, for example, demand to be paid the assets of such person held by a bank in Hong Kong. No court order is necessary, and unless there is some real doubt about the matter, a bank or other party who refuses to pay out in accordance with such demand will likely have to pay the costs of proceedings thereby necessitated." [Emphasis in *italics* supplied.]

97.   In this instance, the relevant property right which forms the subject matter of this arbitration is the claim for damages which Claimant seeks to pursue against Respondent, and which Galle is seeking to challenge (purportedly on behalf of Respondent), pursuant to the Facility Agreement entered into between Claimant and Respondent. This is a *chose in action* and, as such, under Hong Kong law, falls within the definition of a moveable property right.

98.   Claimant suggests[37] that the limitations on the above principle (*i.e.*, the principle that the Hong Kong court will recognise the role of foreign 'officers' in respect of property provided that the

_____
[37] Claimant's Statement, paragraphs 92 to 93.

foreign court made the appointment with proper jurisdiction (in the eyes of the Hong Kong court)) as described in the Conflict of Laws are such that a Hong Kong court would not recognise the authority of a foreign-appointed curator (such as Galle) to demand the transfer of any property of that person other than *immovable* property located in Hong Kong.

99.   Galle suggests this is a misreading or misunderstanding of the relevant paragraph of the Conflict of Laws, arguing that, on a proper reading, the principle propounded by paragraph 7.149 of the Conflict of Laws is that - provided the foreign court made the appointment with proper jurisdiction (in the eyes of the Hong Kong court) - a foreign curator, the role of which the Hong Kong court will recognise, has authority under Hong Kong law to demand *movable* property of a mentally incapacitated person from those holding it in Hong Kong without a court order to the same extent a Hong Kong guardian could do. Therefore, submits Galle, there is recognition under Hong Kong law of a properly appointed foreign curator to deal with at least movable property (including *choses in action*) in Hong Kong.[38]

100.   Upon reading paragraph 7.149, and the limitations set out therein (in particular at sub-paragraph (ii)), the Tribunal agrees with Galle's reading of these provisions, and determines that, under Hong Kong law, the role of a foreign officer (such as Galle in this case) in respect of movable property (such as the subject matter of the present arbitration) will be recognised by the Hong Kong court provided that the foreign court made the appointment with proper jurisdiction in the eyes of the Hong Kong court.

101.   The Tribunal notes for the record that this determination would only apply where the *situs* of the property in question is Hong Kong - the validity of a transfer of property with *situs* elsewhere will, in the eyes of a Hong Kong court, be a matter for the *lex situs* of that property. As this arbitration is seated in Hong Kong, the *situs* of the relevant property under discussion in this Interim Award is, in the Tribunal's view, Hong Kong, and indeed no party has sought to argue otherwise.

102.   The matter does not end there, however. As is clear from the above analysis, this Tribunal must next consider whether *"in the eyes of the Hong Kong court"* the Denver Probate Court appointed Galle to take care of Respondent's property (the *situs* of which is Hong Kong) *"with proper jurisdiction"*. Galle recognises and accepts the Tribunal's role and duty to undertake this assessment.[39]

103.   In this regard, the Tribunal will - as it must - first analyse the orders of the Denver Probate Court, and consider the jurisdiction of the Denver Probate Court (such as it appears from the materials before this Tribunal) to make those orders.

   **B.   *Galle's appointment as Special Conservator***

104.   Galle's appointment as Special Conservator was made pursuant to the Denver Appointment Petition. The Denver Appointment Petition records the fact that Respondent "does not reside in Colorado" having moved from the United States more than 20 years ago and states - upon information and belief - that he is a permanent resident of Thailand. Notwithstanding that Respondent does not reside in Colorado, Galle claimed that the Denver Probate Court had jurisdiction for the proceeding because Respondent has property in Denver, Colorado, specifically his property interest in the AT&T Action. The Denver Appointment Petition

---

[38] Galle's Statement, paragraphs 29 to 30.

[39] Paragraph 31 of Galle's Statement.

records that the Colorado Revised Statutes provide that the Colorado Probate Code applies to property of nonresidents located in Colorado and coming into the control of a fiduciary that is subject to the laws of Colorado.

105.  The Denver Probate Court found that venue was proper, and issued the First Probate Order. This order did not deal with Galle's (or BCC's) authority to represent Respondent's interests in this arbitration, but rather dealt with certain, specifically identified property rights of Respondent, in particular the AT&T Action and the collection and disbursement of any funds received in respect of that legal action, which were sited in Denver, Colorado.

106.  In particular, the First Probate Order appointed Galle as "Special Conservator" to assist in the accomplishment of a specially identified "protective arrangement or other authorized single transaction". That protective arrangement/single transaction was described in the following terms (emphasis supplied):

> "[Respondent] is incapable of making decisions *concerning his lawsuit against [AT&T] and the related appeals.* Among other things, [Respondent] is incapable of communicating, giving input or direction, or responding clearly with his Counsel and other professionals assisting him *in the prosecution of claims against AT&T.* Because he lacks the ability to make simple decisions, substantial assets belonging to [Respondent] will be wasted, if not lost, if no Special Conservator is appointed. *The single transaction herein is the completion of [Respondent's] lawsuit against AT&T, collection of funds due [Respondent] from AT&T, and payment of all costs and attorney's fees incurred in that litigation.*"[40]

107.  The First Probate Order granted Galle the following authority as Special Conservator:

> "[Galle] may make any and all decisions concerning [the AT&T Action] and all related appeals. This authority includes, but is not limited to, settlement of the main case, pursuing collection of any judgment, taking possession of settlement funds or funds collected in satisfaction of any judgment, settlement and payment of all attorney's liens, payment of outstanding fees and costs including appraiser's fees, reimbursement of costs to attorneys, and payment of attorney's fees related to the referenced litigation. This authority includes the decision to pursue further appeals and to make any decision or perform any act that [Respondent] could perform himself in the absence of a Special Conservator. As well, [Galle] shall be empowered to open accounts on behalf of or for the benefit of [Respondent] to deposit the net proceeds collected from AT&T."

108.  The Tribunal notes that the First Probate Order did not purport to appoint Galle to "take charge" of Respondent as a mentally incapacitated person as such, nor did it appoint Galle to look after Respondent's assets as a whole. Rather it dealt with the AT&T Action as (in the terms of the First Probate Order) a "single transaction" being the "completion of [Respondent's] lawsuit against AT&T, collection of funds due [to Respondent] from AT&T, and payment of all costs and attorney's fees incurred in that litigation". In this regard, the Tribunal notes that the First Probate Order held that Respondent was "incapable of making decisions *concerning his lawsuit against AT&T*" and "incapable of communicating, giving input or direction, or responding clearly with his Counsel and other professionals assisting him *in the prosecution of claims*

---

[40] The Tribunal notes that, by its terms, the First Probate Order was due to expire on 31 March 2018 "unless extended or sooner terminated by further order of the [Denver] Court". On the evidence before the Tribunal it is apparent that the term of the First Probate Order was extended to 31 December 2018 by the Amended Letters of Conservatorship. The Amended Letters of Conservatorship therefore did no more than extend the term of Galle's conservatorship per the First Probate Order, and cannot themselves independently support Galle's authority to represent Respondent in this arbitration.

*against AT&T*", and granted Galle the authority to "make any and all decisions concerning *Horn v AT&T Mobility, LLC et al*, Case Number 2014CV31745 in the District Court of Denver County, Colorado [*i.e.*, the AT&T Action] and all related appeals ...".

109.    Equally, the First Probate Order did not reference the arbitration. This is unsurprising, not least of all because the First Probate Order predated the commencement of the arbitration by some 9 months[41], and indeed predated the existence of any dispute as between Claimant and Respondent by at least 5 months[42].

110.    Galle was subsequently purported to be granted authority to defend the arbitration by the Denver Probate Court's Second Probate Order (later supplemented by the Third Probate Order[43]). Both of these orders purport to provide Galle with specific authority to defend this arbitration, expressly providing that, as Special Conservator/Conservator, he has "full right, power and authority to represent the interests of [Respondent] in the arbitration", power to hire local attorneys, experts and other professionals to assist the representation of Respondent in the arbitration, and to engage Colin Cohen of BCC to represent Respondent in the arbitration. The Third Probate Order additionally purports to "approve" the engagement of BCC, Colin Cohen and other solicitors from BCC to represent the interests of Respondent in the arbitration and to provide them with "full right, power and authority to represent the interests of [Respondent] in the arbitration".

111.    In the Tribunal's view, for the reasons expressed below, the Second and Third Probate Orders are critical to Galle's authority in this arbitration. Without them, the basis on which Galle relies for his authority to represent Respondent in these proceedings and appoint BCC as Respondent's legal representatives would fall away - as noted Galle relies on, and solely on, the Denver Probate Orders for his authority to represent Respondent. Galle has made no other applications in relation to authority to other courts (or, if he has, this has not been drawn to this Tribunal's attention), to the body administering this arbitration or to this Tribunal. As such, Galle's authority to represent Respondent in this arbitration stands or falls with the Probate Orders and, in particular, the Second and Third Probate Orders.

112.    In this regard, as noted above, the First Probate Order only appointed Galle as "Special Conservator" to assist in the accomplishment of a specially identified "protective arrangement or other authorized single transaction", that single transaction being identified in the First Probate Order as "the completion of [Respondent's] lawsuit against AT&T, collection of funds due [Respondent] from AT&T, and payment of all costs and attorney's fees incurred in that litigation."

113.    The Tribunal notes therefore that this is not a case where a foreign officer has been appointed in respect of a mentally incapacitated person to be responsible for the person's safety or for

---

[41] The First Probate Order was issued on 7 March 2017, whilst the Notice was filed on 19 December 2017 (see the Agreed Chronology).

[42] The earliest date on which the current dispute could be said to arise as between Claimant and Respondent under the Facility Agreement is 8 August 2017, when Galle agreed to settle the AT&T Action for US$57.5 million.

[43] The Tribunal notes that the Third Probate Order refers to Galle as "conservator" whereas the earlier Probate Orders had referred to Galle as "special conservator". Galle's counsel was unable to shed any light on the difference (in any) between a special conservator and a conservator (see the exchanges at Transcript, page 151, line 8 to page 153, line 10), and this Tribunal is unwilling to speculate on the same, and therefore proceeds on the basis that, for the purposes of the matters before this Tribunal, there is essentially no difference of import between a "special conservator" and "conservator".

their property and affairs, with that officer then looking for assistance from an overseas jurisdiction to enable them to deal with some of the property of the mentally incapacitated person in respect of which they have been appointed which happens to be located in a foreign country.

114.　Here, as is apparent from the analysis above, Galle was originally appointed as "Special Conservator" in relation to specifically identified property of Respondent located in Denver, Colorado. Galle was not appointed in respect of Respondent's safety or his property and affairs *per se*. Indeed, it is not clear whether the Denver Probate Court would have had jurisdiction to appoint Galle in this capacity in respect of Respondent, given that Respondent (according to the Denver Appointment Petition) "moved from the United States to Bangkok, Thailand more than 20 years ago" and "is a permanent resident of Thailand", and that the Denver Appointment Petition indicated that the Denver Probate Court had jurisdiction notwithstanding that Respondent does not reside in Colorado because Respondent has property in Denver and the Probate Code applies to "property of nonresidents *located in the state*". Accordingly, what is clear from the papers is that Respondent is not resident in Denver, Colorado, but in Thailand, and that the application to the Denver Probate Court to appoint Galle as Special Conservator in relation to those assets located in Denver, Colorado was expressly predicated on the basis that Respondent (a) was a non-resident of Colorado and (b) had assets in Denver, Colorado. From the papers before this Tribunal, it appears as though the Probate Code only applies to the property of nonresidents *located in the state*. The Tribunal notes that (per the analysis above) the *situs* of the property over which Galle now claims to represent Respondent (*i.e.*, the chose in action which is Claimant's claim against Respondent in this arbitration) is Hong Kong, not Colorado.

115.　Accordingly, had Galle been relying solely on the First Probate Order and the authorities which suggest that the Hong Kong court will recognise the role of foreign officers in respect of movable property of an incapacitated person located in Hong Kong (provided the foreign court appointed the foreign officer with proper jurisdiction, in the eyes of the Hong Kong Court) this Tribunal would have had no difficulty in coming to a determination that Galle has not taken sufficient steps nor provided sufficient evidence to demonstrate that he (and through him BCC) is authorised to act on Respondent's behalf in this arbitration. The First Probate Order was limited in scope, appointing Galle only in respect of a single transaction - to preserve and protect certain assets of Respondent that were located within its jurisdiction, *i.e.*, the handling of the AT&T Action and the fruits of that litigation which was proceeding in the Denver Court. Galle was not put in a position of administering Respondent's affairs as a whole by virtue of the First Probate Order, such that it could be argued that representing Respondent in the arbitration might be a part of his broader function of administering Respondent's property wherever it might be located.

116.　This being so, in the Tribunal's view, based solely on the issuance of the First Probate Order the issue or question of recognition of the order of the foreign court simply does not arise in this instance, because there is no 'nexus' between the role granted to Galle by the Denver Probate Court under the First Probate Order and the property located in Hong Kong. It is for this reason that the Tribunal earlier expressed the view that the Second and Third Probate Orders are critical to Galle's case on the Preliminary Issue.

C.     *Second and Third Denver Probate Orders*

117.    Accordingly, the Tribunal now turns to consider the circumstances in which the Denver Probate Court issued the Second and Third Probate Orders[44] by which the Denver Probate Court purported to authorise Galle to represent Respondent in this specific arbitration in the terms outlined by the Tribunal earlier in this Interim Award.

118.    The Second Probate Order records the fact that it was made upon the Denver Probate Court's review of Galle's "Motion for Specific Authority to Defend Hong Kong Arbitration". Similarly, the Third Probate Order records the fact that it was made upon the Denver Probate Court's review of Galle's "Motion for Order Confirming Conservator's Authority to Defend Hong Kong Arbitration". In each case, the Denver Probate Court records the fact that it has been "fully advised in the premises".

119.    However, Galle has not placed before this Tribunal any of the papers or materials put before the Denver Probate Court in relation to these critical applications, or even copies of the Motions by which the applications were made. Having not volunteered these documents during the course of the proceedings, following the Preliminary Issue Hearing, the Tribunal invited Galle's counsel to produce the same[45]. As noted above, Galle's counsel declined to produce any documents in response to the Tribunal's request, expressly indicating that they had been specifically instructed not to produce any documents or Motions submitted to the Denver Probate Court which resulted in the Denver Probate Court issuing the Second and Third Probate Orders, notwithstanding the Tribunal's request for the same[46].

120.    As such, this Tribunal does not have the benefit of having had sight of either of these Motions, or any other papers filed to support these applications. Accordingly, the basis for Galle's Motions and for the Denver Probate Court issuing the Second and Third Probate Orders is not apparent to this Tribunal (unlike for the First Probate Order (i) where the Denver Appointment Petition and certain other papers were provided, and (ii) which makes express reference to the Colorado Revised Statutes, Title 15 Article 14 Section 412(3)[47]).

121.    Equally, the basis on which the Denver Probate Court assumed jurisdiction to make orders by which it purportedly authorised a foreign office holder (Galle) to deal with assets beyond the jurisdiction of the Denver Probate Court (the chose in action in this arbitration, the *situs* of which is Hong Kong), which do not (in this Tribunal's determination) fall within the terms of the "single transaction" in respect of which Galle was appointed by virtue of the First Probate Order is not apparent, as neither the Second or Third Probate Orders make any reference to the jurisdictional basis on which they are issued (indeed neither the Second nor the Third Probate Orders contain any reference to any statutory provision or rule of court whatsoever).

---

[44] Naturally, the Tribunal is aware of that the Denver Probate Court has also issued the Fourth Probate Order dated 31 July 2018 which was produced by BCC subsequent to the Preliminary Issue Hearing; however, as this order simply extends Galle's conservatorship per the First Probate Order to 31 August 2019, it not relevant to a consideration of Galle's authority to represent Respondent in this arbitration.

[45] By correspondence dated 22 February 2019.

[46] By correspondence dated 1 March 2019.

[47] Which simply provides: "*The court may appoint a special conservator to assist in the accomplishment of any protective arrangement or other transaction authorized under this section. The special conservator has the authority conferred by the order and shall serve until discharged by the order after report to the court*".

122.   To the extent that Galle intends to suggest that the purported basis for the Second and Third Probate Orders is the same as for the First Probate Order (i.e., the Colorado Revised Statutes, Title 15 Article 14 Section 412(3)), this Tribunal is unable to accept this proposition[48].

123.   Whilst the Tribunal was not addressed on the import of this provision of Title 15 of the Colorado Revised Statutes, on a plain reading of the terms of Section 412(3) of Article 14, it does not appear to assist Galle's case. In no part of Section 412 is there any suggestion that the Statutes empower the Denver Probate Court to authorise a special conservator to deal with assets beyond the jurisdiction of the Denver Probate Court and, as noted, this Tribunal has determined that those assets (being the chose in action in this arbitration, the situs of which is Hong Kong) do not fall within the terms of the "single transaction" in respect of which Galle was appointed by virtue of the First Probate Order pursuant to the Colorado Revised Statutes, Title 15 Article 14 Section 412(3).

124.   Further, as the Tribunal has noted elsewhere in this Interim Award, from the papers which have been placed before this Tribunal, it appears as though Colorado's Probate Code[49] only applies to the property of nonresidents which is located in the state of Colorado. The property in question in this arbitration is not located in Colorado; thus, it appears to this Tribunal at least, that the jurisdictional basis for the Second and Third Probate Orders cannot be the same as that for the First Probate Order.

125.   As a result, it is wholly unclear on what basis the Denver Probate Court considered that it had jurisdiction to provide Galle with authority to represent Respondent in this arbitration in circumstances where, save to the extent of the assets of Respondent within its own jurisdiction, it had not otherwise appointed Galle as the person responsible for Respondent's property and affairs. The Tribunal is troubled by the lack of explanation of the jurisdictional basis for the Second and Third Probate Orders, where these orders are (as noted earlier) critical to Galle's case on his authority to represent Respondent in this arbitration.

126.   The Tribunal has no difficulty in accepting that the Denver Probate Court had jurisdiction to appoint Galle to be responsible for Respondent's assets which are located within the jurisdiction of the Denver Probate Court: the Tribunal takes no issue in relation to the Denver Probate Court's jurisdiction to issue the First Probate Order in this regard. Similarly, the Tribunal takes no issue with the proposition put forward in paragraph 33 of Galle's Statement which submits that the order which the Denver Probate Court made to preserve properties within its jurisdiction for the interest of a mentally incapacitated person not within its jurisdiction was made with proper jurisdiction.

127.   As noted earlier, however, because of the limitations of the First Probate Order, and the fact that - by its express terms - it does not cover property outside Colorado (which includes the property which is the subject matter of this arbitration), there is no question of this Tribunal affording recognition to Galle pursuant to this order.

---

[48] Galle did not expressly make any such submission, but, in the absence of any other stated jurisdictional basis for the Second and Third Probate Orders, it might be said to be implied.

[49] The term "Probate Code" is that used in the Denver Appointment Petition, and appears to this Tribunal to refer to Articles 10 to 17 of Title 15 of Colorado's Revised Statutes.

128.    By contrast, the Tribunal is not satisfied, on the materials placed before it, that Galle has shown that the Denver Probate Court had proper jurisdiction (in the eyes of Hong Kong law) to make orders purporting to give authority to Galle to represent Respondent in relation to an asset located in Hong Kong. The Tribunal therefore is unable to accept that it ought to afford recognition of Galle's authority to represent Respondent in this arbitration pursuant to the Second and Third Probate Orders.

129.    Given the clearly critical nature of these orders to the question before the Tribunal (given the way Galle has put his case on authority), and Galle's acceptance that this Tribunal is required to consider whether his appointment as Respondent's representative in this arbitration was made with proper jurisdiction[50], at the very minimum the Tribunal would have expected Galle to place before it the Motions filed in relation to these orders (which are referred to in the orders themselves) together with the supporting papers (if any) and submissions (if any) that may (or may not) have been put before the Denver Probate Court, so that this Tribunal could consider the basis on which the Denver Probate Court was persuaded to make the Second and Third Probate Orders, when Respondent was non-resident in its jurisdiction and it had limited the First Probate Order to assets within its jurisdiction. How else might this Tribunal assess whether, in the eyes of Hong Kong law, the Denver Probate Court had proper jurisdiction to appoint Galle as Respondent's representative in this arbitration in those circumstances?

130.    Galle has had ample opportunity to put the materials before the Tribunal to enable this Tribunal to undertake this assessment, including by way of a specific request for these materials, post-hearing, but has point-blank refused to place that material before the Tribunal (notwithstanding that the material must be in his possession, and his counsel has not indicated that this is not the case, only that they have been expressly instructed not to provide it to the Tribunal).

131.    As it stands, on the material before this Tribunal, as noted, the Tribunal is not satisfied that the Second and Third Probate Orders (*i.e.*, Galle's appointment as Respondent's representative in this arbitration, as opposed to his appointment as Special Conservator in relation to assets of Respondent located within the jurisdiction of the Denver Probate Court, *i.e.*, the First Probate Order) were made with proper jurisdiction, in the eyes of Hong Kong law.

132.    For completeness, the Tribunal would indicate that it does not consider that Galle's case is assisted by the letter written by Respondent's Guardian *ad litem*, Britt, dated 8 January 2018 in which Britt indicates that he (*i.e.*, Britt) believes that it is in the best interests of Respondent for Galle to represent Respondent in this arbitration and to engage legal counsel in Hong Kong to assist Galle in representing the interests of Respondent[51]. In the Tribunal's view, this letter is

---

[50] Galle's Statement, paragraphs 30 and 31 where Galle states: "The principle propounded by paragraph 7.149 is that *provided the foreign court made the appointment with proper jurisdiction* (in the eyes of the Hong Kong court) a foreign curator, the role of which the Hong Kong court will recognise, has authority recognised under Hong Kong law to demand movable property of a mentally incapacitated person from those holding it in Hong Kong without a court order to the same extent a Hong Kong guardian could do so. Therefore, there is recognition under Hong Kong law of *properly appointed foreign curator* to deal with at least movable property (including choses in action) in Hong Kong. The test is *whether the Denver Court made the appointment of Mr. Galle with proper jurisdiction* (in the eyes of the Hong Kong court). Clearly, in the eyes of the Denver Court, the Denver Probate Orders were made with proper jurisdiction, otherwise the court would not have made them in the first place. However, *the test is whether there was proper jurisdiction in the eyes of the Hong Kong court.*" [Emphasis supplied.]

[51] Galle's Statement, paragraph 12.

simply an expression, by Britt, of his views, and nothing more. Further, as Claimant pointed out[52], the purpose for which it was written is entirely unclear, and there is no evidence that Britt's appointment by the Denver Probate Court as Respondent's Guardian *ad litem* encompassed authority to determine Respondent's interests outside the AT&T Action or the proceedings before the Denver Court. The Tribunal notes that, whilst Galle did reference Britt's letter in his Statement, Galle did not place great emphasis on this in support of his case on authority, which principally rested on the Probate Orders of the Denver Probate Court. Nor did Galle's counsel address this aspect of Galle's case at the Preliminary Issue Hearing when Britt's letter was discussed before the Tribunal[53], or otherwise respond to the comments on this made by Claimant in Claimant's Reply.

133.    As such, the Tribunal determines that, to the extent that Galle relies on Britt's letter as a determination made by Britt (and not just an expression of his view) and as providing Galle with authority to represent Respondent in this arbitration, any such determination would lie outside Britt's competence and authority to provide, and this Tribunal does not consider that Britt's letter suffices to cloak authority on Galle to represent Respondent in this arbitration which authority Galle would otherwise not have.

134.    With regard to the issue of the test this Tribunal should apply to determine whether the Denver Probate Court made the appointment of Galle with proper jurisdiction, for Galle, BCC has suggested that this means "would a Hong Kong court consider itself to have proper jurisdiction to preserve property within its jurisdiction (*lex situs*, e.g., causes of action or funds in bank) for a mentally incapacitated person not within its jurisdiction"[54]. BCC answers its own question in the affirmative ("the answer is yes"). In this regard, BCC relies on the authority of *re LYO* [2005] 3 HKC 201. The Tribunal notes that, whilst the situation being considered by Lam J in *re LYO* was entirely different to the situation facing this Tribunal (*re LYO* concerned an application for determining whether the Hong Kong Court had jurisdiction to hold an inquiry as to mental capacity under section 7 of the Mental Health Ordinance and appoint a committee of the estate in Hong Kong in respect of a non-resident mentally incapacitated person having property within Hong Kong - where Lam J determined that the Hong Kong court had such jurisdiction and indicated he would give directions for the setting down of the matter for inquiry under section 7 of the Mental Health Ordinance - whereas here, by contrast, this Tribunal is being asked to recognise the effect of the Probate Orders issued by the Denver Probate Court as providing authority to a foreign officer - Galle - to represent Respondent in this arbitration, with no application for an inquiry or to appoint a committee of the estate in Hong Kong under the Mental Health Ordinance), nonetheless this Tribunal takes no issue with Lam J's decision in *re LYO*, nor with the proposition that the Hong Kong court has jurisdiction in respect of property in Hong Kong of an incapacitated person who is outside Hong Kong exercisable by appointing a committee of the estate (with such order ordinarily being limited to Hong Kong property).

135.    The test, as propounded by BCC, and the submissions in paragraph 31 of Galle's Statement, go to the Denver Probate Court's jurisdiction to issue the *First* Probate Order, as to which (as noted earlier) this Tribunal does not take issue. But (again, as noted earlier) this Tribunal does not consider that this assists Galle in relation to the critical question of whether, as a matter of Hong Kong law, the Denver Probate Court had proper jurisdiction to authorise Galle to represent

---

[52] Claimant's Reply, paragraph 37.

[53] Transcript, page 68, lines 1-15.

[54] Galle's Statement, paragraph 31.

Respondent in this arbitration (*i.e.*, to issue the *Second* and *Third* Probate Orders). The Tribunal has already stated that it is not satisfied, on the evidence as placed before it in these proceedings, that the Denver Probate Court had such authority (in the eyes of Hong Kong law). That would require Galle to persuade this Tribunal of the veracity of the following hypothetical proposition - the Hong Kong court, having issued an order appointing a committee of the estate in respect of a non-HK-resident person on the basis of the presence of assets in Hong Kong (in respect only of those Hong Kong assets), upon application, would have jurisdiction to extend the authority of that committee of the estate to deal with assets of the non-HK-resident incapacitated person to deal with their assets located outside Hong Kong. The Tribunal has not been provided with any authority to support this proposition, and has serious doubts as to whether a Hong Kong court would have such jurisdiction or that, if it had, that it would, in its discretion, agree to make such an order.

136. Having determined the Preliminary Issue in favour of Claimant, *i.e.,* having determined that, on the evidence before it, Galle has not demonstrated that he has authority to represent Respondent in this arbitration, Claimant invites this Tribunal to consider what is the appropriate jurisdiction to appoint a representative of Respondent for the purpose of defending claims generally[55].

137. This Tribunal does not consider that it is a part of its role to advise the Parties to this arbitration how they ought to act so as to ensure Respondent is properly represented in this arbitration. This is a matter for the Parties to consider and for them to deal with. In any event, this Tribunal does not feel it has been provided with sufficient information to be able to determine this question. The Tribunal therefore declines to determine what is the appropriate jurisdiction to appoint a representative of Respondent for the purpose of defending claims generally.

**D.    *Additional issues***

138. This Tribunal will deal with the question of how to conduct this arbitration going forward, given its decision on the Preliminary Issue, at the end of this Interim Award.

139. First, however, the Tribunal will deal with certain other matters that have been canvassed before it by the Parties.

140. Given:

(a) the Tribunal's determination above that it is not satisfied that the Second and Third Probate Orders of the Denver Probate Court (which is neither the jurisdiction of the seat of this arbitration, nor the jurisdiction of domicile of Respondent, and which - on the evidence put before this Tribunal - appears only to have jurisdiction in respect of the assets of Respondent sited in Colorado, as a non-resident of Colorado) were made with proper authority in the eyes of Hong Kong law; and

(b) the fact that Galle has taken no steps to have himself appointed as a properly authorised representative (a) under the law of Respondent's domicile, (b) by registering himself with the administering institution as a next friend, guardian *ad litem* or other representative of

---

[55] Paragraph 108 of Claimant's Statement.

Respondent as a mentally incapacitated person, (c) by applying to this Tribunal, or (d) by applying to the Hong Kong courts as the supervising courts of this arbitration[56],

it is not, strictly speaking, necessary for this Tribunal to determine the other issues Claimant raises and which it submits this Tribunal ought to take into account in assessing whether to recognise Galle's authority to represent Respondent in this arbitration.

141.   However, for the record, those matters are as follows:.

(a)   First, Claimant submits that no evidence has been provided of Respondent's incapacity to deal with the arbitration or the issues in the arbitration.

(b)   Secondly, Claimant submits that no evidence has been provided of Galle's appropriateness to be appointed as Respondent's next friend, guardian *ad litem* or representative in this arbitration, or of his ability to act impartially in the conduct of this arbitration on Respondent's behalf. Claimant suggests there is good reason to question whether Galle would be able to act impartially.

142.   Claimant suggests that this Tribunal ought to have been afforded a proper opportunity to scrutinise any proposed representation and alleged disability, but that Galle has provided no such opportunity and has vigorously objected to doing so. Galle suggests that this Tribunal should only scrutinise any proposed representation by verifying the authenticity of the evidence produced to satisfy itself that Galle and BCC have authority to act for Respondent, and should not go so far as to consider whether Respondent was mentally incapacitated "as this issue has been properly determined by the Denver Court"[57]. We consider these contentions below.

### 1.   Evidence of Respondent's current incapacity

143.   The Denver Probate Court issued the First Probate Order, appointing Galle as Special Conservator in relation to certain assets of Respondent the *situs* of which was Colorado, because it determined that Respondent was incapable of making decisions concerning the AT&T Action and that, because he lacks the ability to make simple decisions, substantial assets belonging to Respondent will be wasted, if not lost, if a Special Conservator is not appointed.

144.   In support of the claim that Respondent was incapable of making decisions concerning the AT&T Action, the Denver Appointment Petition relied on the 2014 Psychiatric Report and the 2015 Neurology Report, as well as the evidence of a Dr. Diffee who, it appears from the Guardian *ad litem*'s report to the Court of 10 August 2017, appeared before the Denver Probate Court on the Denver Appointment Petition and testified to Respondent's deteriorating and debilitating mental condition, and to his resulting inability to participate in, or discuss, the AT&T litigation. The 2014 Psychiatric Report diagnosed Respondent with "chronic conversion disorder with multiple motor symptoms" as "the result of the pressure from a continuing stressful situation", being "the process of the sale of his interests in his company in Colorado". The 2015 Neurology Report "agree[d] with the diagnosis from [Respondent's] psychiatrists of conversion disorder", noted that there was "no abnormal neurological examination and no

---

[56] Galle/BCC do not suggest that any such steps have been taken, submitting it to be unnecessary in light of the Probate Orders of the Denver Probate Court.

[57] Galle's Statement, paragraph 6.

abnormal investigation" and therefore "recommend[ed] that ... [Respondent] should follow recommendations from his psychiatrists".

145.    As Claimant has pointed out, the 2014 Psychiatric Report and 2015 Neurology Report are both dated more than two and a half years before the Notice was issued[58]; they do not reference the present dispute between Claimant and Respondent or the arbitration; and they do not relate (or refer) to any examination conducted to assess Respondent's capacity to deal with the current dispute between the Parties or the issues arising in the arbitration. Galle's counsel was asked about Dr. Diffee by the Tribunal at the Preliminary Issue Hearing[59]. Galle's counsel was unable to advise the Tribunal who Dr. Diffee was, or whether he (or she) had ever had any contact with Respondent, indicating rather that it appeared that the doctor gave evidence based on the 2014 Psychiatric Report, a three page document that had been produced several years previously, and not from his/her own examination of Respondent.

146.    Further, the evidence before this Tribunal suggests that Galle had not successfully communicated with Respondent since 2016, and most likely since October 2015[60]; no evidence was led by Galle to suggest that he had been able to contact Respondent since May 2016 (when he wrote to Claimant indicating that he had not heard from Respondent since October 2015) and Galle's counsel's exchanges with the Tribunal during the Preliminary Issue Hearing appeared to confirm that Galle had had no contact with Respondent since at least 2016[61]. Indeed, Galle's counsel confirmed during the course of the Preliminary Issue Hearing that Galle did not know if Respondent was aware about the settlement of the AT&T Action, and it seems apparent to the Tribunal that Respondent is likely wholly unaware of the settlement of the AT&T Action (which occurred in August 2017) and the fact he has recovered a sum of US$57.5 million by virtue of that settlement,[62] and also wholly unaware of even the existence of the current arbitration (which was commenced in December 2017).

147.    And so, there is no medical report or indeed any evidence which specifically addresses the *current* capability, or otherwise, of Respondent to handle his affairs (generally, or otherwise); nor is there any medical report which addresses the question of the Respondent's ability to address the issues arising *in relation to the arbitration between Claimant and Respondent* (as opposed to the AT&T Action). All the reports in evidence in these proceedings are directed to Respondent's capabilities in relation to handling the dispute with AT&T, and in particular the AT&T Action. And, as noted, those reports predate the commencement date of this arbitration by two and a half years or more. Accordingly, the statement in Galle's Statement that this Tribunal should not go so far as to consider whether Respondent was mentally incapacitated

---

[58] Transcript, page 25, lines 5-10.

[59] Transcript, page 147, line 22 to page 149, line 15.

[60] See the email from Galle to Claimant dated 6 May 2016 at pages 9 to 11 of Exhibit C-5. In the Affidavit filed in the Denver Probate Court in support of the Denver Appointment Petition filed on 19 January 2017, Galle states at paragraph 7: "In the late Fall of 2015, and continuing through to the present [*i.e.*, 19 January 2017], I have been unsuccessful in reaching [Respondent]. He has not responded to any forms of communication that we had historically used (i.e. email, fax, telephone, encrypted software devices, etc.). Notwithstanding, I have continued to attempt to communicate with [Respondent], without response, at least monthly for the last fifteen (15) months."

[61] See the Transcript at page 212, lines 19 to 22 where, in responding to the Tribunal's questions, Galle's counsel confirmed that Galle is not aware where Respondent is, and that there have been no updates on Respondent's whereabouts since 2016 at which time he was known to be in Thailand.

[62] Transcript, page 243, lines 2-3.

because "this issue has been properly determined by the Denver Court"[63] is not accurate - what the Denver Probate Court determined was that Respondent was mentally incapable of dealing with the AT&T Action, and consequently appointed Galle as Special Conservator in relation to a "single transaction" over Respondent's assets sited in Colorado[64].

148. The Parties accept and agree that the test of mental incapacity is "issue specific", per the Hong Kong Court of Appeal authority of *Ng Hong Ki v Leung Fong Kiu* [2012] 1 HKLRD 435, at paragraph 34 (following the English law position identified in *Masterman-Lister v Burtton & Co (Nos 1 and 2)* [2003] 1 WLR 1551[65]). Per Kwan JA in *Ng Hong Ki*: "*The focus of the enquiry is <u>on the litigation under consideration</u> rather than the whole of that person's property and affairs*" [emphasis supplied][66].

149. On this, per Kennedy LJ in *Masterman-Lister v Burtton & Co (Nos 1 and 2)*[67], "*What, however, does seem to me to be of some importance is the issue-specific nature of the test; that is to say <u>the requirement to consider the question of capacity in relation to the particular transaction (its nature and complexity) in respect of which the decisions as to capacity fall to be made</u>.... Of course, as Boreham J said in White's case ... capacity must be approached in a common sense way ... bearing in <u>mind the basic right of any person to manage his property and affairs for himself, a right with which no lawyer and no court should rush to interfere</u>. The conclusion that <u>in law capacity depends on time and context</u> means that inevitably <u>a decision as to capacity in one context does not bind a court which has to consider the same issue in a different context</u>.... The final decision as to capacity, it is agreed, rests with the court but, in almost every case, the court will need medical evidence to guide it.*" [Emphasis supplied.]

150. As noted, no evidence has been produced to this Tribunal which is directed to the question of Respondent's ability to deal with this arbitration and the issues which arise in this arbitration.

---

[63] Galle's Statement, paragraph 9.

[64] In this regard, the Tribunal notes that it does not accept Galle's counsel submission made during the Preliminary Issue Hearing (Transcript, page 159, lines 12-14) to the effect that the supposed reference to "all things related to the AT&T Action" in the 2014 Psychiatric Report - or indeed the 2015 Neurology Report - extends to cover this arbitration. This arbitration is, at best, only peripherally related to the AT&T Action, and of course there was not even a dispute on foot as between Claimant and Respondent at the time Respondent was examined for the purposes of these medical reports, or when these medical reports were issued. That dispute has only arisen after the settlement of the AT&T Action, and the payment to Galle (for Respondent) of US$57.5 million (albeit that Respondent himself appears to be unaware of these developments). Further, the Tribunal notes that counsel's statement as to what the medical reports say is inaccurate - the medical reports do not in fact say "all things related to the AT&T Action" (or even mention that action) but rather address "the sale of [Respondent's] interests in his company in Colorado". This is in the Tribunal's view an entirely separate matter to the underlying dispute in this arbitration.

[65] Paragraph 136 of Claimant's Statement and paragraph 5 of Galle's Skeleton.

[66] As the test is issue specific, and time and context dependent, Galle's submission that this Tribunal ought not deal with the matter of Respondent's mental capacity now, in this Interim Award, because it will be addressed at the substantive hearing is misguided. The question of Respondent's mental capacity as it stands now, to deal with this arbitration, is an entirely separate issue to whether Respondent had the requisite mental capacity to enter into the Facility Agreement in December 2011, *i.e.,* some 7 years or more ago. But in any event, this Tribunal need not, and does not, make any determination as to Respondent's mental capability, either now or in 2011, in this Interim Award.

[67] At paragraphs 27 and 29.

As is also noted above, in terms of medical evidence, the only evidence which has been produced as to Respondent's mental status is "stale" in that it is predated the commencement of this arbitration by two and a half years, or more, (indeed, it entirely predates the existence of any dispute as between Claimant and Respondent, which only arose in late 2017). The medical evidence produced therefore does not refer or relate to Respondent's ability to comprehend or handle this arbitration or the issues in it. Rather, the medical evidence produced indicates only that Respondent's mental state was such that he was unable to deal with the sale of his interest in his company in Colorado (which the Denver Probate Court has been persuaded to interpret as meaning that Respondent was unable - at least as at the time it made the First Probate Order in March 2017 - to deal with the AT&T Action, and matters directly related to it, such as appeals and settlement). Indeed, as Claimant pointed out, in his affidavit sworn in support of the Denver Appointment Petition, Galle indicated that, on several occasions in the period from 2006 to 2014, when asking Galle to oversee the AT&T assignment agreement, Respondent communicated to him that he would be concentrating on "personal matters" indicating that even if Respondent was incapable of dealing with the AT&T assignment agreement, he was capable of dealing with other personal matters.[68]

151.   Further, there have been significant developments since the date the two medical reports relied upon to evidence Respondent's mental state were issued, developments which might have a significant positive impact on Respondent's mental state - particularly given the fact that the medical reports issued in 2014/2015 record the fact that Respondent's fragile mental state resulted from stress arising out of the sale of Respondent's interests in his company in Colorado. Specifically, in August 2017, five months after the First Probate Order was issued, the AT&T Action finally came to an end, after decades of litigation, with settlement terms being agreed by which Respondent recovered a substantial sum of US$57.5 million, thus essentially bringing the matter of the sale of his interests in his company in Colorado to an end (with a substantial recovery flowing to Respondent).

152.   It is also noteworthy that the medical reports themselves indicate that Respondent's mental state had waxed and waned over previous years[69]. At various points in the proceedings, Galle's Counsel suggested that Respondent's mental state was "deteriorating", but there is no cogent evidence before the Tribunal that this is the case. As noted, the evidence we do have has a rather different import – i.e., that Respondent's mental state waxes and wanes. The Tribunal accepts that in his report to the Court dated 10 August 2017, Respondent's Guardian *ad litem* suggested that "[Respondent's] mental health has been deteriorating" but the Tribunal finds it difficult to reconcile this statement with the fact that no-one had apparently been able to contact Respondent for almost two years at the point in time when the Guardian *ad litem* made this statement. No medical evidence has been produced to this Tribunal to the effect that Respondent's mental state had deteriorated between 2014/2015, when the 2014 Psychiatric Report and 2015 Neurology Report were issued, and August 2017, still less any evidence to suggest any further deterioration since August 2017. The unsatisfactory nature of the "evidence" of Britt was evident during the Tribunal's exchanges with Galle's counsel[70]. Further, as noted, the 2014 Psychiatric Report itself notes the fact that Respondent's mental state is subject to

---

[68] Transcript, page 56, lines 9-17.

[69] The 2014 Psychiatric Report records the fact that Respondent "first experienced these symptoms from September 2005 as a result of stress in business discussions. After five months the symptoms subsided. However after stress returned in 2007 the symptoms recurred again for a long period of time. Again, beginning in November 2014, the symptoms have recurred since the stress related to the sale of his Colorado asset increased in intensity." See also, Transcript at page 26, lines 1-3.

[70] Transcript, page 146, line 8 to page 149, line 15.

improvement and deterioration. Indeed, the fluctuating nature of mental illness is noted in the authorities: "Another problem is that mental illness can be a fluctuating health condition. It is a well-known fact that a mental patient may be well today but the condition may deteriorate sharply the next day" (per Judge David Lok in *Chan Ka Yi v DBS Bank* (Hong Kong) Ltd [2010] 2 HKLRD 528, at paragraph 11).

153.   In the circumstances, the Tribunal is unable to place any real reliance on the medical reports from 2014/2015 - issued when the AT&T Action was still on foot and which only direct themselves to Respondent's ability to deal with the sale of his interests in his company in Colorado, which is now complete - in relation to determining whether Respondent's mental state is such *now* that he should be represented by a third party *in this arbitration*.

154.   It would, in the Tribunal's view, be dangerous to make an assumption - on the basis of the evidence that has been presented to this Tribunal - that Respondent is currently incapable of dealing with the issues arising in this arbitration, especially when one takes into account the dicta of Boreham J in White's case, cited by Kennedy LJ in *Masterman-Lister v Burtton & Co (Nos 1 and 2)* (and to which the Tribunal has referred earlier in this Interim Award, with approval, albeit in a slightly different context), that "capacity must be approached in a common sense way ... bearing in mind <u>the basic right of any person to manage his property and affairs for himself, a right with which no lawyer and no court should rush to interfere</u>" (emphasis supplied).

155.   This Tribunal concurs with the views of Boreham J in White's case, and is far from satisfied that the evidence that it has seen suffices to demonstrate with the requisite degree of certainty that Respondent is not capable of dealing with the issues arising in this arbitration. However, having said this, it is not for this Tribunal to determine Respondent's mental state in this Interim Award, and we make no determination as to whether Respondent's current mental state is such that he is able to handle this arbitration, or whether he ought to be represented by a third party in defending these proceedings. We have however given our views of the evidence and how we would interpret this issue if it did fall to be decided by us, based on that evidence.

156.   And so, for the record, for the reasons expressed above, this Tribunal does not consider that the medical evidence placed before it (which consists of the 2014 Psychiatric Report and the 2015 Neurology Report, and nothing more) suffices to demonstrate that Respondent's mental state is such that he is not capable of handling this arbitration without the appointment of a "guardian" or "committee of the estate". The Tribunal accepts that it is possible that such appointment is necessary, but that is a matter to be determined (if necessary) in another venue, and not by this Tribunal. That body might take a different view of the evidence to the view taken by this Tribunal, or further evidence might be placed before that body to demonstrate the need for such an appointment. In any event, as it stands, if Galle (or another) wishes to appear in this arbitration to represent Respondent, then an appropriate application will need to be made, to the appropriate body, to seek an appropriate order; alternatively, of course, Respondent himself might come forward and appear in this arbitration, in which case such an application and order might not be necessary.

157.   Given the Tribunal's determination above, in particular that it need not, and indeed does not, make a determination on Respondent's mental capacity to deal with this arbitration, the issue of whether such a determination would be summary, per Galle's submission, or otherwise is moot. Suffice to say that, unlike in the authority cited by Galle (the commentary to Order 80, rule 2 at page 475 of Bundle 2, citing *Chan Ka Yi v DBS Bank (Hong Kong) Ltd* [2010] 2 H.K.L.R.D 528), this is not a case where it would be inappropriate to determine Respondent's mental capacity to deal *with this arbitration* as a preliminary issue -

because it would lead to a duplication of evidence and costs and embarrassment in relation to credibility of witnesses - because this is a wholly different question to any question that might arise as to Respondent's mental capacity at the substantive hearing, the question of Respondent's mental capacity being time and context dependent.

158.   This deals with the first of the two "other issues" raised before this Tribunal, referred to above.

   **2.   Galle's suitability to act as Respondent's representative in this arbitration**

159.   As to the second of the "other issues" identified above, the Tribunal notes that the reason the Denver Probate Court appointed Galle as Special Conservator in relation to Respondent's assets sited in Colorado - by virtue of the First Probate Order - was because it found that Galle was the person best suited to act as such as he was Respondent's long-time lawyer and was intimately familiar with the (then) 15+ year dispute between Respondent and AT&T. However, by contrast, as noted above, the basis on which the Denver Probate Court considered that Galle was the appropriate person to represent Respondent in this arbitration has not been explained (Galle having refused to produce the documents which might have assisted the Tribunal in understanding this and assessing the position, when given the opportunity, post-hearing, to produce these documents, having not produced them voluntarily during the course of the hearing). In the event, on the state of the evidence before it, the Tribunal has been left in a position that it can only speculate as to the grounds on which the Denver Probate Court saw fit to appoint Galle as Respondent's representative in this arbitration, which the Tribunal finds is highly unsatisfactory.

160.   In any event, this arbitration concerns a claim between Claimant and Respondent, and does not involve AT&T, and, although Galle is said to be Respondent's long-term lawyer, it appears that Galle has not been able to contact his client for more than three years (*i.e.*, since October 2015: see above). Respondent was himself not involved in the settlement of the AT&T Action in August 2017, and apparently, in the more than one year that has passed since then (at least as at the date of the Preliminary Issue Hearing in November 2018) Galle has not notified, or not been able to notify, Respondent (or any member of his family) of that settlement, which is clearly an event of no little significance for Respondent for a number of reasons[71].

161.   This Tribunal has concerns over the suitability of someone to be appointed to represent a party in a legal process, such as in this arbitration, when that individual appears to have no contact with the person they are purporting to represent, and appears unable to get in touch with that person or elicit a response from him (or anyone close to him), for whatever reason, and where the underlying party (*i.e.*, in this case Respondent) has not chosen his representative (and indeed is wholly unaware he is being represented in the hearing by another, and is likely entirely unaware of the underlying proceedings). Again, the Tribunal is mindful of the dicta of Boreham J in in White's case, quoted above, as to the basic right of any person to manage his property and affairs for himself, a right with which no lawyer and no court should rush to interfere, and of the provisions of the HKIAC Rules to the effect that parties may be represented by persons "of their choice" (subject to the fair and efficient conduct of the arbitration)[72].

---

[71]At the Preliminary Issue Hearing, when asked by the Tribunal to comment on Claimant's query on whether Respondent is aware of the settlement of the AT&T Action, Galle's Counsel's response was: "*we don't know if [Respondent]'s aware about the settlement*" (Transcript, page 241, line 21 to page 243, line 3).

[72] Articles 13.5 and 13.6 of the HKIAC Rules.

162.    In Galle's Skeleton, Galle's Counsel states "given Respondent and his family members are not contactable, it is submitted that the most appropriate person [to be appointed as Respondent's guardian *ad litem*] would be Mr. Galle himself". The Tribunal is unconvinced of the internal logic of this proposition, or of its truth. Galle has not outlined the steps (if any) he has taken to contact Respondent and his family members to this Tribunal since this arbitration began, or indeed since the AT&T Action was settled over a year ago, and a sum of almost US$60 million received on behalf of Respondent. Indeed, Galle's counsel was unable to answer the simple question put to him by the Tribunal at the Preliminary Issue Hearing as to the efforts Galle had made to contact Respondent and advise him of the receipt of the US$57.5 million from AT&T since that money had been put into an account[73]. The Tribunal would expect a representative, in receipt of almost US$60 million on behalf of the person they represent, to take *substantial* steps to locate the person he represents (or his family) to pass this news on to him and to seek instructions on how to deal with those funds, including how to handle the claim made by the Claimant which has resulted in the commencement of this arbitration; the steps taken by Galle to do so (if any) simply have not been explained to this Tribunal. The statement that the Respondent and his family members "cannot" be contacted is unsupported by any evidence of the attempts made to contact them (in particular following the receipt of almost US$60 million on Respondent's behalf) and, in the circumstances, the Tribunal is not comfortable to accept the veracity of the same.

163.    It also appears that Galle has either not been able, or that he considers it unnecessary, to advise Respondent of the existence of these proceedings. At the Preliminary Issue Hearing, Counsel appearing for Galle was repeatedly asked to explain to this Tribunal what had been done by Galle to inform Respondent of these proceedings; the answers were initially evasive, but ultimately Counsel confirmed that he "*did not have an answer*" to the Tribunal's question as to the efforts made by Galle to advise Respondent about these proceedings, indicating that "*we don't need to give an answer for that*".[74]   From this, Tribunal has no option but to understand that Galle has either not seen fit to advise Respondent (or his family members) of the existence of these proceedings and to take instructions from him (to the extent this is possible) in relation to the same, or that he has tried to contact Respondent (or his family) but that Respondent/his family has refused to engage with Galle on this, or that - despite his efforts - Galle has simply been unable to locate Respondent or any of his family members. All this gives rise to concerns on the Tribunal's part as to whether Galle is indeed an appropriate person to represent Respondent in this arbitration.

164.    Claimant has raised a number of other issues relating to Galle's suitability (or otherwise) to act as Respondent's representative in this arbitration, in particular, Claimant raises the issue of potential conflicts of interest, based on various matters, including but not limited to the fact that payments were made to Galle and his company, Brunelleschi, out of monies transferred by Claimant to Respondent pursuant to the Facility Agreement, and that Claimant apparently has claims against both Respondent and Galle under the Irrevocable Letter of Instruction and against Respondent under the Security Agreement involving the same facts as the claims made in this arbitration. Claimant also suggests that Galle's role in negotiating the settlement with AT&T for less than 90% of the expected value of Respondent's AVI and his subsequent refusal to pay Claimant raise "serious questions" about Galle's impartiality.

---

[73] Transcript, page 154, lines 4-9.

[74] Transcript, page 196, line 14 to page 198, line 13.

165. In relation to the payments to Brunelleschi, Galle claims that payments were made to defray out of pocket expenses but not for profit costs, and that "this has been made clear to Claimant on previous occasions"[75]. However, the documents produced by Claimant in Claimant's Response clearly showed that a sum of US$65,000 was paid to Brunelleschi in respect of fees. Galle has not seen fit to address this issue either at the Preliminary Issue Hearing, or in his written submissions filed prior to the Preliminary Issue Hearing. The Tribunal is troubled by this, and considers that it does raise further concerns as to Galle's suitability to act as Respondent's representative in this arbitration; ultimately the payment of fees may or may not be an issue, but the apparent inaccurate, and false, statements made to the Claimant and now to this Tribunal to the effect that no payments have been made to a company owned by Galle for profit costs, and the failure to explain why those statements were made when they have been demonstrated to be untrue (as is now accepted by Galle[76]) when the opportunity to do so has arisen, is concerning to this Tribunal.

166. For the record, the Tribunal does not (and does not need to) make a determination as to whether Galle is an appropriate person to represent Respondent, or of Galle's suitability to act as Respondent's representative, in this arbitration (assuming Respondent does indeed require such representation, due to his mental state) or of his ability to act impartially in the conduct of this arbitration on Respondent's behalf. However, the circumstances that have been raised by Claimant to call into question Galle's impartiality, and that have become apparent during the course of the Preliminary Issue Hearing do, in this Tribunal's view, give rise to concerns in this regard which, if this Tribunal were subsequently to be asked to consider this point at a date in the future, it would expect Galle (if he were to be put forward as Respondent's representative) to address. If called upon to do so, this Tribunal would also expect whoever is put forward as Respondent's representative to explain why they, the chosen representative, are the appropriate person to represent Respondent in this arbitration. The Tribunal notes that, per the Hong Kong Civil Procedure, any next friend / guardian *ad litem* needs to be "sufficiently impartial", and that it is desirable for such a person to be a relation, connection or friend of the party (which would suggest someone who is currently in contact with and able to communicate with Respondent), not a mere volunteer[77].

167. This deals with the second of the "other issues" identified above.

   E.   *Claimant's application for a freezing order*

168. The Tribunal now turns to consider the application Claimant makes for a freezing order. As noted above, in Claimant's Reply, Claimant seeks further relief in the form of an interim award freezing Respondent's assets up to the value of US$5,000,000, in the following terms: "*The Respondent, whether through his agent, servant or himself, be restrained from dealing with his assets up to the amount of US$5 million. Such award to cover all of the Respondent's assets wherever they are located, including the Settlement Sum described in the Notice of Arbitration, or any other assets controlled by [Galle] on behalf of the Respondent.*"

---

[75] Galle's Statement at paragraph 38.1.

[76] The Tribunal takes it that the fact that - despite these prior denials and misstatements - Galle's company Brunelleschi did indeed receive sums for profit costs and not just to defray expenses is no longer disputed and has been accepted by Galle given this fact appears on the Agreed Chronology. Claimant also addressed this during the Preliminary Issue Hearing (Transcript, page 15, line 21 to page 20, line 20). Galle did not respond to this, either at the Preliminary Issue Hearing, or otherwise.

[77] Hong Kong Civil Procedure, 2018, 80/3/8.

169.   At the Preliminary Issue Hearing, Galle's counsel took objection to Claimant's plea for injunctive relief on the basis that there had been no "actual application"[78] save by way of "side note" in Claimant's submissions, which is not the way an application "normally works". Usually, noted Galle, an application requires supporting evidence, perhaps by way of affirmation. Galle's counsel further submitted that Claimant only raised the application in the Reply which "in itself is already difficult" and that out of procedural fairness, at least, it ought to be a separate application "on its own"[79]. Upon pressing by the Tribunal on the question, Galle's counsel noted that the basic principles of injunctive relief had not been addressed, that the authorities in this regard were not before the Tribunal, and the question of the balance of convenience had not been addressed, all of which are procedural deficiencies[80]. Galle's counsel also indicated that Galle had not been given a proper opportunity to respond to the application, and that Claimant had failed to put forward any substantive evidence relating to the application - there is no evidence, says Galle, of the risk of dissipation[81].

170.   Claimant's counsel pointed out that this was not correct in that the Notice itself did seek an interim award preserving assets out of which a subsequent award may be satisfied (at paragraph 5.2 of the Notice)[82] and that (although not initially raised as a preliminary issue) Claimant did raise the prospect of an interim award freezing Respondent's assets in Claimant's Reply, explaining the reason for this was because the application arises out of the statements made in Galle's Statement to the effect that the only assets of which Galle is aware (and he has been dealing with Respondent for a number of years) are those administered under the auspices of the Denver Probate Court (added to the prior statements that money has been paid out of these assets)[83].

171.   In his oral submissions at the Preliminary Issue Hearing Claimant's counsel also noted that Galle had not addressed this point in writing or in his skeleton[84].

172.   Claimant's counsel further submitted that interim relief in the form of a freezing order was something Claimant considered necessary on the basis of the evidence, and that the Tribunal has the power to grant such relief under the HKIAC Rules[85] (although Claimant does not identify the relevant provision of the HKIAC Rules by which this Tribunal is empowered to grant such relief, the Tribunal agrees that it has the power to grant a freezing order in appropriate circumstances by virtue of Article 23 of the HKIAC Rules, set out above).

---

[78] Transcript, page 125, lines 3-11.

[79] Transcript, page 128, line 18 to page 129, line 3.

[80] Transcript, page 133, lines 10-17.

[81] Transcript, page 210, line 13 to page 211, line 2.

[82] Transcript, page 125, line 13 to page 126, line 5.

[83] Transcript, page 126, line 6 to page 127, line 4.

[84] Transcript, page 127, lines 12-13.

[85] Transcript, page 127, lines 14-18.

173.    The Tribunal understands and appreciates Claimant's concerns at the apparent dissipation of what appears to be the only known assets of Respondent and its frustration at Galle's refusal to tell Claimant how the sum of US$57.5 million received in August 2017 has been dealt with[86]. However, on balance, at this stage the Tribunal is not willing to grant Claimant the freezing order it seeks on the basis of the evidence and submissions before it at the Preliminary Issue Hearing.

174.    First, the Tribunal is concerned at its power (or otherwise) to freeze the assets of *a respondent* (as here) who is resident outside the jurisdiction (in Thailand), and, secondly, the Tribunal is concerned that *the assets* it is being asked to freeze are (i) located outside the jurisdiction and (ii) are being administered under the auspices of an overseas court.

175.    Further, as the Tribunal noted during the course of the Preliminary Issue Hearing[87], there is an issue as to whether there are in fact remaining assets in Denver that might be frozen and, if there are, then the extent of those assets. Claimant's counsel quite fairly conceded that Claimant was unaware the extent to which the assets in Denver had been diminished or even if they remain because, despite asking, there is no evidence as to what the assets are and where they are[88]. The Tribunal would want specific assets to be identified and to be sure of the existence of those assets before freezing the same (or to be satisfied by full submissions that it need not do so before issuing a freezing order).

176.    The Tribunal notes that, at the Preliminary Issue Hearing, Claimant's counsel quite fairly recognised that the application had not been made in the orthodox[89] manner (although Claimant's counsel maintained that notice of the application had been given, that Galle had had the opportunity to present a case in response, and that evidence was before the Tribunal as well as the relevant authorities[90]), that it might be premature (*"in terms of the request for the freezing order. I think I'm pretty sure where this might go"*[91]), and the procedures followed may not be appropriate or sufficient, and that the matter might need to be left until another day, ultimately conceding that *"I'll be led by the tribunal as to whether we should be dealing with this today"*[92] and that Claimant might "struggle" to say that Galle should not be afforded a "proper" (subsequently, upon the Tribunal's prompt, revised to "further") opportunity to put in submissions in respect of the application for a freezing order, should he wish to.[93]

177.    Finally, although Claimant's counsel indicated during the course of the Preliminary Issue Hearing that, to the extent the Tribunal requires an undertaking in damages, the Claimant was

---

[86] Claimant's Reply, paragraph 106. Transcript, page 137, line 21 to page 138, line 7.

[87] Transcript, page 133, lines 3-8.

[88] Transcript, page 251, lines 9-12.

[89] Transcript, page 246, lines 18-22.

[90] Transcript, page 245, line 14 to page 251, line 21.

[91] Transcript, page 245, lines 14-16.

[92] Transcript, page 127, lines 5-9 and 18-24 and again at page 135, lines 5-8.

[93] Transcript, page 249, lines 6-15.

willing to provide the same[94], as Galle's counsel noted, the Tribunal would also require evidence of the assets available to Claimant to back up the undertaking, or to fortify the same[95].

178.  To be clear, the Tribunal's determination of this issue against Claimant at this stage is no bar to Claimant raising the issue again for determination, on a properly grounded application where it provides affirmation evidence in support of its application and satisfies the Tribunal on the questions raised above (and any other questions that might arise), either at a preliminary stage of these proceedings, or as a part of the final relief sought. But at this stage, on the evidence before it as it stands, the Tribunal is unable to accept Claimant's request for further relief in the form of an interim award freezing Respondent's assets up to the value of US$5,000,000, and rejects this claim for relief.

## X.    TRIBUNAL'S JURISDICTION TO HEAR PRELIMINARY ISSUE

179.  Galle has submitted that if this Tribunal finds, as it has, that Galle and BCC are not properly authorised to act on behalf of Respondent in this arbitration, then this Tribunal as it currently stands would not have been validly constituted, and that this Tribunal should declare itself improperly constituted, leaving Claimant to restart the arbitral proceedings with a different arbitration tribunal[96].

180.  The Tribunal disagrees and finds that, pursuant to and in accordance with the Arbitration Ordinance[97], it has jurisdiction to hear and determine the Preliminary Issue. The Tribunal has heard full submissions from both Galle and BCC in relation to the Preliminary Issue and notes that Galle has himself accepted and submitted that this Tribunal was duly constituted in accordance with the HKIAC Rules, and has expressly referred to and relied upon Article 8 in this regard, exhibiting it to Galle's Statement[98]

## XI.   COSTS

181.  Following the submissions of the parties at the Preliminary Issue Hearing, the Tribunal directed that the matter of costs arising from the Preliminary Issue will be addressed subsequent to the rendering of an interim award on the Preliminary Issue.

182.  Provision is made in the operative section of this Interim Award, below, in relation to the manner in which this Tribunal will receive the submissions of Claimant and Galle in relation to costs.

## XII.  TRIBUNAL'S ORDERS

---

[94] Transcript, page 251, lines 16-21.

[95] Transcript, page 252, lines 1-16.

[96] Galle's Statement, paragraph 8.

[97] See Section 34 of the Arbitration Ordinance.

[98] Galle's Statement, paragraph 7.

183. In accordance with the reasons set-out above, the Tribunal hereby AWARDS, ORDERS AND DIRECTS THAT:

(A) on the basis of the evidence provided, Galle and BCC are currently not properly authorised to represent Respondent in this arbitration and are therefore prohibited (save as provided in (C) below, or pursuant to Articles 37 to 39 of the HKIAC Rules (or Section 69 of the Arbitration Ordinance), or as otherwise directed by this Tribunal) from taking any further steps in this arbitration, until such time as proper authority is obtained;

(B) Claimant's application for further relief in the form of an interim award freezing Respondent's assets up to the value of US$5,000,000 is rejected and dismissed;

(C) Claimant and Galle shall provide written submissions on the costs and expenses of this arbitration (including as to the entity or person who should bear the costs and expenses of the proceedings to date, and as to the quantum of those costs) within the next 28 days. Claimant and Galle shall provide responsive written submission on the costs and expenses of the other, limited to responding on matters raised in the first submission, within 14 days thereafter;

(D) the Tribunal rejects and dismisses all other claims put to it in relation to the Preliminary Issue.

184. The Tribunal notes that, in their respective requests for relief, both Parties asked that the Interim Award be included in the final award. Assuming that this arbitration proceeds before this Tribunal, as currently constituted, this Tribunal would be minded to accede to this request and include this Interim Award in the final award in due course. For now, the Tribunal simply notes this for the record so that, if the final award in this matter is ultimately issued by a differently constituted Tribunal, that tribunal might take the views of this Tribunal into account when considering the terms of the final award.

Seat of arbitration: Hong Kong
Date: 29 March 2019

Signed by Co-Arbitrator

**Mr Gavin Denton**

Signature

Signed by Co-Arbitrator

**Mr. Yuen Chuen Lee**

Signature

Signed by Presiding Arbitrator

**Mr. Simon Powell**

Signature



42

IN THE MATTER OF AN ARBITRATION

UNDER THE ARBITRATION ORDINANCE OF HONG KONG (CAP. 609)

UNDER THE HONG KONG INTERNATIONAL ARBITRATION CENTRE

ADMINISTERED ARBITRATION RULES

HKIAC CASE NO. HKIAC/A17251

BETWEEN

**NOBLE PRESTIGE LIMITED**

Claimant

**and**

**MR. PAUL HORN**

Respondent

---

**PARTIAL AWARD ON COSTS**

**RELATING TO THE INTERIM AWARD ON THE PRELIMINARY ISSUE**

---

**Gavin Denton**
**Yuen Chuen Lee**
**Simon Powell**
**-Presiding Arbitrator-**

**31 July 2019**

## I.    PROCEDURAL HISTORY

1.    On 29 March 2019, the Tribunal issued its Interim Award on the Preliminary Issue, which was notified to the Parties by email on 1 April 2019 ("**Interim Award**"). The procedural history and definitions contained in the Interim Award are hereby incorporated by reference into this Partial Award on Costs Relating to the Interim Award ("**Costs Award**").

2.    At the end of the hearing on the Preliminary Issue, having heard from the parties on the question, the Tribunal directed that the matter of costs arising from the Preliminary Issue would be addressed subsequent to the rendering of the Interim Award. On 2 April 2019, following the rendering of the Interim Award, the Tribunal issued directions for costs submissions relating to the Interim Award. On 30 April 2019, Claimant and Galle submitted their respective costs submissions ("**Claimant's Costs Submissions**" and "**Galle's Costs Submissions**", respectively).

3.    On 14 May 2019, Galle submitted his responsive submissions on costs ("**Galle's Responsive Submissions**"). On 15 May 2019 (at 1:46 a.m. Hong Kong time), Claimant submitted its responsive costs submissions ("**Claimant's Responsive Submissions**"). On even date, Galle objected to the submission of Claimant's Responsive Submissions on the basis that they were received after the deadline for submission as directed by the Tribunal ("**Galle's Objection**").

4.    On 16 May 2019, the Tribunal invited Claimant to provide comments on Galle's Objection before determining the admissibility of Claimant's Responsive Submissions.

5.    On 21 May 2019, Claimant provided its response to Galle's Objection ("**Claimant's Response to Objection**").

6.    On 22 May 2019, the Tribunal invited BCC to provide any comments it wished to make in respect of Claimant's Response to Objection. On 27 May 2019, BCC provided its reply to Claimant's Response to Objection ("**Galle's Reply to Response to Objection**").

## II.    THE PARTIES' REQUESTS FOR RELIEF

7.    Claimant seeks an interim award that:

(a)    Galle pay Claimant all of the fees and costs of dealing with this arbitration as against Galle and BCC as set out in Claimant's Statement of Costs, in an amount of HK$3,741,186.35;

(b)    Galle pay interest on the costs awarded at the judgment rate applicable in Hong Kong of 8.125%;

(c)    Galle pay such amounts forthwith in his personal capacity;

(d)    such award be enforceable immediately; and

(e)    such further or other relief as the Tribunal deems fit.

8.    In Galle's Costs Submissions, Galle requests that the Tribunal grant an order that:

(a)    It is premature at this stage of the proceedings to award costs and expenses; or

2

(b)    If costs and expenses are prematurely allowed that,

    (A) 50% of the costs and expenses (not attorney's fees) of this arbitration to date be to Claimant; and

    (B) 50% of the costs and expenses (not attorney's fees) of this arbitration to date be to Respondent; or

(c)    Include the above costs and expenses Order in its Final Award.

9.    In Galle's Responsive Submissions, Galle additionally requests that the Tribunal grant an order that:

(a)    Galle and BCC are not liable for Claimant's costs and expenses as they are not Respondents in this proceeding, nor parties to the Loan Agreement;

(b)    The Loan Agreement does (*sic*)[1] permit an award of attorney's fees; and

(c)    It is premature at this stage of the proceedings to award costs and expenses, thus the matter is deferred pending the final hearing.

## III.    APPLICABLE RULES

10.    Article 2.4 of the HKIAC Rules provides as follows:

*2.4    If the circumstances of the case so justify, HKIAC may amend the time limits provided for in these Rules, as well as any time limits that it has set. HKIAC shall not amend any time limits set by the arbitral tribunal unless it directs otherwise.*

11.    Article 13 of the HKIAC Rules provides, in relevant part, the following:

*13.1    Subject to these Rules, the arbitral tribunal shall adopt suitable procedures for the conduct of the arbitration in order to avoid unnecessary delay or expense, having regard to the complexity of the issues and the amount in dispute, and provided that such procedures ensure equal treatment of the parties and afford the parties a reasonable opportunity to present their case.*

*...*

*13.5    The arbitral tribunal and the parties shall do everything necessary to ensure the fair and efficient conduct of the arbitration.*

12.    Article 21 of the HKIAC Rules provides as follows:

---

[1] Based on the content of Galle's submissions, the Tribunal presumes that this request for relief should read: "*The Loan Agreement does not permit an award of attorney's fees*".

3

21      *The periods of time set by the arbitral tribunal for the communication of written statements (including the Statement of Claim and Statement of Defence) should not exceed 45 days. However, the arbitral tribunal may, even in circumstances where the relevant period has already expired, extend time limits if it concludes that an extension is justified.*

13.    Article 33 of the HKIAC Rules provides, in relevant part, the following:

*Article 33 – Costs of the Arbitration*

33.1    *The arbitral tribunal shall determine the costs of the arbitration in its award. The term "costs of the arbitration" includes only:*

(a)      *the fees of the arbitral tribunal, as determined in accordance with Article 10;*
(b)      *the reasonable travel and other expenses incurred by the arbitral tribunal;*
(c)      *the reasonable costs of expert advice and of other assistance required by the arbitral tribunal;*
(d)      *the reasonable travel and other expenses of witnesses and experts;*
(e)      *the reasonable costs for legal representation and assistance if such costs were claimed during the arbitration;*
(f)      *the Registration Fee and Administrative Fees payable to HKIAC in accordance with Schedule 1.*

33.2    *The arbitral tribunal may apportion all or part of the costs of the arbitration referred to in Article 33.1 between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.*

33.3    *With respect to the costs of legal representation and assistance referred to in Article 33.1(e), the arbitral tribunal, taking into account the circumstances of the case, may direct that the recoverable costs of the arbitration, or any part of the arbitration, shall be limited to a specified amount.*

14.    Article 34.1 of the HKIAC Rules provides further as follows:

34.1    *The arbitral tribunal may make a single award or separate awards regarding different issues at different times and in respect of all parties involved in the arbitration in the form of interim, interlocutory, partial or final awards. If appropriate, the arbitral tribunal may also issue interim awards on costs.*

## IV.    TRIBUNAL'S DECISIONS

15.    Before determining the question of the costs of the Interim Award, as a preliminary matter, this Tribunal must first consider the question of the admissibility of Claimant's Responsive Submissions. This Tribunal will proceed to do so, taking into account all the matters raised by Claimant and BCC on behalf of Galle in their respective submissions on this issue of 15, 21 and 27 May 2019. The Tribunal will then determine the question of the costs of the Interim Award addressed by the Parties in their respective Costs Submissions submitted on 30 April and 14 May 2019 and (to the extent that this Tribunal has determined them admissible) Claimant's Responsive Submissions submitted on 15 May 2019.

4

16.     References to the Parties' submissions in this Costs Award are merely intended as a summary of the Parties' positions and not intended as a comprehensive restatement of every argument or allegation made by the Parties. The Tribunal has considered all arguments and evidence that the Parties put forward in their respective Costs Submissions and Responsive Submissions, and addresses the contentions made by the Parties, and the evidence put to the Tribunal in support of those contentions, only to the extent relevant to its decisions. The Tribunal's decisions are based on the entire record in this matter, and the Tribunal has taken into account all statements, submissions, evidence and arguments made by the Parties in relation to costs.

### The Admissibility of Claimant's Responsive Submissions

17.     Galle's Objection is based on the fact that Claimant's Responsive Submissions were sent "in the early hours on 15 May 2019 (at around 1:45 am HK time) instead of 14 May 2019". For Galle, BCC categorized this as a "blatant violation" of this Tribunal's Interim Award and direction of 24 April 2019, because the submission had been filed out of time, *i.e.*, not before 23:59 (HK time) on 14 May 2019.

18.     BCC posited that the proper and prudent approach Claimant should have followed was to have made an application for a time extension, and implored the Tribunal to "act fairly and squarely" in the circumstances and to reject and ignore Claimant's Responsive Submissions because "time is always of the essence in the proceedings" and Claimant's Responsive Submissions were lodged out of time.

19.     In Claimant's Response to Objection, Claimant quite properly admitted and accepted that it had delayed in lodging Claimant's Responsive Submissions, and apologised. Notwithstanding this, however, Claimant submitted that the Tribunal should *not* disregard Claimant's Responsive Submissions, and, to the extent the Tribunal considers necessary, asked that the Tribunal exercise its discretion to allow the submissions and/or to extend the time for filing the Parties' Responsive Costs Submissions until the time that Claimant's Responsive Submissions were in fact filed.

20.     In support of its contentions, Claimant noted the Tribunal's discretion to conduct the arbitration in a manner it considers appropriate (referring to and relying upon Section 47(2) of the Arbitration Ordinance, implementing Article 19 of the UNCITRAL Model Law), and that the Tribunal is required to give the Parties "a reasonable opportunity to present their cases and to deal with the cases of their opponents" and to "use procedures that are appropriate to the particular case, avoiding unnecessary delay or expense, so as to provide a fair means for resolving the dispute to which the arbitral proceedings relate" (Section 46(3)(b) and (c)).

21.     The Tribunal notes that the Parties appear to agree that the admission (or otherwise) of Claimant's Responsive Submissions lies within the Tribunal's discretion, and that, in exercising its discretion, the Tribunal should consider what is fair in the circumstances of the case (subject to Claimant's submissions relating to peremptory orders, discussed below).

22.     In respect of the time for filing statements, Claimant also noted that, under the applicable HKIAC Rules (referring to and relying on Articles 2.4 and 21) the Tribunal has the discretion to amend/extend time limits, even where those time limits have expired. Claimant asked the Tribunal to extend the time for filing of Claimant's Responsive Submissions to the time those submissions were filed (to the extent the Tribunal considered it necessary to do so).

23.     With regard to the issue of fairness, Claimant submitted the following:

(a)     The extent of the delay in filing Claimant's Responsive Submissions was not long, the submission being filed just 1 hour and 45 minutes late, and at night, with both Galle and his lead lawyer actually receiving Claimant's Responsive Submissions on 14 May 2019 (in their respective time zones at the time of filing).

(b)     Galle and BCC have not identified any specific prejudice to either of them from the delay. Claimant suggests that any such prejudice would have been minimal and would not justify the prejudice to Claimant from disallowing Claimant's Responsive Submissions.

24.     By contrast, Claimant suggests that the prejudice to Claimant from disregarding Claimant's Responsive Submissions, might be serious. Claimant notes that Galle's Costs Submissions raised important legal issues, in particular in relation to the ability of the Tribunal to award costs against a non-party. Specifically, Galle asserted that he cannot be held liable for costs because he is not a signatory to the Facility Agreement, nor a party to the arbitration generally, which, says Claimant, is an important legal issue addressed in Claimant's Responsive Submissions in which Claimant sought to assist the Tribunal by identifying a number of relevant legal authorities.

25.     Accordingly, Claimant submits that the balance of prejudice weighs in favour of admitting Claimant's Responsive Submissions into evidence.

26.     Finally, Claimant submits that the Tribunal should allow Claimant's Responsive Submissions to ensure due process and the enforceability of the costs award. Claimant notes that the Tribunal is under an obligation to "make every reasonable effort to ensure that an award is valid" (<u>Article 13.8</u>).

27.     In Galle's Reply to Response to Objection, Galle reiterated the points made in Galle's Objection, suggesting that the points raised by Claimant are irrelevant and/or have no bearing on the fact that Claimant's Responsive Submissions were filed out of time, that the matters raised by Claimant are mere excuses to "cover up" its late filing of Claimant's Responsive Submissions, and Claimant has provided no justifiable reason for so doing. Galle asks the Tribunal to "act fairly" and invited it to proceed to reject Claimant's Responsive Submission as late.

28.     The Tribunal, having considered all the above matters, has determined to allow Claimant's Responsive Submissions into evidence pursuant to the Tribunal's discretion and obligations under Articles 13.1, 13.5 and 21 of the HKIAC Rules.

29.     The Tribunal does not consider it proportionate or fair for Claimant's Responsive Submissions to be excluded from evidence when they were filed less than 2 hours after the expiry of the time for filing, especially given the fact that Galle has not identified any actual prejudice which he has suffered or might suffer as a consequence. The Tribunal notes that Galle had ample opportunity to respond to this point in Galle's Reply to Response to Objection, but did not do so. Importantly, Galle accepts that the matter lies in the discretion of the Tribunal and has himself submitted that, in exercising that discretion, the Tribunal must look at fairness to both Parties.

30.     The Tribunal considers that the matters raised by Claimant and, in particular, the extent of the default (less than 2 hours being relatively *de minimis*), and the prejudice that would (or might) be suffered by Claimant if Claimant's Responsive Submissions are excluded, by contrast to the lack of any prejudice to Galle if the submission is admitted (or at least no prejudice that Galle has identified), are compelling, and drive the Tribunal to the conclusion that a proper,

proportionate and fair exercise of its discretion is to admit Claimant's Responsive Submission into evidence.

***Costs of the Interim Award***

31. Having dealt with the issue of the admissibility of Claimant's Responsive Submissions, the Tribunal now turns to consider the issues relating to the costs of the Interim Award.

*Parties' Respective Reservations of Rights*

32. Claimant's Costs Submissions were filed without prejudice to Claimant's position in respect of the procedural and substantive issues in these ongoing arbitration proceedings; and Claimant's right to make further submissions at a later date on any costs not claimed in these submissions as between Claimant and Galle/BCC. Claimant reserved all of its rights in respect of such issues.

33. Galle's Costs Submissions were filed without prejudice to Galle's (and BCC's) *locus standi* and their right to challenge the jurisdiction of the Tribunal and the Interim Award. Galle and BCC state that they make their submissions in respect of the costs and expenses of the present proceedings as the Court appointed Special Conservator and legal counsel for Respondent, and not individually.

*Preliminary Matters*

34. In the Interim Award the Tribunal found in favour of Claimant with respect to the Preliminary Issue, *i.e.*, it found that Galle and BCC had not successfully demonstrated to the satisfaction of this Tribunal that they were properly authorised to represent Respondent in this arbitration. The only outstanding issue in relation to the Preliminary Issue relates to costs.

35. Following the hearing of the Preliminary Issue the Tribunal ordered and directed Claimant and Galle (as the parties to the Preliminary Issue) to provide written submissions on the costs and expenses of this arbitration, including as to the entity or person who should bear the costs and expenses of the proceedings to date, and as to the quantum of those costs. This is accepted by Galle, as is clear from paragraph 9 of Galle's Costs Submissions and paragraph 10 of Galle's Responsive Submissions.

36. Notwithstanding this, as Claimant notes, in his submissions filed in relation to the costs issues to be determined by this Tribunal Galle oftentimes strays beyond these matters and seeks to reopen and/or reargue the matters which the Tribunal has already determined finally and conclusively in the Interim Award.

37. To the extent that the submissions of either Claimant or Galle stray beyond the issues of costs on which the Tribunal has asked for written submissions, they are both immaterial and impermissible, and the Tribunal has given no regard to such matters in this Costs Award. As such, the Tribunal does not propose to address the arguments and counter-arguments put forward by the Parties in their submissions in relation to the substance of the underlying dispute. These matters will be addressed in due course in the ongoing substantive arbitration, when the relevant parties have had the opportunity to present their evidence on these issues and address the Tribunal fully in submissions, both written and oral.

38. In Galle's Responsive Statement, Galle queries how the Tribunal can have jurisdiction over Galle and BCC to enter any award against them personally for costs and expenses when they are not individual parties nor respondents to this arbitration, nor parties to the arbitration

agreement, and when the Tribunal has determined that Galle and BCC have no right, authority or jurisdiction to represent or act for Respondent in defending this arbitration. Galle accuses Claimant of adopting contradictory positions and of it wanting to have it "both ways" in arguing that Galle and BCC have no right to participate in this arbitration but that they are subject to a costs award against them personally.

39. The Tribunal considers that this misunderstands the position. As noted in the Interim Award, the Tribunal has proceeded on the basis that it is accepted that Galle is respondent *to the Preliminary Issue, i.e.,* the determination of whether Galle has authority to represent Respondent in this arbitration. Galle's counsel accepted this at the substantive hearing, and indeed Galle has voluntarily and fully participated in the arbitration in relation to the determination of the Preliminary Issue. Further, on behalf of Respondent, Galle now seeks to make a claim for costs against Claimant in the latest set of submissions lodged.

40. The Tribunal considers therefore that it is Galle, not Claimant, whose position is inconsistent and who seeks to have it "both ways" - for example, on behalf of Respondent, Galle is at the same time seeking an award for costs against Claimant and *in favour of* Respondent, whilst also submitting that the Tribunal has no jurisdiction to make an award for costs *against* him. The Tribunal notes that any award made against Galle in respect of costs will be and only be for the costs incurred in relation to the Preliminary Issue (in respect of which Galle has accepted he is the respondent), and not in relation to the substance of the arbitration: in respect of this issue, as noted above, the Tribunal has found (on the evidence presented to it) that Galle was not authorised to represent Respondent; in so doing it is Galle himself, not Respondent - who did not cloak Galle with authority to represent him - that has put Claimant to expense. In those circumstances, it would not appear appropriate to visit costs on Respondent. The question remains (to the extent this Tribunal finds Claimant should recover costs) can - and, if so, should - Galle be required to bear those costs.

41. There are a number of inaccurate and misleading comments in Galle's submissions on costs as to the findings of the Tribunal in the Interim Award. Not all of these are addressed in this award, as it is not necessary for the Tribunal to correct these matters for the purposes of the decisions to be made by this Tribunal in this award; however, for the record it should be noted that the Tribunal's silence on any such matters should not be understood as its acceptance of the accuracy of the characterisations put on its findings by Galle.

*Relevant Legal Principles*

*(i) Discretion to Award Costs*

42. Claimant submits that the Tribunal has discretion in respect of awarding costs in this arbitration, including as to the fees of legal representatives, the fees of the arbitral tribunal, and the HKIAC Registration Fee and Administrative Expenses, subject to a requirement of reasonableness for legal fees and certain other costs and expenses (citing the HKIAC Rules, Article 33.1). Indeed, the HKIAC Rules confer both power and a duty on the Tribunal to determine the costs of the arbitration. As Claimant notes, the Tribunal also has a broad discretion to award costs at any stage of the arbitral proceedings under the Arbitration Ordinance (Sections 70-72 and 74), and pursuant to general legal principles relating to costs.

43. Galle too refers to and relies on Article 33.1 of the HKIAC Rules (see paragraph 29 of Galle's Responsive Statement). Galle accepts that this Article enables the Tribunal to award costs of the arbitration. However, whilst Galle claims to set out the definition of the "costs of the arbitration" per Article 33.1 of the HKIAC Rules, inexplicably, he entirely omits to refer to

one key item from the Article, being the "reasonable costs for legal representation and assistance if such costs were claimed during the arbitration" (per Rule 33.1(e)).

44.     Galle also refers to the provisions of the Loan Agreement relating to awards of "costs and expenses" in any arbitration, noting that it does not specifically provide for an award of attorney's fees. Galle suggests that attorney's fees do not fall within the rubric of "costs and expenses". The Tribunal disagrees -- attorney's fees quite clearly fall within the ambit of a "cost" or "expense"; it is quite possible for "attorney's fees" to be both "attorney's fees" as well as to fall within the clearly far broader definition of "costs and expenses". There is no need to "rewrite" or add language to the Loan Agreement for this purpose. In any event, so far as the Tribunal understands it, Claimant does not rely on the provisions of the Loan Agreement as the basis for its claim for costs (which is unsurprising perhaps given that - as Galle submits - Galle is not a party to the Loan Agreement), but rather on the relevant HKIAC Rules and the Arbitration Ordinance, and so this issue is moot in any event.

45.     The Tribunal determines that, to the extent they are reasonable, the costs for legal representation and assistance fall within the definition of the "costs of the arbitration" under HKIAC Rule 33.1(e), and can properly be included in the quantum of the claim for costs.

46.     The Tribunal further determines that it is empowered to award costs in this arbitration, including as to the fees of legal representatives (to the extent they are reasonable) by virtue of the applicable HKIAC Rules and the Arbitration Ordinance. Galle's submissions in relation to the Loan Agreement in this regard are not accepted, and are in any event immaterial.

*(ii) Galle as a Party to the Arbitration in Relation to the Determination of the Preliminary Issue*

47.     Claimant submits that Galle personally (*i.e.,* in his personal capacity, not as Special Conservator for Respondent's assets) should bear Claimant's costs. Claimant submits that Galle can be so liable in two ways: first, because he subjected himself to the jurisdiction of this Tribunal by volunteering himself into this arbitration; and, further or alternatively, because the circumstances are such that he can be made so liable as a non-party.

48.     Galle submits that neither he nor BCC can be held personally liable for costs and expenses incurred by Claimant in this arbitration because they are:

        (a)     not signatories to the Loan Agreement containing the agreement to arbitrate before this Tribunal;

        (b)     not signatories to the Loan Agreement containing the agreement to pay costs and expenses;

        (c)     not named-respondents in this arbitration;

        (d)     not subject to the jurisdiction of this Tribunal; and

        (e)     were appointed to defend Respondent by a United States Court (but, according to Galle, were then "prohibited" by this Tribunal in the Interim Award from doing so).

49.     Galle also claims that he was never served with the arbitration proceedings in his individual capacity because he was merely discharging his duties in the capacity of a Special Conservator appointed by a United States Court to defend Respondent. Claimant suggests in Claimant's Responsive Submissions that this is incorrect, submitting that Claimant personally served Galle with all the relevant documents for these proceedings on 21 December 2017 by

email from Mr. Jason Carmichael of RPC to Galle dated 21 December 2017 attaching the Notice of Arbitration and the covering letters to Chris Lambert and RobSec Limited dated 19 December 2017 (see exhibit C2/14 to Claimant's Responsive Submissions) and it was on the basis of those documents that Galle took steps in this arbitration purportedly on behalf of Respondent.

50.    Galle further notes that he is not a party to these arbitration proceedings. The same, says Galle, holds true for BCC.

51.    Galle contends that for the reasons set out above, neither he nor BCC can be personally liable for any costs or expenses under an arbitration agreement to which they are not parties.

52.    In this regard, as Claimant points out, although Claimant has always maintained that it is inappropriate to refer to Galle as Respondent, the Preliminary Issue was determined as between Claimant and Galle in his personal capacity, and it is accepted that Galle was a party to the Preliminary Issue.

53.    Further, after being provided with a copy of the Notice, Galle effectively agreed to the terms of this arbitration, and has taken steps as a party to it.

54.    In this regard, Galle has held himself out as having authority to appear in this arbitration as a representative of Respondent. The Tribunal's finding that Galle (and BCC) have not shown that they have proper authority to represent Respondent in this arbitration does not alter the fact that Galle (through BCC) has volunteered himself into these proceedings and has fully participated in them (and continues to do so).

55.    As Claimant notes, in so doing Galle (and BCC as his legal representatives) knew (and expressly confirmed) the applicable Rules, designated an arbitrator purportedly on behalf of Respondent, and confirmed the appointment of the Tribunal Secretary. Claimant submits that Galle (and BCC) therefore agreed to be bound by the rules of this arbitration. Galle maintained throughout that he has standing to appear on behalf of Respondent, and chose to defend the Preliminary Issue of his authority. When Claimant challenged Galle's and BCC's standing, Galle (and BCC) initially demanded that the matter be resolved immediately and without delay.

56.    In light of this, the Tribunal finds that Galle agreed to be subject to the Tribunal's jurisdiction for the purposes of resolving the issue of whether he (and BCC) had authority to represent Respondent in these proceedings. As such, the Tribunal finds that Galle accepted the jurisdiction of the Tribunal at least to this extent. The Tribunal will consider the consequences of this in the section below. However, for the purposes of determining whether Galle can be liable to bear Claimant's costs, the Tribunal is not convinced that this suffices such as to make Galle a "party" to the arbitration proceedings such that this Tribunal is entitled to grant costs orders against Galle in relation to the determination of the Preliminary Issue *as a party* to the arbitration proceedings.

*(iii) Galle's Liability for Costs as a Non-Party*

57.    This, however, is not the end of the matter. Claimant submits, further, or in the alternative (and without prejudice to its contentions that Galle is liable for costs as a party to the arbitration for the purposes of determining the Preliminary Issue), that the circumstances permit this Tribunal to grant an award of costs against Galle (and BCC) as non-parties, and urges the Tribunal to do so as against Galle.

58.     Claimant notes that whilst the general rule is that, as a private proceeding, an arbitration cannot affect the rights of third parties, there are exceptions to this general rule. Claimant suggests that two such exceptions apply in this case. First, Galle purported to act as Respondent's agent by virtue of his role as Special Conservator of certain of Respondent's assets; and secondly Galle acquiesced in the award by attending the proceedings (through his counsel). An agent's liability for costs arises from the implied undertaking or promise made by the agent that the authority which he professes to have does in point of fact exist (*Yonge v Toynbee* [1909] 1 K.B. 215 (EWCA), followed in Hong Kong in *Chan Ka Yi v DBC Bank (HK) Ltd* [2010] 2 HKLRD 528 per Lok J). In this case, the Tribunal has found (in the Interim Award) that Galle and BCC failed to show that they had the authority they professed to have to represent Respondent in this arbitration. Accordingly, pursuant to the principles espoused in the authorities cited by Claimant in Claimant's Costs Submissions, both Galle and BCC can be held personally liable for costs.

59.     Claimant cites a number of legal authorities setting out the principles on which non-party costs orders may be granted, including *Symphony Group PLC v Hodgson, Dymocks Franchise Systems (NSW) Pty Ltd v Todd*, and *Systemcare (UK) Ltd v Services Design Technology Ltd*. Suffice to say, on the basis of these authorities, the Tribunal accepts and determines that, in an appropriate case, it is empowered to make a costs order against a non-party.

60.     Further, Claimant submits that the Hong Kong legal authorities relating to costs of challenges to authority are clear - a person who has appeared in proceedings without proper authority is liable to pay the costs of a party that challenges such authority. In particular, Claimant relies on the Hong Kong authority of *Chan Ka Yi v DBC Bank (HK) Ltd* [2010] 2 HKLRD 528, as well as various UK authorities which, whilst accepting that these UK authorities do not bind this Tribunal, Claimant submits are of persuasive effect, including:

   (a)   *Symphony Group PLC v Hodgson* [1994] 1 QB 179 (cited in a number of Hong Kong cases, including To Pui Kui v Ng Oi Che [2015], HKEC 337; Ng Yuk Pui Kelly v Dung Wai Man [2019] HKEC 1369; Big Island Construction (HK) Ltd v Wu Yi Development Co Ltd [2018] HKEC 1020; and Hong Kong Civil Procedure 2019 at 62/6A/6D);

   (b)   *Dymocks Franchise Systems (NSW) Pty Ltd v Todd* [2004] UKPC 39; [2004] 1 WLR 2807 (also cited in a number of Hong Kong cases including To Pui Kui v Ng Oi Che [2015] HKEC 337; Ng Yuk Pui Kelly v Dung Wai Man [2019] HKEC 1369; and Hong Kong Civil Procedure 2019 at 62/6A/6);

   (c)   *Metalloy Supplies Ltd (In Liquidation) v MA (UK) Ltd* [1997] 1 W.L.R. 1613;

   (d)   *Systemcare (UK) Ltd v Services Design Technology Ltd* [2011] EWCA Civ 546 (cited in the Hong Kong cases of Ng Yuk Pui Kelly v Dung Wai Man [2019] HKEC 1369 and Big Island Construction (HK) Ltd v Wu Yi Development Co Ltd [2018] HKEC 1020);

   (e)   *Didisheim v London and Westminster Bank* [1900] 2 Ch. 47;

   (f)   *Yonge v Toynbee* [1909] 1 K.B. 215 (EWCA);

   (g)   *Adams v Ford* [2012] EWCA Civ 544;

(h) *Richmond v Branson & Son* [1914] 1 Ch. 968 (EWHC);

(i) *Masterman-Lister v Burton (Nos. 1 and 2)* [2002] EWCA Civ 1889; and

(j) *Zoya Ltd v Sheikh Nasir Ahmed (trading as Property Mart) (No 2)* [2016] 4 WLR 174 (Ch D)).

61.   Claimant notes that these authorities support the proposition that a person who has appeared in proceedings without proper authority can be liable to pay the costs of a party that challenges such authority even where the challenge is unsuccessful, if the challenge was justified. Of course, here, the challenge has been successful (hence, the challenge was clearly justified).

62.   Where (as here) the challenge has been successful, Hong Kong authorities allow costs to be ordered not just against a person appearing in the proceedings (in this case, Galle) but also against a solicitor that acted without proper authority (in this case, BCC), although the Tribunal notes that Claimant makes no claim for relief that BCC should bear Claimant's costs of these proceedings.

63.   As Claimant notes, in this case the Tribunal has found in favour of Claimant on the issue of Galle's and BCC's authority to represent Respondent in this arbitration (see paragraph 183 of the Interim Award). Claimant has been dealing in this arbitration with a person (Galle) and with legal representatives (BCC) appointed by such person, who - on the evidence placed before the Tribunal - lack proper authority to appear on behalf of Respondent.

64.   On Claimant's submission, Galle and BCC relied on the purported authority of the Denver Probate Orders as the basis on which to represent Respondent in this arbitration. They did so knowing (or they ought to have known) the Hong Kong law applicable to representatives claiming authority on the grounds of mental incapacity, in particular that the test for mental incapacity is issue specific, that any evidence filed in respect of their authority must relate to the specific issues in this arbitration, and that medical evidence of incapacity is generally required.

65.   Notwithstanding this knowledge,  Galle and BCC persisted in their claims to be duly authorised on behalf of Respondent in these proceedings on the basis of medical evidence obtained years prior to the current dispute arising, which was obtained for purposes other than these proceedings and in respect of other proceedings between Respondent and another person. The Tribunal noted in the Interim Award (at paragraph 147) that there is no evidence specifically addressing the current capability of Respondent to handle his affairs nor a medical report which addresses the question of Respondent's ability to address the issues arising in relation to the arbitration between Claimant and Respondent.

66.   As Claimant further notes, Galle and BCC were provided with ample opportunity to withdraw from this arbitration or to provide further, proper evidence of their authority to represent Respondent. But they chose not to, rather persisting for more than one year with the argument that they had sufficient authority to represent Respondent in this arbitration without taking further steps before the Hong Kong Courts, the HKIAC or the Tribunal to obtain proper authority (see paragraph 111 of the Interim Award).

67.   As a result, submits Claimant, all steps taken by Claimant in this arbitration as against Galle and BCC have been taken as against persons with no proper authority to take any steps in this

arbitration, save for steps required in any event, such as preparing, filing and serving the Notice.

68.  Claimant therefore submits that, in light of the Tribunal's findings in the Interim Award, it should receive forthwith all of its costs of and related to these arbitration proceedings, and of any related costs of dealing with or taking steps as against Galle or BCC, from the day after Claimant filed the Notice (*i.e.*, from 20 December 2017).

69.  Galle submits that the law does not support, nor permit, the entry of an award for costs and expenses on an interim basis before a final hearing against a non-party Court appointed Special Conservator, nor a law firm. Galle submits that the law cited by Claimant in support of its position that costs and expenses may be awarded against non-parties, pre-final hearing are 'inapposite'. Galle seeks to distinguish *Chan Ka Yi v DBS Bank (Hong Kong) Ltd* on the basis that it is an interlocutory decision dealt with in a summary way, that should not be regarded as a final decision. Further, Galle suggests that to give "maximum flexibility" to the final award to deal with the issue of costs, the costs of the arbitration, including the preliminary issues, should be reserved until the final award (citing *Chan Ka Yi v DBS Bank (Hong Kong) Ltd* in support of this proposition). Galle suggests that the reason for this is because mental illness can be a fluctuating condition, and Respondent's mental health condition may change at the main trial, noting that the Tribunal has made no determination as to the mental capacity of Respondent in the Interim Award.

70.  Galle further seeks to distinguish the present case from the principles set out in the authorities cited by Claimant in support of its submission that costs ought to be borne by Galle, a non-party, on the basis that - in the present case - Galle was acting on the "instructions" of a US Court as Special Conservator and was "ordered" specifically to defend this arbitration by the Second and Third Probate Orders. This Tribunal doubts this representation of the underlying facts, and, in particular, does not consider that it is accurate to state that Galle was acting under the instructions of the US Court nor that the US Court ordered him to defend this arbitration. Rather, Galle applied to the US Court for the Second and Third Probate Orders (but, this Tribunal notes, refused to provide the Tribunal with the papers in respect of those applications, when requested, and did not provide any proper explanation as to why the papers were not to be provided to this Tribunal) and then sought to rely on the orders resulting from those applications as the basis for his authority to represent Respondent in this arbitration. The Tribunal has already made its determination that Galle failed to show he was duly authorised to represent Respondent in the present arbitration. Galle's submissions continue to ignore the issue specific nature of the question of mental capacity, notwithstanding that at the substantive hearing Galle's representatives accepted that this question is issue specific. The Tribunal does not consider that this submission assists Galle's case.

71.  Galle also seeks to distinguish the authorities relied upon by Claimant on the basis that Galle and BCC did not adduce "positive evidence" in respect of Respondent's mental capacity, merely seeking to rely on the Orders of the US Court "that already decided the issue of [Respondent's] lack of mental capacity based upon expert evidence presented there". Galle seeks to distance himself (and BCC) from the fact that, before this Tribunal, he purported to be authorised to act in behalf of Respondent, suggesting that Galle "merely acted on the Order of the Denver Probate Court to defend the present proceedings". Throughout these proceedings Galle (and BCC) have steadfastly maintained that they are properly authorised to represent Respondent in these proceedings, and relied on the Denver Probate Orders for that authority; there was never any suggestion (until now) that they were under some sort of Court

ordered imperative to appear in the present arbitration as Respondent's representatives, and the Tribunal does not consider this to be correct representation of the facts.

72. Again, therefore, the Tribunal does not consider this assists Galle's case, the purported distinguishing features being immaterial. The key point which Claimant's authorities show is that costs can be visited on a non-party where that party purports to represent a party to proceedings, but is not duly authorised to do so. In accordance with the Tribunal's determinations in the Interim Award, the Tribunal does not consider, on the evidence placed before it, that Galle nor BCC were so authorised to represent Respondent in this arbitration.

73. Accordingly, under Hong Kong law (the applicable law in this case) the Tribunal determines that it is empowered to award costs against Galle (and/or BCC) as non-parties, if, in its discretion, the Tribunal considers the circumstances are such that it is appropriate for it to do so.

*(iv) Timing of Award of Costs*

74. The HKIAC Rules provide for the Tribunal's power to grant an award of costs at any stage in respect of different aspects of an arbitration (Article 34.1). Claimant requests that the Tribunal grant its award in respect of the costs of the proceedings to date as a final partial (or interim) award, as the Tribunal's award on this matter will resolve the issue of the costs of and relating to this arbitration up to this stage (and as between Claimant and Galle) finally.

75. In this regard, Galle suggests that the issue of who is entitled to recover costs and expenses should be decided at the end of the proceeding, when a decision is made on the merits of the dispute. Galle notes that the only issues the Tribunal has decided are whether Galle and BCC may defend this arbitration proceeding on Respondent's behalf and whether Respondent's assets in the United States may be frozen. No decision has been made on the merits of the case. Galle suggests that it is only when various substantive issues arising in the arbitration have been determined, and after the Tribunal has decided whether it has jurisdiction to proceed, that the Tribunal might decide who is the prevailing party "arguably entitled to recover its costs and expenses".

76. Galle suggests therefore that it would be premature to render any decisions awarding costs and expenses at this stage. Galle further contends that Section 7.2 of the Loan Agreement "requires" that a ruling be made on the merits and whether there was a default before there can be any award for costs and expenses. Claimant objects to this interpretation of Section 7.2 of the Loan Agreement, and the Tribunal agrees with Claimant's interpretation that on a proper reading of the relevant provision there is no such stipulation in Section 7.2 of the Loan Agreement, which requires a full determination of the rights and obligations between Claimant and Respondent before costs are awarded.

77. By contrast, Claimant submits that Galle should pay the costs of this arbitration to date forthwith. In short, Claimant justifies its submission on three bases - first, Claimant questioned Galle's and BCC's authority to represent Respondent at an early stage, shortly after the Answer was filed on 24 January 2018; secondly, the Tribunal has agreed with Claimant on most (although not all) of the arguments between the parties concerning the Preliminary Issue; and, thirdly, the Tribunal found fault with Galle's conduct.

78. Claimant also submits that the substantive issues to be determined in this continuing arbitration are different from the issues determined in this arbitration to date. The substantive proceedings will determine issues as between Claimant and Respondent, such as the liability of Respondent to pay Claimant under the Facility Agreement. Those issues do not involve

Galle (save perhaps as a witness), now that he has been found not to have proper authority to represent Respondent in this arbitration. As noted above, the Tribunal's award on this matter will resolve the issue of the costs of and relating to this arbitration up to this stage (and as between Claimant and Galle) finally.

79.     The Tribunal finds Claimant's argument compelling. As Claimant points out, the Interim Award is an interim and not a final award. This is properly so because the Interim Award does not resolve all of the issues in the arbitration as between Claimant and Respondent. The Tribunal has, however, resolved finally the issue of whether Galle and BCC have authority to represent Respondent based on the current factual position. The current issue of costs will not be affected by any future steps taken in this arbitration, either by Galle (or BCC on his behalf) or by Respondent. This remains the case even if Galle or BCC were to provide evidence of proper authority in the future. As noted by Claimant, an arbitral tribunal's right to make an interim (or partial) award "is a default power, which exists unless it is removed from the arbitrators by written agreement of the parties". Further, the HKIAC Rules expressly provide for the power to grant interim (or partial) awards. Further, again as Claimant notes, "if the tribunal believes that it is appropriate to issue an award on costs as part of an interim award during the course of the proceedings, then such an award would be enforceable and may not be rescinded by the tribunal".

80.     The Tribunal considers that Claimant should not be required to wait until the end of the substantive proceedings to recover its costs against Galle relating to the determination of the Preliminary Issue, as between Claimant and Galle. This Tribunal is persuaded, and is minded to follow the general approach suggested, by the Court in the English authority of *Greencore UK) Holdings Plc v Elementis Plc* (referred to by Claimant) that, when preliminary issues have been ordered and fought out, the successful party should have its costs and should be entitled to have those costs assessed. As the Court stated in *Greencore* this makes commercial sense and, if there is to be an adjustment in the future because the other side wins the trial eventually, that can be accommodated.

81.     Accordingly, the Tribunal considers that it is right and proper that it issue a costs award now and does so in the form of a partial award.

*(v) Costs Award and Quantum*

82.     Galle submits that, if the Tribunal is minded to make an award in respect of costs and expenses at this stage of the proceedings, then the apportionment of costs and expenses should be 50/50 because, although Claimant was successful in relation to its claim that Galle and BCC are not properly authorised to represent Respondent in this arbitral proceeding, the Tribunal rejected Claimant's request to freeze Respondent's assets located in the United States. Accordingly, Galle submits, as Claimant prevailed on one issue and Galle prevailed on the second issue, either each party should be liable for 50% of the costs and expenses, or neither party should be liable for costs and expenses.

83.     The Tribunal notes that, in making this submission, Galle essentially accepts the general principle under Hong Kong law (the law governing this arbitration) that the losing party pays the costs of the successful party. This is, in the Tribunal's determination, the starting point for the consideration of how costs should be allocated.

84.     In this regard, the Tribunal does not accept Galle's proposed 50/50 split; the time spent dealing with the matter on which Claimant was unsuccessful (the freezing order) was *de minimis* by comparison to the time spent on the matter on which Claimant was successful (the

question of Galle/BCC's authority). The Tribunal notes, for example, that no formal application was made, and no evidence filed in relation to the freezing order. Nevertheless, the Tribunal does, however, take the fact that Claimant made an application for a freezing order and that application was unsuccessful into account in assessing the quantum of any costs allowable to Claimant.

85.   In exercising its discretion on costs, the Tribunal bears in mind the following matters which Claimant has indicated an arbitral tribunal should generally consider before issuing an award on costs:

(a)   whether there are any relevant agreements between the parties concerning costs, in which case, the Tribunal will likely have to give effect to the agreement;

(b)   whether there has been a written offer of settlement;

(c)   whether to apply the rules governing the award of costs applicable to civil proceedings before the court. If so, the Tribunal should consider whether there are any special circumstances justifying departure from the normal rule that costs should follow the event;

(d)   whether the tribunal had reserved any issues of cost in the arbitration or otherwise issued any interlocutory order as to costs which should be dealt with before the issuance of the final award; and

(e)   whether the tribunal had directed that recoverable costs of proceedings should be limited to a specified amount

86.   Applying these principles to the present case, Claimant submits that:

(a)   there are no relevant agreements concerning costs as between Galle and Claimant to which the Tribunal must give effect;

(b)   there have been discussions between Claimant and BCC (on behalf of Galle) on a without prejudice save as to costs basis in which Claimant has made offers to settle the dispute;

(c)   there are no special circumstances in this case that would justify departing from the normal rule that costs should follow the event;

(d)   the Tribunal has not reserved any issues of costs to be dealt with at a later stage. Claimant submits that it is entirely appropriate that the costs of and related to the arbitration to date (in relation to which Galle and BCC have purported to have authority) should be dealt with separately from any of the substantive matters in this arbitration and should be awarded now; and

(e)   the Tribunal has not directed that recoverable costs of these proceedings be limited to a specified amount.

87.   In addition, Claimant relies on the following as justification that it should receive all of its costs of and related to this arbitration as against Galle and BCC (to be paid forthwith):

(a)   Claimant questioned Galle's and BCC's authority to represent Respondent at an early stage, shortly after the Answer was filed on 24 January 2018;

(b)    the Tribunal has agreed with Claimant on most (although not all) of the arguments between the Parties concerning the Preliminary Issue; and

(c)    the Tribunal has found fault with Galle's conduct.

88.    The Tribunal has taken these matters into account, as well as all other matters advanced by the Parties, in exercising its discretion on costs.

89.    In this regard, the Tribunal considers that - subject to the outstanding issue of quantum, addressed below - as a matter of principle, as the party prevailing on the Preliminary Issue, Claimant is entitled to an award of costs in its favour and that Galle should be personally liable for those costs, and it so finds.

90.    The question that then remains relates to quantum. In this regard, on quantum, Claimant indicates that its costs from 20 December 2017 to 30 April 2019 (i.e., the date of Claimant's Costs Submissions) amount to HK$3,741,186.35, as particularised in Claimant's Statement of Costs appended to Claimant's Costs Submissions.

91.    Claimant claims for costs in this amount as costs that have, in effect, (on Claimant's case) been wasted as a result of Galle and BCC appearing in this arbitration without proper authority, in dealing with their attempts to prove that they did have such authority, and in dealing with "unnecessary" arguments regarding other matters.

92.    Claimant also claims interest at the Hong Kong judgment rate of (currently) 8.125% p.a. on all costs awarded, from the date of the costs award until the date of payment. In this regard, Claimant cites Section 80 of the Arbitration Ordinance in support of its claim for interest.

93.    Galle submits that the costs and expenses incurred by Claimant are "manifestly excessive, unreasonable and unnecessary". However, as Claimant notes, at least some of these costs were caused by the conduct of BCC, representing Galle, in the arbitration. The Tribunal also notes that the hourly rates charged by Claimant's legal team are not unreasonable when viewed against the hourly rates generally allowable on taxation for party and party taxations in civil proceedings and that the number of fee earners involved in the case are relatively limited (comprising two partners, one assistant, two trainees and a legal executive). Further, Claimant does not claim costs incurred up to the date Claimant issued the Notice, as these costs would have been incurred in any event, and are not attributable to Galle, displaying a reasonable approach on Claimant's part. Those will be costs that may be claimable in the substantive arbitration (dependent on Claimant prevailing in the substantive arbitration and on costs being awarded in its favour, matters which remain open and on which the Tribunal makes no comment).

94.    In any event, the Tribunal has considered all the matters raised by Galle in relation to the quantum of costs claimed by Claimant, in particular as to the claim for costs in seeking advice from Colorado counsel, number of fee earners participating in the arbitration (which Galle claims is unreasonably disproportionate), duplication, and the extent of the fees generated in relation to (for example) the preparations for the Preliminary Issues Hearing.

95.    The Tribunal considers there is some merit in some of the points raised by Respondent, but that, on the whole, Claimant's claim for costs is both justified and reasonable.

96.    In undertaking its assessment, the Tribunal has also taken into account the fact that Claimant was not successful in persuading the Tribunal to freeze Respondent's assets in the United

States, but notes that this took up limited time at the hearing and in the preparations for the same, as well as in the Tribunal's post-hearing work.

97.    Having undertaken a thorough consideration of all matters raised by Claimant and Galle, the Tribunal assesses the quantum of Claimant's claim for costs at HK$3,250,000 and makes an award for costs in favour of Claimant in this sum, such sum to be paid by Galle forthwith.

*(vi) Interest*

98.    As Claimant notes, the Ordinance also provides that interest is payable on costs awarded or ordered by an arbitral tribunal *"from (a) the date of the award or order on costs; or (b) the date on which costs ordered are directed to be paid forthwith, at the judgment rate, except when the award or order om costs otherwise provide"* (Section 80). Since 1 April 2019, the judgment rate has been set at 8.125% per annum, and this remains the case as at the date of this Costs Award.

99.    The Tribunal agrees with Claimant's submission that there is no reason in this case to depart from this standard rule to award post-award interest at the judgement rate. Further, the Tribunal grants Claimant's request to include such interest in this Costs Award, as it can envisage that Claimant may need to enforce the costs award against Galle outside Hong Kong.

100.   The Tribunal accordingly orders that interest is duly payable on the sum of HK$3,250,000 awarded to Claimant for costs in this award at the judgment rate (currently 8.125% per annum) as from the date of this award, unless Galle duly pays the sum of HK$3,250,000 to Claimant within 7 days of the date of this award.

*(vii) Counterparts*

101.   This award shall be executed in one or more counterparts, each of which shall be considered an original but all of which together shall constitute one and the same award.

## V.    TRIBUNAL'S ORDERS

102.   In accordance with the reasons set-out above, the Tribunal hereby AWARDS, ORDERS AND DIRECTS THAT:

(A)    Galle do pay Claimant the sum of HK$3,250,000 in respect of the fees and costs of dealing with the Preliminary Issue in this arbitration within the next 7 days.

(B)    If Galle fails to pay the above sum to Claimant within the 7 days period specified above, Galle do pay interest on the sum of HK$3,250,000 as from the date of this award until the date the sum of HK$3,250,000 is duly paid to Claimant, at the rate of 8.125% per annum, being the judgment rate applicable in Hong Kong.

(C)    The amounts set out in (A) and (B) above be paid by Galle in his personal capacity.

(D)    This award be enforceable immediately, if the sum of HK$3,250,000 is not paid to Claimant within the 7 day period indicated in (A) above.

(E)   The Tribunal rejects and dismisses all other claims put to it in relation to costs and expenses of this arbitration (including as to the entity or person who should bear the costs and expenses of the proceedings to date, and as to the quantum of those costs).

*[The remainder of this page is left blank intentionally.]*

Seat of arbitration: Hong Kong

Date:  3\   July 2019

Signed by Co-Arbitrator

**Mr Gavin Denton**

Signature

Signed by Co-Arbitrator

**Mr. Yuen Chuen Lee**

Signature

Signed by Presiding Arbitrator

**Mr. Simon Powell**

Signature

19

Seat of arbitration: Hong Kong
Date: 3) July 2019

Signed by Co-Arbitrator

**Mr Gavin Denton**

Signature

Signed by Co-Arbitrator

**Mr. Yuen Chuen Lee**

Signature

Signed by Presiding Arbitrator

**Mr. Simon Powell**

Signature

Seat of arbitration: Hong Kong
Date: 31 July 2019

Signed by Co-Arbitrator

**Mr Gavin Denton**

Signed by Co-Arbitrator

**Mr. Yuen Chuen Lee**

Signed by Presiding Arbitrator

**Mr. Simon Powell**



IN THE MATTER OF AN ARBITRATION

UNDER THE ARBITRATION ORDINANCE OF HONG KONG (CAP. 609)

UNDER THE HONG KONG INTERNATIONAL ARBITRATION CENTRE

ADMINISTERED ARBITRATION RULES

HKIAC CASE NO. HKIAC/A17251

**BETWEEN**

### NOBLE PRESTIGE LIMITED

Claimant

**and**

### MR. PAUL HORN

Respondent

---

### FINAL AWARD

---

**Gavin Denton**
**John P. Bang**
**Simon Powell**
**-Presiding Arbitrator-**

**14 May 2020**

## Table of Contents

*I.*    *PARTIES AND ARBITRAL TRIBUNAL* ................................................................. 3

*II.*   *ARBITRATION AGREEMENT* ............................................................................ 6

*III.*  *APPLICABLE LAW, PLACE AND LANGUAGE OF ARBITRATION* ................... 6

*IV.*   *PROCEDURAL HISTORY* .................................................................................. 7

*V.*    *BACKGROUND TO THE DISPUTE* .................................................................... 8

*VI.*   *RELEVANT CONTRACTUAL PROVISIONS* ...................................................... 11

*VII.*  *THE PARTIES' POSITIONS* ............................................................................ 14

*VIII.* *THE PARTIES' REQUESTS FOR RELIEF* ...................................................... 18

*IX.*   *TRIBUNAL'S DECISIONS* ............................................................................... 19

*X.*    *COSTS* ............................................................................................................. 39

*XI.*   *TRIBUNAL'S ORDERS* .................................................................................... 43

## I.    PARTIES AND ARBITRAL TRIBUNAL

1.    Claimant in these proceedings is as follows:

**Noble Prestige Limited (Claimant)**

Noble Prestige Limited (**Noble Prestige**) is a limited liability company incorporated in Hong Kong with companies registration number 1667008. Claimant's contact details are as follows: 16/F, Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong. Telephone: +852 2869 1996. Facsimile: +852 2110 9521. Email: adkinson@private-capital.com.hk.

2.    Respondent in these proceedings is as follows:

**Mr. Paul Horn (Respondent)**

Mr. Paul Horn is a citizen of the United States of America who is last known to be a resident of Thailand. Respondent's contact details as provided in the Facility Agreement (as defined below) are as follows: c/o The Galle Law Group, P.A., 13501 South Shore Boulevard, Suite 103, Wellington, Florida, 33414, U.S.A. Facsimile: +1 561 798 1809. Attention: Craig T. Galle, Esq. (**Mr. Galle**).

Claimant and Respondent, together, are referred to in this Final Award as the "**Parties**".

3.    Claimant's legal representatives in these proceedings are Reynolds Porter Chamberlain (**RPC**) whose contact details are as follows:

> Attn: Jonathan Crompton / Catherine Leung / Bernard Luk
> **Reynolds Porter Chamberlain**
> 38/F, One Taikoo Place, 979 King's Rd, Quarry Bay
> Email: jonathan.crompton@rpc.com.hk / catherine.leung@rpc.com.hk /
>     bernard.luk@rpc.com.hk
> Tel: +852 2216 7000   Fax: +852 2216 7001

4.    Respondent has not appeared in these proceedings, and is not represented by counsel. The participation of Respondent and his representation in these proceedings was the central focus of the first phase of this arbitration, and was the subject of the Interim Award (as defined below), and is discussed in greater detail in the Interim Award and to an extent in the procedural history below. For purposes of correspondence to Respondent, the following contact details have been used pursuant to the terms of the Facility Agreement, Security Agreement and Irrevocable Letter of Instruction (as each of these documents is defined below) executed by both Parties:

> Paul Horn
> c/o The Galle Law Group, P.A.
> By email only: pololawyer@aol.com / gallelaw@aol.com
>
> Robertsons Solicitors
> Attn.: Christopher Lambert
> 57th Floor, The Center
> 99 Queens Road Central

3

Hong Kong
Email: clambert@robertsonshk.com

RobSec Limited
5705, 57/F, The Center
99 Queens Road Central
Hong Kong

5.     Claimant has also provided an email address for Respondent (mmedia17@yahoo.com).
       Respondent has himself used this email address in corresponding with Claimant, and others, in
       the past. Further, this is the email address used for the purposes of serving a copy of the Notice
       of Arbitration, and its exhibits, on Respondent, and which has been copied on all
       correspondence issued to Respondent since the issuance of the Interim Costs Award (as this
       term is defined below).

6.     The tribunal for this matter originally consisted of Gavin Denton and Yuen Chuen Lee as co-
       arbitrators, and Simon Powell as presiding arbitrator (**Preliminary Issue Tribunal**), the
       constitution of which is set out in the Interim Award on Preliminary Issue dated 29 March 2019
       (**Interim Award**). The Preliminary Issue Tribunal subsequently rendered a Partial Award on
       Costs Relating to the Interim Award on the Preliminary Issue dated 31 July 2019 (**Interim
       Costs Award**). Terms used in this Final Award and not otherwise defined shall have the
       meaning ascribed to them in the Interim Award and the Interim Costs Award.

7.     The procedural history of this arbitration is addressed in the next section of this Final Award.
       However, in relation to the constitution of the Tribunal, it is pertinent to note the following
       events subsequent to the rendering of the Interim Costs Award on 31 July 2019.

8.     On 9 August 2019, Mr. Lee resigned as a co-arbitrator in this matter. On the same date Claimant
       requested additional information in this regard.

9.     On 11 August 2019, Mr. Powell provided additional details regarding the resignation of
       Mr. Lee and the procedures moving forward, and solicited the Parties' comments on whether
       he should resign as presiding arbitrator in light of the fact that one of the co-arbitrators who
       jointly nominated him had resigned.

10.    On 20 August 2019, the HKIAC wrote to the Parties, Mr. Denton and Mr. Powell to
       acknowledge receipt of Mr. Lee's notification of his resignation, and invited Respondent to
       designate a substitute arbitrator pursuant to Article 12.1 of the HKIAC Rules by
       9 September 2019.

11.    On 25 August 2019, Claimant provided its comments on the arbitrator replacement process,
       including that it was Claimant's position that Mr. Powell should continue as presiding arbitrator.

12.    On 10 September 2019, the HKIAC noted that Respondent had failed to nominate a substitute
       arbitrator, and that it would take the necessary steps for such appointment.

13.    On 17 September 2019, the HKIAC wrote to the Parties to inform them of its intention to
       appoint Mr. John Bang as substitute arbitrator on behalf of Respondent, and invited comments
       by 24 September 2019.

14.    On 23 September 2019, Claimant confirmed it had no objection to the appointment of Mr. Bang
       as substitute arbitrator, on the basis that he would not charge for travel and accommodation

4

expenses for any meetings and hearings to take place in Hong Kong. No objection to Mr. Bang's appointment was received from Respondent within the time limit granted.

15. On 26 September 2019, the HKIAC informed the Parties that Mr. Bang had been appointed as the substitute second arbitrator pursuant to Articles 7 and 8 of the HKIAC Rules. The HKIAC also noted the appointment process for the presiding arbitrator in Article 8.1(c) of the HKIAC Rules, which provides that the co-arbitrators shall nominate the presiding arbitrator. The HKIAC further noted that Mr. Powell had been designated by Mr. Denton and Mr. Lee, the latter of whom was nominated by Mr. Galle, who was determined in the Interim Award not to be properly authorized to represent Respondent.

16. On 3 October 2019, Mr. Powell resigned as presiding arbitrator in light of the provisions of the HKIAC Rules and the method of his designation, stating however that he would be willing to sit as presiding arbitrator should the co-arbitrators wish to designate him as such.

17. On even date, the HKIAC wrote to the Parties to note Mr. Powell's resignation as presiding arbitrator. The HKIAC confirmed that it had consulted with Messrs. Denton and Bang, both of whom confirmed that they would like to designate Mr. Powell as presiding arbitrator. The HKIAC invited comments from the Parties on Mr. Powell's appointment as presiding arbitrator by 8 October 2019. Claimant confirmed on 8 October 2019 that it had no objection to Mr. Powell's appointment. No objection to Mr. Powell's appointment was received from Respondent within the time limit granted.

18. On 10 October 2019, the HKIAC confirmed Mr. Powell's appointment as presiding arbitrator pursuant to Articles 9.2 and 10.2 of the HKIAC Rules. (Mr. Powell, together with Messrs Denton and Bang, are referred to as the "**Tribunal**" in this Final Award).

19. Mr. Denton's contact details are as follows:

> Mr. Gavin Denton
> **Arbitration Chambers**
> Chinachem Hollywood Centre
> Suite 803, 1 Hollywood Road, Central
> Hong Kong
> Email: gavin.denton@arbchambers.com

20. Mr. Bang's contact details are as follows:

> Mr. John P. Bang
> **Bae, Kim & Lee LLC**
> Tower B, Centropolis, 26 Ujeongguk-ro, Jongno-gu
> Seoul 03161, Korea
> Email: john.bang@bkl.co.kr

21. Mr. Powell's contact details are as follows:

> Mr. Simon Powell
> **c/o Powell Arbitration Limited**
> 14/F., Chun Wo Commercial Centre,
> 23-29 Wing Wo Street,
> Central, Hong Kong
> Email: sdp@powellarbitration.com

22.     The HKIAC counsel in charge of the administration of this matter is Mr. Filip Nordlund. Mr. Nordlund's contact details are as follows:

> Attn: Filip Nordlund
> Counsel
> **Hong Kong International Arbitration Centre**
> 38/F Two Exchange Square
> 8 Connaught Place
> Hong Kong
> Email: fnordlund@hkiac.org / arbitration@hkiac.org

## II.     ARBITRATION AGREEMENT

23.     The present dispute arises out of a Loan Facility Agreement between Claimant and Respondent dated 19 December 2011 (**Facility Agreement**).

24.     The dispute resolution procedures are contained in Clause 19 of the Facility Agreement:

> *"19.     GOVERNING LAW AND JURISDICTION*
>
> *19.1     This agreement and any dispute or claim arising out of, or in connection with it, or its subject matter or formation (including non-contractual disputes or claims) shall be governed by, and construed in accordance with, the laws of Hong Kong.*
>
> *19.2     Any dispute, controversy or claim arising out of or in relation to this agreement, or the breach, termination or invalidity thereof, will be settled by arbitration in accordance with the Hong Kong International Arbitration Centre rules presently in force.*
>
> *19.3     The number of arbitrators will be 3 (three), each party to appoint 1 (one) arbitrator and the arbitrators so appointed to appoint the third.*
>
> *19.4     The place of arbitration will be Hong Kong and the language to be used in the arbitral proceedings shall be English.*
>
> *19.5     The [Respondent] appoints RobSec. Limited 5705, 57/F The Centre, 99 Queen's Road, Central, Hong Kong as his duly authorised representative to accept service of process on his behalf for any dispute arising out of or related to this Agreement."*

## III.     APPLICABLE LAW, PLACE AND LANGUAGE OF ARBITRATION

25.     In accordance with Article 19 of the Facility Agreement:

(a)     Hong Kong is the place of the arbitration (Article 19.4);

(b)     the arbitration shall be conducted in accordance with the HKIAC Rules (Article 19.2);

(c)     the arbitration shall be conducted in English (Article 19.4); and

(d)     the governing law of the Facility Agreement is the law of Hong Kong (Article 19.1).

## IV.   PROCEDURAL HISTORY

26.   The procedural history of this arbitration from its commencement on 19 December 2017 to 31 July 2019 (when the Preliminary Issue Tribunal issued the Interim Costs award) is set out in the Interim Award and the Interim Costs Award and is hereby incorporated by reference into this Final Award. Subsequent events up to 10 October 2019 (when the HKIAC confirmed Mr. Powell's appointment as Presiding Arbitrator) have been dealt with above. The Tribunal now sets out the relevant procedural history subsequent to 10 October 2019 below.

27.   On 12 October 2019, following the constitution of the Tribunal on 10 October 2019, the Tribunal circulated a draft Procedural Order No. 1 (**PO1**) to the Parties, setting out a proposed timetable for the remainder of the proceedings and proposing that a Case Management Conference (**CMC**) be held at 11am on 17 October 2019. In view of the proceedings to date and Respondent's failure to appear, despite ample opportunity, the Tribunal proposed two alternative timelines, depending on whether Respondent ultimately submitted a Statement of Defence. In the event that no Statement of Defence was filed by the deadline imposed, a number of steps would be removed from the procedural timetable, primarily relating to reply submissions, document production and expert reports, enabling the substantive hearing to proceed at an earlier time.

28.   On 14 October 2019, Claimant confirmed its availability for the proposed CMC on 17 October 2019.

29.   On 16 October 2019, Claimant provided its comments on the draft PO1 and timetable circulated earlier by the Tribunal. No comments were received from Respondent.

30.   On 17 October 2019, the proposed CMC was held by telephone conference. Claimant participated, whilst Respondent did not appear. A summary of the proceedings at the CMC is provided in PO1.

31.   On 18 October 2019, the Tribunal issued PO1 together with the procedural timetable for the remainder of the proceedings. A one-day hearing was fixed for 20 December 2019 if no Statement of Defence was submitted by Respondent on or before 25 November 2019.

32.   On 7 November 2019, Claimant sought a two day extension within which to submit its Statement of Claim from 11 November 2019 to 13 November 2019. The Tribunal granted the extension, after providing Respondent with an opportunity to comment and/or object if he so wished and receiving no response.

33.   On 14 November 2019 (at 12:04am), Claimant submitted its Statement of Claim dated 13 November 2019, along with the Witness Statement of Mr. Ricky "Rick" Adkinson (**Mr. Adkinson**) dated 13 November 2019 (**Mr. Adkinson's Witness Statement**). These documents were technically submitted 4 minutes late, at 4 minutes after midnight, rather than before midnight on 13 November 2019, for which Claimant apologized.

34.   On 16 November 2019, having considered the matter, the Tribunal wrote to the Parties to confirm and acknowledge that it considered this short delay in Claimant's submission of the Statement of Claim and Mr. Adkinson's Witness Statement to be *de minimis* and that it was not such as to cause any prejudice to Respondent. The Tribunal nevertheless granted a consequential extension for Respondent to file its Defence and Counterclaim (if any) to 28 November 2019.

35.     Respondent failed to file its Statement of Defence by 28 November 2019.

36.     On 29 November 2019, Claimant circulated the following documents: Claimant's chronology of basic events (**Chronology**), Claimant's *dramatis personae*, Claimant's list of issues (**List of Issues**), Claimant's opening submissions (**Opening Submissions**), and Claimant's hearing bundle (in two volumes).

37.     On 20 December 2019, the substantive hearing was held in Hong Kong at the offices of RPC in Quarry Bay (**Substantive Hearing**). Jonathan Crompton, Catherine Leung and James Lee of RPC appeared at the Substantive Hearing on behalf of Claimant. Claimant's witness, Mr. Adkinson, attended the Substantive Hearing by teleconference. The Tribunal attended the Substantive Hearing in person, while the Tribunal Secretary (Mr. Tim Robbins) attended the Substantive Hearing by teleconference. Neither Respondent himself nor any representative for Respondent attended the Substantive Hearing.

38.     On 28 February 2020, Claimant submitted its costs submissions (**Submissions on Costs**).

39.     On 2 March 2020, Claimant submitted its revised costs submissions (**Revised Submissions on Costs**).

40.     On 24 April 2020, Claimant submitted an updated and revised costs submission (**Updated Submissions on Costs**) by email.

41.     On 26 April 2020, the Tribunal formally closed the arbitral proceedings pursuant to Article 30.1 of the HKIAC Rules.

## V.     BACKGROUND TO THE DISPUTE

42.     The underlying dispute arises out of the Facility Agreement between Claimant and Respondent dated 19 December 2011. Claimant submits that the Facility Agreement required Respondent to pay various costs for the appointment of appraisers and others to value his "Appreciated Value Interest" (**AVI**) pursuant to a valuation clause in an assignment agreement between Respondent and McGaw Cellular Communications Inc. (**McGaw**) (and others) dated 4 October 1991 (**Assignment Agreement**).

43.     By the Assignment Agreement, Respondent sold, assigned and transferred the interests he held in a 'non-wireline cellular telephone system' in Colorado, USA known as Colorado 3 System (**System**) to McGaw. McGaw subsequently transferred its interests in the Assignment Agreement to AT&T Wireless Services k/n/a New Cingular (**AT&T**).

44.     The Assignment Agreement provided that Respondent's AVI would constitute 40% of the value of the System.

45.     The Statement of Claim sets out the factual history regarding the Assignment Agreement and Respondent's efforts to enforce its terms. Claimant's account is based largely on the documentary evidence adduced in these proceedings and is supported by the evidence adduced by Claimant's sole witness in these proceedings, Mr. Adkinson, in Mr. Adkinson's Witness Statement and in his oral evidence at the Substantive Hearing. The Tribunal does not find it necessary to recite the same in this Final Award in great detail. In short, however, the Tribunal notes that, having failed to reach agreement with AT&T on the value of the System and on the selection of the appraisers (which prevented them from determining the amount to be paid to Respondent for his AVI pursuant to the Assignment Agreement), Respondent commenced an action against AT&T in the US District Court for the City and County of Denver, Colorado for

8

the purpose of requiring AT&T to comply with the valuation provisions of the Assignment Agreement.

46.   Respondent was ultimately successful in obtaining summary judgment in his favour for specific performance of the Assignment Agreement, requiring AT&T to engage in the appraisal process referred to in the Assignment Agreement.

47.   As part of this appraisal process, Respondent was required to pay various valuation costs required for the appointment of appraisers and others to value his AVI. Respondent sought assistance to obtain the funds needed to pay for the valuation process, including from Mr. Adkinson.

48.   Claimant avers that around early to mid-November 2011, Mr. Adkinson was contacted by Mr. Christopher Lambert, a Partner of Robertsons Solicitors who had previously acted for Respondent, about Respondent's need to value his AVI and about funding the valuation. On 24 November 2011, Respondent informed Mr. Adkinson that the maximum funding required should be US$500,000. Negotiations over the following few weeks led to Claimant signing the Facility Agreement on 16 December 2011, which was then countersigned by Respondent on 19 December 2011. The Facility Agreement is dated 19 December 2011.

49.   Claimant further avers that, pursuant to the terms of the Facility Agreement, it agreed to provide funds to Respondent for the purposes of paying various costs associated with the appraisal in an amount of US$500,000 to allow Respondent to value the AVI and recover sums owed to him under the Assignment Agreement (**Valuation Funding**). The specific purpose of the Valuation Funding was, says Claimant, agreed and set out clearly in the Facility Agreement (referencing and relying on Clause 3 and Column II of Schedule 2 of the Facility Agreement).

50.   Claimant further submits that, pursuant to the terms of the Facility Agreement, in consideration of Claimant agreeing to provide the Valuation Funding, Respondent was required under the Facility Agreement to pay Claimant the sum of US$5,000,000 or 5% of the amount Respondent received for the AVI (whichever was the greater) (**Repayment Amount**) within five business days of Respondent receiving payment for his AVI.

51.   Claimant also submits that, by virtue of the terms of the Facility Agreement, Respondent was not entitled to accept any settlement or any other sum which was less than 90% of the sum otherwise due to be paid to Respondent for his AVI without the prior written consent of Claimant.

52.   Claimant and Respondent also entered into a security agreement (**Security Agreement**) and irrevocable letter of instruction (**Irrevocable Letter of Instruction**), both also dated 19 December 2011 (the Security Agreement and Irrevocable Letter of Instruction together are referred to in this Final Award as the **Ancillary Agreements**; and the Ancillary Agreements together with the Facility Agreement, as the **Agreements**).

53.   On 24 December 2011, Respondent countersigned an engagement agreement with Brunelleschi Advisors, LLC (**Brunelleschi**), in the form of a letter from Brunelleschi dated 21 December 2011, in relation to "*matters pertaining to the appraisal of [Respondent's] interest in [the System]* (**Brunelleschi Engagement Agreement**). Pursuant to the Brunelleschi Engagement Agreement, Brunelleschi would bill time at standard rates, including for "*advice on the terms of the contract with the designated appraiser*", and would "*require an initial retainer of US$35,000 USD.*"

54. Claimant submits that, in compliance with and pursuant to the terms of the Facility Agreement, it performed its obligation to provide the Valuation Funding to Respondent and, in this regard, on several dates between 20 December 2011 and 10 February 2014, paid the aggregate sum of US$500,624.26 to Respondent's advisers, The Galle Law Group, P.A. (**GLG**) and Brunelleschi. GLG is the law firm of Mr. Galle.

55. Notwithstanding the summary judgment for specific performance entered by the District Court in Denver in March 2008 (as referred to above), Respondent had still not been able to agree on the selection of the appraisers with AT&T and the valuation of the System was still outstanding as at 2014. Sometime in 2014 Respondent therefore filed a further action in the District Court in Denver (**AT&T Action**) to resolve the remaining disputes. On 11 April 2015, the District Court in Denver appointed the third appraiser pursuant to the Assignment Agreement. Respondent thereafter indicated an intention to appeal against the court's decision, and on 11 June 2015, filed a Motion to Stay Appraisal Pending Appeal with the District Court in Denver. In October and November 2015, Mr. Adkinson's solicitor Jason Carmichael (**Mr. Carmichael**) asked Mr. Galle for updates on the matter. Mr. Galle responded on 11 November 2015 that he had not heard from Respondent despite having reached out to him multiple times (subsequent to this, by email of 6 May 2016, Mr. Galle indicated that he had not heard from Respondent or his wife since October 2015).

56. On 19 January 2017, Mr. Thomas Overton (**Mr. Overton**) of the Overton Law Firm (Respondent's counsel in the AT&T Action), filed the Petition for Appointment of Special Conservator for Adult seeking to appoint Mr. Galle as 'Special Conservator' over certain of Respondent's assets. In the affidavit in support of his appointment, Mr. Galle stated on oath before a Florida Notary Public that Respondent's AVI *"is believed to be valued in excess of [US]$100 million."*

57. On 7 March 2017, the Denver Probate Court granted an order appointing Mr. Galle as Special Conservator over certain of Respondent's assets.

58. On 7 April 2017 Mr. Galle informed Claimant of Mr. Galle's appointment as Special Conservator and that the minimum amount Respondent would receive from AT&T would be US$39,700,000.

59. Mr. Adkinson states that, at a meeting on 29 September 2017, Mr. Galle informed him that, acting as Special Conservator on behalf of Respondent, Mr. Galle had negotiated with AT&T and received a sum of US$57.5 million in respect of Respondent's AVI (**AVI Consideration**). Mr. Galle also provided Mr. Adkinson with a letter dated 25 September 2017 from Mr. James Britt (**Mr. Britt**) of the Britt Law Offices, LLC (the Court appointed Guardian *Ad Litem* for Respondent), addressed to Mr. Overton. In this letter, Mr. Britt indicated that he objected to and would not approve the disbursement of US$5,000,000 to Claimant under the Facility Agreement. Instead, acknowledging that Claimant was "certainly entitled" to a return on its investment, Mr. Britt indicated his view that the amount that should be paid to Claimant was US$2,000,000.

60. By letter dated 17 November 2017, addressed to Respondent and copied to Mr. Galle, Claimant (acting through RPC) demanded that Respondent pay the sum of US$5,000,000 required under the Facility Agreement in full.

61. By letter dated 17 November 2017, Mr. Britt indicated that no-one was suggesting that Claimant should not be paid nor that Claimant did not provide a benefit to Respondent. Mr. Britt further indicated that he was authorised to state that Respondent's estate was willing to pay Claimant US$2,000,000.

62.   On 19 December 2017, having not received payment of the sum demanded, Claimant commenced these proceedings by issuing the Notice of Arbitration.

## VI.   RELEVANT CONTRACTUAL PROVISIONS

63.   Relevant excerpts from the Facility Agreement:

"*2.      THE FACILITY*

*The Lender grants to the Borrower an unsecured US$ term loan facility of a total principal amount not exceeding US$500,000 (US$ five hundred thousand) on the terms, and subject to the conditions, of this agreement.*

*...*

*3.      PURPOSE*

*3.1      The Borrower shall use all money borrowed under this agreement: ...*

*(ii)      for the specific purposes for each of the drawdown amounts detailed in column II of Schedule 2;*

*4.      DRAWING*

*...*

*4.2      Payment of the Loan shall be made to the attorney IOTA trust account of The Galle Law Group, P.A., maintained in accordance with the Florida Bar Association Rules.*

*...*

*6.      INTEREST*

*The Borrower shall not be required to pay interest on the Loan.*

*...*

*7.      COSTS*

*...*

*7.2      Following the occurrence of an Event of Default (which is not remedied by the Borrower in the manner contemplated by clause 12.1) the Borrower shall pay on demand to the Lender by way of full reimbursement, all costs and expenses that the Lender incurs in connection with the preservation and enforcement of the Loan and/or this agreement.*

*...*

*8.      REPAYMENT*

*The Borrower shall repay the Loan by way of payment to the Lender of the Repayment Amount on the Repayment Date.*

**9.      PAYMENTS**

...

9.3     *All payments made by the Borrower under this agreement shall be made in full, without set-off, counterclaim or condition*

...

**11.     COVENANTS**

...

11.3    *He shall procure that any of his unsecured and unsubordinated obligations and liabilities under this agreement rank, and will rank, at least pari passu in right and priority of payments with all his other unsecured and unsubordinated obligations and liabilities, present or future, actual or contingent, except for those obligations and liabilities mandatorily preferred by law;*

...

11.5    *He shall not:*

...

*(iii) save with prior written consent of the Lender accept any settlement or other sum which is less than 90% of the sum that is otherwise due to be paid to him for his Appreciated Value Interest;*

...

**12.     EVENTS OF DEFAULT**

12.1    *Each of the events or circumstances set out in this clause 12 (other than this clause 12.1) is an Event of Default ...*

12.2    *The Borrower fails to pay any sum due under this agreement ...*

12.3    *The Borrower fails to comply with any provision of:*

*(i) this agreement; ...*

*(iii) the Security Agreement.*

...

12.6    *The Borrower commences negotiations, or enters into any composition, compromise, assignment or arrangement, with one of more of his creditors with a view to rescheduling any of his Indebtedness (because of actual or anticipated financial difficulties)."*

64.  The "Repayment Amount" and "Repayment Date" are defined in Schedule 1 to the Facility Agreement:

*"Schedule 1 Repayment Amount and Repayment Date*

*Repayment Amount*

*The amount repayable to the Lender by the Borrower shall be:*

    *1.    US$5,000,000; or*

    *2.    5% of the gross amount (including all interest payments and without any deductions whatsoever) paid to the Borrower by ATT (or any of its affiliated, associated or group companies) for the Borrower's Appreciated Value Interest;*

*whichever shall be the greater.*

*By way of example only, if the amount paid to the Borrower as aforesaid for the Borrower's Appreciated Value Interest is US$150,000,000 (US$ one hundred and fifty million), then the Repayment Amount will be:*

    *US$7,500,000 (US$ seven million five hundred thousand)*

*All sums payable by the Borrower to the Lender under this Agreement shall be paid free and clear of all deductions or withholdings whatsoever unless the deduction or withholding is required by law. If any deductions or withholdings are required by law to be made from any of the sums payable under this Agreement, the Borrower shall pay to the Lender such sum as will, after the deduction or withholding has been made, leave the Lender with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.*

*Repayment Date*

*The day falling five (5) Business Days after the gross amount is paid to the Borrower as aforesaid for the Borrower's Appreciated Value Interest."*

65.  The recitals to the Security Agreement explain the purposes of the Valuation Funding:

*"WHEREAS, Horn has sought a $500,000.00 USD loan (the "Loan") from Noble to fund the Valuation Costs and simultaneously with the execution of this Agreement, Horn and Noble have executed a Loan Facility Agreement (the "Loan Agreement")"*

66.  The recitals to the Irrevocable Letter of Instruction also explain the purposes of the Valuation Funding

*"WHEREAS, pursuant to that certain Loan Facility Agreement dated December 19th, 2011 (the "Loan Agreement"), Noble has made available to Horn the sum of $500,000 USD (the "Loan") which sums are to be utilised by Horn to pay the fees of certain expert appraisers and related costs necessary to value Horn's Appreciated Vale Interest ("AVI") in the Colorado 3 cellular communications system (the "System");"*

67.   Relevant excerpts from the Facility Agreement:

"3.   *As a means of protecting Noble's security interest (lien), Horn shall be required to inform Noble, in writing, within seventy-two (72) hours of the occurrence of the following events:*

   *A.   a court adjudication and/or agreement with the ATT Parties as to the amount due Horn on the Appreciated Value Interest*

...

5.   *It is the intention of the parties to this Agreement that Noble shall receive its funds due under the Loan Agreement either earlier than or simultaneously with Horn's receipt of the funds due him on Appreciated Value Interest and Horn's lawyers' receipt of funds due them for legal services.*"

## VII.   THE PARTIES' POSITIONS

68.   Claimant submits that it performed its obligations stated in the Facility Agreement, and that there is no allegation raised to the contrary by Respondent or anyone in any of the correspondence or documents before this Tribunal. Claimant was required to provide the Valuation Funding under the Facility Agreement to enable Respondent to complete the valuation pursuant to Clause 1.5(b)(ii) of the Assignment Agreement, and it duly did so by providing the aggregate sum of US$500,624.26 between December 2011 and February 2014.

69.   Claimant further submits that Respondent has breached the following of his obligations under the Facility Agreement:

   (a)   not to accept any sum which is less than 90% of the amounts due to Respondent for his AVI, save with the prior written consent of Claimant (Clause 11.5);

   (b)   to pay Claimant a pre-defined sum, calculated according to the sums received by Respondent from AT&T, within five Business Days of Respondent's receipt of sums from AT&T (Clause 8 and Schedule 1);

   (c)   to ensure that Respondent's other unsecured obligations and liabilities ranked at least *pari passu* with Respondent's obligation under the Facility Agreement to pay Claimant (Clause 11.3);

   (d)   not to negotiate or compromise with any of his creditors with a view to rescheduling his indebtedness (Clause 12.6); and

   (e)   to remedy within 14 days any remediable event of default, including any breach of Respondent's obligations under the Ancillary Agreements (Clause 12.1 and 12.3), including Respondent's obligations to notify Claimant within 72 hours of reaching agreement with AT&T (Clause 3 of the Security Agreement), paying Claimant earlier than or simultaneously with Respondent's receipt of funds due to him on his AVI or Respondent's lawyer's receipt of funds due to them for legal services (Clause 5 of the Security Agreement).

14

70.    Claimant submits that Respondent has breached all of these obligations, either himself or through his agents / representatives, as follows:

(a)    acting through Mr. Galle as Special Conservator appointed by the Denver Probate Court, Respondent accepted US$57.5 million from AT&T, being less than 90% of the "*excess of US$100 million*" that Mr. Galle informed the Denver Probate Court was payable by AT&T. This breach was irremediable.

(b)    Respondent's acceptance of US$57.5 million from AT&T for his AVI triggered obligations on the part of Respondent to (i) notify Claimant within 72 hours, and (ii) pay US$5 million to Claimant within five business days of Respondent's receipt of the AVI Consideration from AT&T. In respect of each of these obligations:

(1)    Respondent (himself or through Mr. Galle) did not notify Claimant within 72 hours of reaching agreement with AT&T;

(2)    the agreement between AT&T and Respondent provided for AT&T to pay Respondent his AVI Consideration within 10 business days of AT&T's receipt of the Denver Probate Court Order approving the agreement. The Denver Probate Court issued the approval order on 23 August 2017, such that AT&T would have made that payment within around the following 10 business days pursuant to the agreement which in turn would have triggered Respondent's obligation to pay the Repayment Amount to Claimant within five business days of Respondent's receipt from AT&T of the US$57.5 million in respect of Respondent's AVI. But Respondent did not pay the Repayment Amount to Claimant within five business days of receipt from AT&T of the US$57.5 million; indeed, over two years later Respondent had still not paid Claimant any sum pursuant to the Facility Agreement;

(c)    Respondent (himself or through his agents / representatives) has compromised with other creditors and settled other obligations / liabilities of Respondent ahead of paying Claimant. Respondent, acting through Mr. Galle, has made payments to third parties out of the AVI Consideration before paying Claimant. In particular, Mr. Britt informed Respondent that "*[w]ith the exception of one other claimant that we anticipate will soon be resolved, all other claims of Mr. Horn have been amicably resolved without the need for litigation*" and Mr. Adkinson has been informed that Robertsons accepted payment of a reduced amount for its fees. In addition to being a breach of Respondent's obligation under Clause 11.3 of the Facility Agreement, this is also a breach of Claimant's obligations under the Security Agreement and the Irrevocable Letter of Instruction. Having settled other claims on the assets of Respondent, these breaches are intentional and irremediable.

71.    Claimant claims a further and alternative entitlement to repayment of the Valuation Funding in the amount of US$500,635.26, as money had and received, in the event that its claim for payment of the Repayment Amount is invalid.

72.    Claimant also raises a further, proprietary, claim against Respondent on the basis of constructive trust for payment of both the Valuation Funding and, in addition, the full amount of the AVI Consideration (the sum of US$57.7 million) as traceable proceeds being held on constructive trust on behalf of Claimant by Respondent.

73.    Respondent has not appeared in these proceedings and has not otherwise made any submissions. However, on 24 January 2018 those purporting to represent Respondent did submit an Answer

15

to the Notice of Arbitration (**Answer**) purportedly on behalf of Respondent. In the Answer, those purporting to represent Respondent raised the following "observations and comments". First, they indicated that the legality of the Facility Agreement will be challenged on the basis that there is evidence to show that Respondent was a mentally incapacitated person at the time of signing the Facility Agreement and hence that Respondent had no capacity to sign the Facility Agreement. Secondly, they indicated that the Facility Agreement is voidable and unenforceable because the funding and collection of the "usurious" Repayment Amount is a clear violation of the common law principles of maintenance and champerty. Thirdly, they indicated that the Effective Interest Rate under the Facility Agreement was 150% which is usurious and Claimant is in clear violation of section 24 of the Money Lenders Ordinance (Cap. 163) (**MLO**).

74.   In the Answer, those purporting to represent Respondent indicated that Respondent rejected Claimant's claims as set out in the Notice, and rejected the relief sought in the Notice, and requested the Tribunal to:

    (a)   dismiss Claimant's claims in their entirety;

    (b)   declare that the Facility Agreement is void and unenforceable; and

    (c)   order Claimant to pay all arbitration costs., including Respondent's solicitors' costs and expenses.

75.   In the Answer those purporting to represent Respondent also reserved the right to provide further details of the arguments and the amount of relief sought in due course and to raise issues as to whether arbitration is a proper forum to obtain the relief sought.

76.   However, at the CMC held on 17 October 2019, the Tribunal noted that it remained incumbent on Claimant to make out its case even if Respondent did not appear in the proceedings or otherwise make any submissions, and that it expected Claimant to address the matters that had been raised during the jurisdictional phase of these proceedings by those purporting to represent Respondent calling into question the validity and/or enforceability of the arrangement between Claimant and Respondent out of which the substantive claim in these proceedings arises. These matters are, in brief, that:

    (a)   Respondent was mentally incapacitated at the time of signing the Facility Agreement, and therefore had no capacity to sign the Facility Agreement;

    (b)   the Facility Agreement was entered into between Claimant and Respondent for the purpose of paying for the litigation costs of the AT&T Action when Claimant had no interest in that action, and therefore the Facility Agreement is champertous and should be struck down as such; and

    (c)   the Facility Agreement is unenforceable as it is "usurious" and invalid, the 'effective interest rate' applied being 150% per annum, which violates Section 24 of the MLO.

77.   Claimant has addressed these issues in its pleadings and submissions in this arbitration, without prejudice to its position that its claims are uncontested, and that these matters have not been raised by Respondent or any other individual properly authorised to represent Respondent.

    (a)   With regard to incapacity, Claimant submits that the burden of proof is on Respondent to establish both that he was mentally incapable at the time when he entered into the Facility Agreement such that he did not mentally understand what he was doing, *and* further that Claimant was aware of this incapacity. Claimant notes that Respondent

has not himself raised this argument but that, even if he had, he would not be able to discharge his burden of proof because the evidence is clear both that (i) Respondent plainly understood what he was doing when he entered into the Facility Agreement, and (ii) even if Respondent were mentally incapacitated, Claimant did not know it. Claimant notes that no evidence has been presented as to Respondent's medical condition at the time he negotiated and entered into the Facility Agreement (*i.e.,* November/December 2011), the two psychiatric reports on which Galle based the argument that Respondent was mentally incapacitated at the time the Facility Agreement was entered into (*i.e.,* the 2014 Psychiatric Report and the 2015 Neurology Report, as defined and discussed in the Interim Award) were issued three years after the Facility Agreement was entered into, and in any event do not provide any evidence that Respondent did not have the capacity to enter into the Facility Agreement. Instead, the evidence shows that Respondent was actively involved in the negotiation of the Facility Agreement, plainly understood what he was doing, and that all other parties (including Respondent's own lawyer at that time, Mr. Galle, and Claimant) believed Respondent had proper capacity. Further, the fact that Respondent gave instructions to his lawyer at the time, Mr. Galle, in respect of the Agreements and entered into the Brunelleschi Engagement Agreement around the same date, suggests that, if Respondent was mentally incapacitated at that time, Mr. Galle was unaware of this, making it improbable that Claimant knew of Respondent's mental incapacity.

(b)     Claimant denies that the Facility Agreement was champertous, as it did not provide funding for, or officiously intermeddle with, litigation (whether the AT&T Action or otherwise). The Facility Agreement provided expressly for the Valuation Funding for specified non-litigation costs of appraisers and others required to enable Respondent to value his AVI pursuant to the valuation provisions of the Assignment Agreement. Claimant notes that there was no litigation pending at the time when the Facility Agreement was negotiated or entered into (the first of the Denver Court actions having already concluded with the summary judgment in Respondent's favour, and the second having not yet begun nor being in contemplation). In any event, even if the Facility Agreement were found to be an agreement to provide funding for litigation in the form of the AT&T Action, Claimant submits that the AT&T Action took place in the state of Colorado, where common law champerty and maintenance no longer exist (such litigation funding thereby not be such as to render the Facility Agreement invalid or unenforceable). Finally, even if the Facility Agreement were deemed to be an agreement to provide funding for litigation in a jurisdiction which does not tolerate litigation funding, Claimant says the Facility Agreement should still not be held to be unenforceable on grounds of public policy as the Facility Agreement did not lead to the oppression of AT&T by Respondent through the means of legal proceedings.

(c)     In respect of the argument based on a violation of Section 24 of the MLO, Claimant denies that the MLO is applicable as the payment of the Valuation Funding pursuant to the Facility Agreement was not a loan, noting that the Facility Agreement does not provide for the return of the Valuation Funding nor the repayment of any principal. Even if the MLO were applicable (because the Facility Agreement is deemed to be a loan), the Facility Agreement expressly provides that no interest was payable on the Valuation Funding - the actual interest rate provided under Clause 6 of the Facility Agreement is 0%. Claimant further submits that a calculation of the "effective interest rate" under the Facility Agreement (which forms the basis of Mr. Galle's case under the MLO) is not possible, and the "effective interest rate" indicated by Mr. Galle has anyway not been calculated pursuant to the MLO and is inconsistent with the interest rate calculated by Mr. Britt. As such, Claimant submits, the interest rate suggested by Mr. Galle is unreliable and should be disregarded.

17

78.     Claimant also notes that Mr. Galle has accepted that Claimant performed its obligations under the Facility Agreement in a timely manner, indicating that such obligations (and therefore the Facility Agreement itself) were valid; Mr. Britt (Respondent's Guardian *Ad Litem* before the Denver Probate Court) has accepted that Claimant is entitled to a payment, but has disagreed with the amount of that payment; and neither Respondent nor his representatives have returned to Claimant the amount of the Valuation Funding to which Claimant would be entitled if the Facility Agreement were void and/or unenforceable.

## VIII.   THE PARTIES' REQUESTS FOR RELIEF

79.     Claimant seeks the following relief:

Primary Relief

(a)     A **declaration** that Respondent was in material, substantial and/or fundamental breach of the Facility Agreement by, among other things:

    (1)     agreeing (through Mr. Galle) to accept US$57,500,000 for his AVI; and

    (2)     failing to pay Claimant US$5,000,000 within five business days of receipt from AT&T of payment for his AVI.

(b)     An **order** that Respondent pay to Claimant forthwith:

    (1)     the sum of US$5,000,000 due as a debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement; and

    (2)     interest at a rate of HSBC Prime Rate + 1%, from 1 September 2017 (being the first day of the month after Respondent received payment from AT&T) to the date of this award.

(c)     A **declaration** that Respondent hold the sum of US$500,624.26 on constructive trust for Claimant.

Alternative Relief

(d)     *In the alternative*, an **order** that Respondent pay Claimant the following sums in restitution:

    (1)     the sum of US$500,624.26; and

    (2)     the sum of US$ 57.7 million.

Further Relief

(e)     An **order** for its legal and other costs in the sum of HK$3,500,557.95 plus any further amounts recoverable by Claimant for payment of the fees and expenses of the HKIAC and the Tribunal in these proceedings (less the amounts previously claimed in Claimant's Partial Costs Submissions for the HKIAC and Tribunal fees and expenses in the sum of HK$480,551,50);

(f)     Interest on all amounts awarded from the date of this award until the date of payment at the Hong Kong judgment rate of 8.125% p.a. (being the relevant Hong Kong judgment rate at the time Claimant lodged its Statement of Claim); and

(g)     Such further and other relief the Tribunal considers appropriate.

80.     In the Answer, those purporting to represent Respondent sought the following relief purportedly on behalf of Respondent:

(a)     The **dismissal** of Claimant's claims in their entirety.

(b)     A **declaration** that the Facility Agreement is void and unenforceable.

(c)     An **order** that Claimant pay all arbitration costs, including Respondent's solicitors' costs and expenses.

## IX.     TRIBUNAL'S DECISIONS

81.     As noted above, on 29 November 2019, Claimant submitted its List of Issues pursuant to paragraph 30 of PO1 dated 17 October 2019. Because Respondent had not submitted a Statement of Defence and Counterclaim within the time provided in the Procedural Timetable (or, indeed, at all), pursuant to paragraph 31(2) of PO1 the List of Issues was not required to be in agreed form. Nevertheless, the List of Issues is comprehensive. The Tribunal finds it most convenient to follow the structure of the List of Issues and proceed to make its determination on each of the issues raised with it for determination as identified in the List of Issues, in turn, and it duly does so in this section of the Final Award.

### Formation of Contract

82.     The first issue Claimant lays before this Tribunal for determination under this head is what law governs the formation and interpretation of the Facility Agreement and any disputes under it.

83.     This matter is clear, and can therefore be dealt with shortly. By virtue of the provisions of Clause 19 of the Facility Agreement,[1] the Facility Agreement itself - and any dispute under it - is governed by the laws of Hong Kong, and the Tribunal so determines.

84.     Having determined that the proper law of the contract which governs the Facility Agreement is Hong Kong law, the second issue Claimant asks this Tribunal to determine is whether the Facility Agreement was validly formed under Hong Kong law, with the necessary elements of (i) offer, (ii) acceptance, (iii) consideration and (iv) intent to create legal relations.

85.     The evidence placed before this Tribunal (including Mr. Adkinson's Witness Statement and its exhibits) shows that Claimant and Respondent (themselves and/or through their representatives) started discussing Respondent's need for Valuation Funding, and the possibility of Claimant providing the same, in November 2011. Following preliminary discussions, on or around 25 November 2011, Claimant and Respondent began to prepare and negotiate the detailed terms of the Facility Agreement. Following further discussions and negotiations, the terms of the Facility Agreement were finalised and agreed and, on 16 December 2011, Mr. Adkinson signed the Facility Agreement on behalf of Claimant. Respondent counter-signed the Facility Agreement on 19 December 2011, and the Facility Agreement was duly dated 19 December 2011.[2]

86.     Considering all the evidence and matters placed before it in these proceedings, the Tribunal finds and determines that the Facility Agreement contains all the essential elements for the

---

[1] C-10.
[2] C-8, paras 10-30.

formation of a contract under Hong Kong law and thus determines that the Facility Agreement was validly formed under Hong Kong law. The parties reached agreement - and recorded their agreement in the Facility Agreement - after its terms were negotiated. Respondent himself took part in those negotiations, as did his legal advisor, Mr. Galle. The Facility Agreement is supported by consideration - Claimant was to provide the Valuation Funding to Respondent in exchange for Respondent paying a return to Claimant. Claimant and Respondent intended to create legal relations by executing the Facility Agreement, and the terms of their contract were complete and certain.

87.    The Tribunal also notes that no-one has alleged that the Facility Agreement was not validly formed. By contrast, there have been allegations that the Facility Agreement is unenforceable, but enforceability is a separate issue to the issue of the validity of the formation of the Facility Agreement under Hong Kong law. The Tribunal deals with the question of enforceability later in this Final Award.

**Claimant's Performance**

88.    The second issue Claimant places before this Tribunal for determination is whether Claimant performed its obligations under the Facility Agreement.

89.    Again, the Tribunal considers that this issue is clear and, as such, it can be dealt with quickly. Claimant's essential obligation under the Facility Agreement was to provide the agreed Valuation Funding to Respondent. The evidence placed before this Tribunal shows that Claimant duly provided the Valuation Funding to Respondent pursuant to the terms of the Facility Agreement on several dates between 20 December 2011 and 10 February 2014. The aggregate amount of the Valuation Funding provided was US$500,624.26.[3] This is slightly in excess of the funding Claimant agreed to provide under the Facility Agreement (the "maximum total amount" of the facility was stated to be US$500,000), but the Tribunal does not consider that anything turns on this.

90.    The Tribunal therefore finds and determines that Claimant did indeed perform its obligations under the Facility Agreement by providing the agreed Valuation Funding to Respondent.

**Respondent's Breaches**

91.    The third issue Claimant asks this Tribunal to consider in its List of Issues is Respondent's breaches of the Facility Agreement.

92.    In particular, in its List of Issues, Claimant asks this Tribunal to consider whether Respondent had the following 5 obligations to Claimant and, if so, whether he breached those obligations:

    (a)    Did Respondent have and breach an obligation under the Facility Agreement to pay Claimant?

    (b)    Did Respondent have and breach an obligation not to accept any sum which is less than 90% of the amounts due to him for his AVI?

    (c)    Did Respondent have and breach an obligation to ensure that his obligation to pay Claimant ranked at least *pari passu* with Respondent's other unsecured obligations and liabilities?

---

[3] C-8, para 32; C44-C57.

20

(d)     Did Respondent have and breach an obligation not to negotiate or compromise with any of his creditors with a view to rescheduling his indebtedness?

(e)     Did Respondent have and breach an obligation to remedy within 14 days any remediable event of default, including any breach of Respondent's obligations under the Ancillary Agreements?

93.     The Tribunal now turns to consider these 5 questions raised by Claimant, in turn.

94.     First, did Respondent have and breach an obligation under the Facility Agreement to pay Claimant?

95.     Respondent's payment obligation under the Facility Agreement is contained in and delineated by the provisions of Clause 8 and Schedule 1. By virtue of Clause 8 of the Facility Agreement, Respondent had an obligation to pay Claimant the Repayment Amount on the Repayment Date. The terms Repayment Amount and Repayment Date are defined in Schedule 1. The amount payable by Respondent under the Facility Agreement depends upon the gross amount paid to Respondent by AT&T for Respondent's AVI but is in any event a minimum sum of US$5 million.

96.     It is only in the event of AT&T paying Respondent more than US$100 million for Respondent's AVI that a sum of more than US$5 million would be payable to Claimant under the Facility Agreement. The evidence shows that AT&T paid Respondent a sum of US$57.5 million for his AVI. As such the Repayment Amount is the minimum sum of US$5 million, and it is unnecessary for the Tribunal to undertake a calculation under the second limb of the definition to ascertain the extent of the Repayment Amount. The Tribunal finds that the Repayment Amount (*i.e.,* the sum that it was agreed Respondent would pay to Claimant under the Facility Agreement) is US$5 million.

97.     Respondent's obligation to pay Claimant the Repayment Amount arose on the Repayment Date. This term is also defined in Schedule 1 as being the day falling 5 business days after AT&T pays the gross amount to Respondent for Respondent's AVI.

98.     The evidence presented to this Tribunal shows that AT&T paid Respondent the sum of US$57.5 million for Respondent's AVI some time before 29 September 2017 (the date on which Respondent's legal representative, Mr. Galle, met Claimant's representative, Mr. Adkinson, at the Peninsula Hotel in Hong Kong and informed Mr. Adkinson that Respondent had received the sum of US$57.5 million from AT&T for his AVI).[4]

99.     This being so, the Repayment Date would have been some time in early October 2017 at the very latest. In fact, it is highly likely that the Repayment Date was some time earlier than this, most likely in September 2017, and the Tribunal so finds. In this regard, the Tribunal notes that the settlement agreement between Respondent and AT&T is dated 8 August 2017, and provided for AT&T to pay the sum of US$57.5 million to Respondent within 10 business days of AT&T's receipt of the Denver Probate Court Order approving the settlement.[5] The Denver Probate Court Order re the Motion to Approve Settlement Agreement is dated 23 August 2017.[6] Assuming that the Court Order was received by AT&T relatively promptly after its entry (as one would fully expect to be the case in the circumstances), such that AT&T received it before the end of August 2017, the Repayment Date would be some time in early September 2017. In any event,

---

[4] C-8, paras 40-42; C-21.
[5] C-19.
[6] C-20.

whatever the exact date of the Repayment Date, it is clear to this Tribunal from the evidence before it that Respondent's obligation to pay Claimant had certainly arisen by early October 2017, at the very latest.

100.   It is equally clear to this Tribunal that Respondent had not paid Claimant the Repayment Amount by early October 2017. In fact, on the evidence received by this Tribunal, it appears clear that Respondent has still not paid the Repayment Amount to Claimant as at the date of this Final Award, some two and a half years later.

101.   Therefore, in relation to the first question under this head, the Tribunal finds and determines that Respondent did have an obligation under the Facility Agreement to pay Claimant and further finds and determines that Respondent has breached this obligation.

102.   Secondly, did Respondent have and breach an obligation not to accept any sum which is less than 90% of the amounts due to him for his AVI?

103.   Clause 11.5(iii) of the Facility Agreement is clear in this regard, providing that Respondent "*shall not ... save with the prior written consent of [Claimant] accept any settlement or other sum which is less than 90% of the sum that is otherwise due to be paid to him for his [AVI]*". There is, therefore, in the Tribunal's view no doubt whatsoever that Respondent did indeed have an obligation not to accept any sum which is less than 90% of the amounts due to him for his AVI (save with the prior written consent of Claimant).

104.   Next, then, did Respondent breach this obligation? Certainly, he did not seek - much less obtain (in writing or otherwise) - Claimant's consent before accepting the sum of US$57.5 million from AT&T for his AVI. And, assuming that the sum that was otherwise due to be paid to him for his AVI was at least US$63.89 million (US$57.5 million being just under 90% of that sum), he was certainly obliged to, in this Tribunal's view. Alternatively, if the sum otherwise payable to Respondent for his AVI was US$63.88 million or less, then no such consent would have been required because the sum accepted by Respondent (US$57.5 million) would then have been more than 90% of the amounts otherwise due to him for his AVI.

105.   The question then is what sum was "otherwise payable" to Respondent for his AVI, had there been no settlement? This largely depends on the fair market value of the System - the sum payable to Respondent by AT&T under the Assignment Agreement was to be calculated pursuant to a formula set out in the Assignment Agreement which, although somewhat complex, had at its core the fair market value of the System. However, the relevant parties were not able to agree on the fair market value of the System under the Assignment Agreement, and nor was the appraisal procedure provided for under the Assignment Agreement (which would have produced a fair market value for the System) ever completed.

106.   Accordingly, Claimant falls back and relies on the statement made, on oath, by Respondent's own legal representative, Mr. Galle, in his Affidavit in Support of Petition for Appointment of Special Conservator for Adult sworn on 9 January 2016 before Jennifer Hargain - a Notary Public in the State of Florida - that "*the Assignment Agreement, and [Respondent]'s interest thereunder, is believed to be valued in excess of $100 million dollars*".[7]

107.   It is not clear how Mr. Galle's belief that Respondent's interest under the Assignment Agreement was valued in excess of $100 million arose or what the precise basis was for his belief (because Mr. Galle does not expand on this point in his Affidavit), but, assuming that this

---

[7] C-16.

statement is true and accurate, then Respondent would have been required to obtain Claimant's prior written consent before accepting the sum of US$57.5 million for that interest. As he did not, Respondent breached this obligation.

108.     The above is the best - indeed the only - evidence that has been placed before this Tribunal as to the sum that was "otherwise payable" to Respondent for his AVI had Respondent not entered into the settlement agreement with AT&T. The Tribunal has considered this and - for the reasons explained below - is willing to, and does, accept that the sum otherwise payable to Respondent for his AVI, had he not entered into the settlement agreement with AT&T, would have been in excess of US$100 million. Accordingly, it follows that Respondent was obliged, by virtue of Clause 11.5(iii) of the Facility Agreement, to seek Claimant's prior written consent before accepting the sum of US$57.5 million from AT&T for his AVI. Respondent failed to do so. This was a breach of his obligation not to accept a sum of less than 90% of the amounts otherwise due to him for his AVI (without the prior written consent of Claimant, which he neither sought, nor obtained).

109.     The Tribunal is willing to accept the evidence adduced by Claimant that the sum otherwise payable to Respondent for his AVI was in excess of US$100 million for multiple reasons, including the fact that: (i) the statement relied on was made by Respondent's own lawyer, Mr. Galle, who (according to Mr. Galle's own statements in that same affidavit) had known Respondent since 1998 and had provided legal representation to him since that time, and indicated that  Respondent was his current client and that he was currently providing services to him as lead lawyer in connection with the monies due to Respondent from AT&T under the Assignment Agreement; (ii) Mr. Galle indicated he had been in constant communications with Respondent for 7 years on the matters involving AT&T from 1998 to the end of 2015, involving weekly communications regarding the Assignment Agreement, the appraisal process, and the litigation arising therefrom; (iii) Mr. Galle made the statement, on oath, before a Notary Public of the State of Florida, where Mr. Galle is an attorney licensed to practice law; (iv) Mr. Galle was aware that his affidavit was to be produced in proceedings before the Denver Probate Court and relied upon by that Court in an application for his own appointment as Respondent's Personal Representative or Special Conservator; (v) Mr. Galle confirmed in his affidavit that he had personal knowledge of the facts set forth in his affidavit and that, if called to testify in the matter, he would testify in accordance with the statements made in the affidavit; and (vi) Mr. Galle expressly agreed that, if appointed as Special Conservator (as he subsequently was), he subjected himself to the jurisdiction of the Colorado Courts.[8]

110.     Given the above, the Tribunal finds it inherently unlikely that Mr. Galle's statement that Respondent's interest under the Assignment Agreement (being essentially the sum otherwise payable to Respondent had it not been for the settlement agreement with AT&T) was worth in excess of US$100 million would be a falsehood and, in the absence of any other evidence to the contrary, the Tribunal is willing to accept Mr. Galle's indication of his belief that the value of Respondent's AVI was in excess of US$100 million as being valid and an accurate reflection of the value of Respondent's AVI for the purposes of this Final Award.

111.     Accordingly, on the second point raised under this head, the Tribunal duly finds and determines that Respondent did have, and did breach, his obligation not to accept any sum which is less than 90% of the amounts due to him for his AVI without the prior written consent of Claimant.

---

[8] C-16.

112.    Thirdly, then, under this head, did Respondent have and breach an obligation to ensure that his obligation to pay Claimant ranked at least *pari passu* with Respondent's other unsecured obligations and liabilities?

113.    Clause 11.3 of the Facility Agreement is clear in this regard. It provides that Respondent "*shall procure that any of his unsecured and unsubordinated obligations and liabilities under this agreement rank, and will rank, at least pari passu in right and priority of payments with all his other unsecured and unsubordinated obligations and liabilities, present or future, actual or contingent, except for those obligations and liabilities mandatorily preferred by law*". Again, therefore, there is no doubt, in the Tribunal's view, that Respondent did indeed have an obligation to ensure that his obligation to pay Claimant under the Facility Agreement ranked at least *pari passu* with his other unsecured obligations and liabilities (except for those mandatorily preferred by law), and the Tribunal so finds and determines.

114.    Next, then, did Respondent breach this obligation? In this regard, Claimant points to certain payments that, acting through Mr. Galle, Respondent made to third parties out of the AVI Consideration before paying Claimant. In a letter from Mr. Britt (Respondent's Guardian *Ad Litem* for the purpose of proceedings before the Denver Probate Court) to Claimant's legal representatives dated 17 November 2017, Mr. Britt stated that "*[w]ith the exception of one other claimant that we anticipate will soon be resolved, all the other claims of Mr. Horn have been amicably resolved without the need for litigation*".[9] Further, in his Witness Statement, Mr. Adkinson notes that Mr. Christopher Lambert (a Partner of Robertsons Solicitors who had previously acted for Respondent) told him that that Robertsons had been forced by Mr. Galle to accept a significantly reduced payment from Respondent for its fees.[10]

115.    On the evidence placed before this Tribunal, the Tribunal is therefore persuaded that, on the balance of probabilities, Respondent did breach his obligation to Claimant under Clause 11.3 of the Facility Agreement by settling other unsecured obligations and liabilities in priority to Claimant's claims. Respondent thus failed to ensure that his obligation to pay Claimant ranked at least *pari passu* with his other unsecured obligations and liabilities, which was a breach of Clause 11.3 of the Facility Agreement.

116.    Accordingly, on the third point raised under this head, the Tribunal duly finds and determines that Respondent did have, and did breach, his obligation to ensure that his obligation to pay Claimant ranked at least *pari passu* with his other unsecured obligations and liabilities.

117.    Fourth, then, did Respondent have and breach an obligation not to negotiate or compromise with any of his creditors with a view to rescheduling his indebtedness?

118.    Clause 12.6 of the Facility Agreement is clear in this regard. By virtue of Clause 12.6 it was a specified Event of Default under the Facility Agreement if Respondent "*commences negotiations, or enters into any composition, compromise, assignment or arrangement, with one or more of his creditors with a view to rescheduling any of his Indebtedness (because of actual or anticipated financial difficulties)*". Indebtedness was broadly defined under the Facility Agreement to mean "*any obligation to pay or repay money, present or future, whether actual or contingent, sole or joint*".

119.    Accordingly, this Tribunal finds and determines that Respondent had an obligation under the Facility Agreement not to negotiate or compromise with any of his creditors with a view to rescheduling his indebtedness.

---

[9] C-22.
[10] C-8, para 50.

120.  Did Respondent breach this obligation? Claimant relies on the same matters to make good its contention that Respondent did indeed breach this obligation as it relies on to show that Respondent breached his obligation to ensure that his obligation to pay Claimant ranked at least *pari passu* with Respondent's other unsecured obligations and liabilities. That is: (i) the letter from Mr. Britt of 17 November 2017, which noted that bar one (which was anticipated would be shortly resolved) all the other claims of Respondent had been amicably resolved without the need for litigation; and (ii) Mr. Lambert's statement to Mr. Adkinson that Robertsons had accepted a reduced sum for its outstanding fees.[11]

121.  The Tribunal has considered these matters. Having done so, the Tribunal is persuaded - on the basis of the evidence before it - that, on a balance of probabilities, Respondent did breach this obligation by negotiating with and entering into a compromise with one of more of his creditors with a view to rescheduling his indebtedness.

122.  Accordingly, on the fourth point raised under this head, the Tribunal duly finds and determines that Respondent did have, and did breach, his obligation not to negotiate or compromise with any of his creditors with a view to rescheduling his indebtedness.

123.  The fifth, and final, matter Claimant places before this Tribunal for determination under the "Respondent's Breaches" head is whether Respondent had and breached an obligation to remedy within 14 days any remediable event of default, including any breach of Respondent's obligations under the Ancillary Agreements?

124.  Again, the Facility Agreement is clear in this regard. By virtue of Clause 12.1 Respondent was obliged to remedy any default notified to him by Claimant within fourteen (14) Business Days of Claimant notifying Respondent of the default and of the remedy required. One such Event of Default, set out in Clause 12.3, was if Respondent failed to comply with any provision of the Facility Agreement and/or the Ancillary Agreements.

125.  Accordingly, this Tribunal finds and determines that Respondent did have an obligation to remedy any remediable event of default notified to him by Claimant within 14 Business Days of Claimant notifying Respondent of the default and of the remedy required. Given the provisions of Clause 12.3(ii) and (iii), this obligation extended to any failure by Respondent to comply with the provisions of the Ancillary Agreements (as well as any failure to comply with the Facility Agreement, by virtue of Clause 12.3(i)).

126.  Did Respondent breach this obligation? Claimant contends that he did. In support of its contentions in this regard, Claimant cites and relies upon Respondent's failure (himself or through Mr. Galle) to notify Claimant within 72 hours of reaching agreement with AT&T on the amount due to Respondent for his AVI. In this regard, the Tribunal notes and accepts that, by virtue of the provisions of Clause 3 of the Security Agreement, Respondent was obliged to inform Claimant within 72 hours of the agreement with AT&T of the amount due to Respondent for his AVI. Respondent's clear failure to do so was not only a breach of this provision of the Security Agreement but also constituted an Event of Default under the Facility Agreement (specifically Clause 12.3(iii)).

127.  Claimant cites and relies on its legal representatives letter to Respondent of 17 November 2017 as being its request to cure this Event of Default.[12] In that letter Claimant noted that Respondent's failure to notify Claimant within 72 hours of Respondent's settlement of the dispute with AT&T constituted a breach of the Security Agreement by Respondent (paragraph

---

[11] C-22; C-8, para 50.
[12] C-64.

25

11), that Respondent's failure to comply with any provision of the Security Agreement constituted an event of default under Clause 12.3 of the Facility Agreement (paragraph 45), and - in paragraph 47 - indicated that the letter served as notification to Respondent that he is in breach of his obligations under the Facility Agreement, including under Clause 12.3, and the Security Agreement and that Claimant required him to remedy such default by paying US$5 million to Claimant forthwith and in any case with in 14 Business Days (as defined in the Facility Agreement) of the date of the letter.

128.    Accordingly, the Tribunal finds that Claimant duly notified Respondent of his default under the Facility Agreement and the Security Agreement by virtue of the letter of 17 November 2017 and, as required by Clause 12.1 of the Facility Agreement, notified him of the remedy required. The remedy required was to pay Claimant the sum of US$5 million forthwith and in any case within 14 Business Days of the date of the letter. That payment has still not been made despite the passage of more than two years. As such, this Tribunal finds and determines that Respondent breached his obligation to remedy a remediable event of default notified to him by Claimant within 14 Business Days of Claimant notifying Respondent of the default and of the remedy required.

129.    Accordingly, on the fifth point raised under this head, the Tribunal duly finds and determines that Respondent did have, and did breach, his obligation to remedy within 14 days any remediable event of default, including any breach of Respondent's obligations under the Ancillary Agreements.

### Loss, Damage, Causation

130.    Next, Claimant puts two issues to this Tribunal relating to loss, damage and causation.

131.    The first is: did Claimant suffer loss and damages as a result of Respondent's breaches? The second is: was such loss and damage caused by Respondent's breaches?

132.    Claimant submits that it has suffered losses in the form of the Outstanding Payment (as defined in the Statement of Claim). The Outstanding Payment is the sum of US$5 million which Claimant submits is due under the Facility Agreement. Alternatively, Claimant seeks damages in the same sum (*i.e.,* US$5 million) for Respondent's breach of the Facility Agreement.

133.    Claimant further submits that such losses have arisen as a direct and foreseeable consequence of Respondent's failure to pay Claimant the sums due, and of Respondent's other breaches of the Facility Agreement.

134.    The Tribunal accepts Claimant's submissions in this regard. Accordingly, subject to the arguments put forward earlier in these proceedings by those purportedly representing Respondent relating to the potential invalidity/unenforceability of the Facility Agreement (with which the Tribunal deals below), the Tribunal finds and determines that Claimant suffered loss and damages as a result of Respondent's breaches and that such loss and damage was caused by Respondent's breaches.

135.    Accordingly (again subject to the arguments put forward earlier in these proceedings by those purportedly representing Respondent relating to the potential invalidity/unenforceability of the Facility Agreement, with which the Tribunal deals below), the Tribunal thus accepts Claimant's primary claim for payment of US$5 million as a debt or, alternatively, as damages for Respondent's breach of contract, those losses having arisen as a direct and foreseeable consequence of Respondent's failure to pay Claimant the sums due and of Respondent's other breaches of the Facility Agreement.

**Issues Raised Purportedly on Behalf of Respondent**

136.   Before turning to Claimant's alternative claim, the Tribunal will first consider the issues raised by those purportedly acting on behalf of Respondent to argue that the Facility Agreement is void and/or unenforceable. As noted earlier, these are matters that the Tribunal expressly directed Claimant to address during the CMC held on 17 October 2019. As Claimant has noted, its claims are otherwise uncontested. However, it remains for Claimant to make out its case before this Tribunal. Given that those purporting to represent Respondent had raised certain matters at an earlier stage of these proceedings which, if made out, might result in the Facility Agreement's invalidity or unenforceability (see paragraphs 22 to 31 of Section V of the Answer), the Tribunal considered it necessary for Claimant to address those matters.

137.   At the time Mr. Galle was purporting to act on behalf of Respondent in these proceedings (prior to the Tribunal's ruling that he has no authority to act for Respondent in this arbitration), he argued that the Facility Agreement is void and/or unenforceable for three reasons. These have been set out above, but in short they are that:

   (a)   Respondent was mentally incapacitated at the time of signing the Facility Agreement, and therefore had no capacity to sign the Facility Agreement;

   (b)   the Facility Agreement was entered into between Claimant and Respondent for the purpose of paying for the litigation costs of the AT&T Action when Claimant had no interest in that action, and therefore the Facility Agreement is champertous and should be struck down as such; and

   (c)   the Facility Agreement is unenforceable as it is "usurious" and invalid, the 'effective interest rate' applied being 150% per annum, which violates Section 24 of the MLO.

138.   The Tribunal deals with each of these issues, in turn, below.

139.   First, then, the Tribunal addresses the issue of Respondent's mental capacity.

140.   Claimant notes that the general rule under Hong Kong law is that a person who is mentally disordered is still bound by his contract unless he can show that: (i) he did not understand what he was doing; and (ii) the other party was aware of his incapacity (see: *Fortune Asset Development Limited v De Monsa Investments Limited* [2009] HKEC 1369, at §§41-42).[13] The burden of proof is therefore on Respondent, to establish both that he was mentally incapable at the time when the Facility Agreement was entered such that he did not understand what he was doing, *and* that Claimant was aware of this incapacity. Claimant submits that not only has Respondent not raised this argument himself, but - even if he had - he would not be able to discharge his burden of proof, because the evidence is clear both that: (i) Respondent plainly understood what he was doing when he entered into the Facility Agreement; and (ii) even if Respondent were mentally incapacitated, Claimant did not know it.

141.   Claimant first points out that the two Thai medical reports on which those claiming to represent Respondent relied to demonstrate that Respondent was mentally incapacitated at the time the Facility Agreement was entered into are dated 18 December 2014 and 26 February 2015. By contrast Respondent executed the Facility Agreement over three years earlier, on 19 December 2011. As such these reports do not address the issue of Respondent's mental capacity at the time of entry into the Facility Agreement - there is, as Claimant rightly submits,

---

[13] CL-17.

27

no evidence presented as to Respondent's mental condition at the time he negotiated and entered into the Facility Agreement.

142. Further, neither report address the specific issue of Respondent's ability to enter into the Facility Agreement.

143. As regards Respondent's capability at the relevant time (*i.e.*, at the time when the Facility Agreement was being negotiated and executed in November/December 2011), Claimant notes that Respondent's conduct at this time was not such as to indicate that Respondent was suffering from a mental incapacity that might affect his ability to understand the Facility Agreement. Rather, the evidence before this Tribunal demonstrates the opposite, in that Respondent was actively involved in negotiating the Facility Agreement and clearly understood what he was doing at that time: see, for example, Respondent's emails of 23 and 24 November 2011 to Mr. Adkinson and Mr. Marco Capriz (**Mr. Capriz**) (Claimant describes Mr. Capriz as a connection of Mr. Adkinson; Mr. Capriz met with Respondent at Mr. Adkinson's request on two occasions prior to the execution of the Facility Agreement in November 2011, once with and once without Mr. Adkinson being present); and Respondent's emails to Mr. Adkinson of 6 and 15 December 2011.[14] In his communications, Respondent urged Mr. Adkinson to provide the initial funding amount of US$25,000 on an urgent basis, indicated his appreciation for Mr. Adkinson's support in the deal, detailed a breakdown of the required Valuation Funding, and corrected an apparent mistake in the draft Facility Agreement to protect Claimant's interest.

144. Claimant submits that Respondent's conduct and involvement in negotiating the Facility Agreement was not such as to raise any suspicion on the part of Claimant that Respondent did not understand what he was doing.

145. In sum, the Tribunal accepts Claimant's submission that there is no evidence that, in negotiating and executing the Facility Agreement, Respondent did not understand what he was doing.

146. The Tribunal further accepts Claimant's submission that there is no evidence that, if Respondent were suffering from a mental incapacity such that he was not able to understand what he was doing, Claimant was aware of this.

147. As a result, the Tribunal finds and determines that, on the evidence before it: (i) Respondent understood what he was doing when he entered into the Facility Agreement, but that (ii) even if this is wrong and Respondent was in fact mentally incapacitated at that time, Claimant was not aware of this. As such the Tribunal does not find the Facility Agreement void and/or unenforceable as a consequence of Respondent's mental incapacity.

148. Secondly, was the Facility Agreement entered into between Claimant and Respondent for the purpose of paying for the litigation costs of the AT&T Action when Claimant had no interest in that action, the Facility Agreement thereby being champertous and liable to being struck down as such?

149. Those purporting to represent Respondent claimed earlier in the proceeding that the Facility Agreement was unenforceable as being contrary to the rules of champerty and maintenance.

150. In this regard, Claimant does not deny that it had no commercial interest in the AT&T Action. However, Claimant nevertheless denies that the enforceability of the Facility Agreement is affected by the rules of champerty and maintenance for two main reasons.

---

[14] C-8, paras 13-30; C-29; C-30; C-35; C-42.

151.    First, because the purpose of the Facility Agreement was not to fund the AT&T Action. Rather, the Valuation Funding was provided for the specific purposes stipulated in Column II of Schedule 2 of the Facility Agreement itself. None of those purposes include any payment of litigation costs, such as court costs and legal fees. Rather the Facility Agreement provided for the Valuation Funding to enable Respondent to value his AVI pursuant to the valuation provisions of the Assignment Agreement.

152.    And, secondly, because there was no litigation pending at the time Claimant and Respondent negotiated and executed the Facility Agreement. At that time, the District Court in Denver had already granted summary judgment in favour of Respondent (some three years earlier, in 2008), terminating the proceedings between Respondent and AT&T. The AT&T Action did not re-commence until 2014, over 2 years after the Facility Agreement was entered into and after Claimant had paid the last of the Valuation Funding to Respondent. Clearly, then, the purpose of the Facility Agreement was not to fund litigation, but rather to provide funding to Respondent to assist him to pay appraisers and other costs for the appraisal process as required under the Assignment Agreement.

153.    Thus, submits Claimant, as the Facility Agreement was not made for the funding of litigation, it is not in breach of the common law rules of champerty and maintenance.

154.    In the Tribunal's view it is clear, from the background facts, the Chronology, the evidence placed before this Tribunal and the terms of the Facility Agreement itself that the purpose of the funding was not to fund litigation (be it the AT&T Action or otherwise) but to enable Respondent to pay for the costs associated with the valuation of Respondent's AVI pursuant to the valuation provisions of the Assignment Agreement. As such the Tribunal does not find the Facility Agreement void and/or unenforceable as being contrary to the rules of champerty and maintenance.

155.    This being so, it is not strictly necessary for the Tribunal to determine whether - if the Facility Agreement were for the purpose of providing funding related to a dispute - it was "officious intermeddling" such as to make it champertous. However, for completeness, and in case this matter is ever subject to review in another forum, the Tribunal would indicate that in this regard it accepts Claimant's submissions that:

        (a)     Respondent had already been engaged in a dispute relating to AT&T's obligation to engage in the valuation mechanism prior to the agreement to provide funding;

        (b)     the Facility Agreement provided that the Valuation Funding was to be used for specific purposes, none of which related to factual witnesses, evidence or otherwise to any litigation; and

        (c)     Valuation Funding would have been required regardless of whether there might have been a dispute in the background.

156.    As such, the Tribunal accepts Claimant's submission that, even if the Facility Agreement was for the purpose of providing funding related to a dispute, it did not amount to "officious intermeddling" in that dispute such as to make the agreement champertous.

157.    Equally, it is not strictly necessary for the Tribunal to determine the final two issues Claimant raises under this head (being: (i) whether Colorado law recognises champerty and maintenance to the extent it would invalidate the Facility Agreement; and (ii) if Colorado law would not invalidate the Facility Agreement, does Hong Kong public policy require the invalidation of

29

the Facility Agreement as a matter of Hong Kong law). However, for similar reasons as expressed above, in case this matter is ever considered in another forum, the Tribunal would indicate that, on these issues, it accepts Claimant's submissions that:

(a)    common-law maintenance and champerty no longer exist in Colorado, as made clear by the full Supreme Court of Colorado (*en banc*) in 1952 (see: *Fastenau v Engel*, 125 Colo. 119, 240 P.2d 1173);[15]

(b)    the statue cited by Mr. Britt in his letter of 25 September 2017 (being the Uniform Credit Code of Colorado) does not apply extraterritorially to the Facility Agreement; and

(c)    the Hong Kong courts would not strike down the Facility Agreement for public policy considerations. In this regard, the Tribunal notes that under Hong Kong law, if an agreement might be considered champertous "*as a matter of purely domestic [Hong Kong] law*", where a contract made in Hong Kong and governed by Hong Kong law provides assistance for an arbitration or legal proceedings in a jurisdiction that does not object to the agreement, "*as a matter of principle, Hong Kong public policy should not invalidate such contract*" (see *Unruh v Seeberger and Eganagoldpfeil (Holdings) Limited* [2007] 2 HKLRD 414).[16]

158.    As such, the Tribunal finds and determines that Colorado law does not recognise champerty and maintenance and would therefore not invalidate the Facility Agreement even if it did provide funding for litigation. The Tribunal further finds and determines that Hong Kong public policy does not require the invalidation of the Facility Agreement as a matter of Hong Kong law, and that the Hong Kong courts should not strike down the Facility Agreement for public policy considerations, given that (on this basis) the Facility Agreement would be providing assistance for legal proceedings in a jurisdiction (Colorado) that does not object to the agreement.

159.    In sum, therefore, the Tribunal does not find the Facility Agreement void and/or unenforceable as a consequence of the rules of champerty and maintenance.

160.    With that, the Tribunal turns to the final question under this head - is the Facility Agreement unenforceable as "usurious" and invalid, the 'effective interest rate' applied being 150% per annum in violation of Section 24 of the MLO, which provides that "*[a]ny person (whether money lender or not) who lends or offers to lend money at an effective rate of interest which exceeds 60% per annum commits an offence*".

161.    Under this head, Claimant places 4 issues before this Tribunal for determination, as follows:

(a)    Was the Valuation Funding under the Facility Agreement a "loan" triggering the application of the MLO?

(b)    If the Valuation Funding was a "loan", what is the "Effective Interest Rate"? Under this head, Claimant asks two subsidiary questions: (i) is the effective interest rate (if any) 150% as alleged by Mr. Galle in the Answer; and (ii) is the effective interest rate (if any) more than 60% for the purpose of section 24 of the MLO?

(c)    What is the actual interest rate under the Facility Agreement?

---

[15] CL-23.
[16] CL-20.

(d)      Is the Facility Agreement invalid or unenforceable pursuant to section 24 of the MLO?

162.   The Tribunal deals with each of these issues in turn below. First, was the Valuation Funding under the Facility Agreement a "loan"? Claimant notes that the Facility Agreement was (in its words) "poorly labelled" as a "loan facility agreement". Claimant asks the Tribunal to view this in the context of Respondent urging Claimant to provide the Valuation Funding within a short period of time, the first draft of the agreement being prepared by Claimant's lawyers within the context of this urgency. However, notwithstanding this label, Claimant submits that the Facility Agreement does not have the qualities of a loan agreement.

163.   Citing *Ng Shou Chun v Hung Chun San* CACV 182/1993,[17] Claimant notes that the characterisation of a loan as such is a matter of substance not form. Claimant further notes that the Facility Agreement does not possess the "essence" of a loan agreement in two particular ways.

164.   First, the Facility Agreement does not provide for the repayment of the Valuation Funding (whereas the "essence of a loan" - per the Annotated Ordinances of Hong Kong, MLO at 2.22 - involves a payment and an obligation to make repayment ("*An agreement for a loan is a simple contract whereby the lender agrees to pay money in consideration of the borrower's promise of repayment*") (emphasis supplied). Instead the Facility Agreement provides that Claimant will be paid a determinable sum (based on the amount of the AVI Consideration) of at least US$5 million shortly after Respondent's receipt of the AVI Consideration. It does not provide for the repayment of the Valuation Funding provided. Thus, if Respondent had received nothing from AT&T, Claimant would not be entitled to receive any sum back from Respondent; there was no provision for repayment in this sense at all.

165.   Secondly, the Facility Agreement expressly excludes any entitlement for Claimant to any interest (Clause 6 of the Facility Agreement), such that no interest was payable under the Facility Agreement (whereas the "very nature" of a money lending loan - per *Harvester Stock Investment Co v Kwan Siu May*, HCA 1983 No. 11515[18] - is that it "should be repaid with interest").

166.   The Tribunal accepts that the fact the relevant agreement is labelled a "Loan Facility Agreement" is not conclusive. The Tribunal also accepts that Hong Kong law requires it to analyse the overall transaction and consider in overall terms what it was that the parties to the transaction were attempting to achieve before deciding whether the transaction was a loan. And further the Tribunal accepts that it should look at the substance of the transaction, not the form, in deciding its nature.

167.   Having undertaken such an exercise, the Tribunal finds and determines that, although (as Claimant readily admits) the Facility Agreement is badly named and contains some unfortunate wording (for example Clause 8 provides that "The Borrower shall repay the Loan by way of payment to the Lender of the Repayment Amount on the Repayment Date"), it is in substance, in reality, and in law, not an agreement for the provision of a "loan".

168.   In coming to this decision, the Tribunal is particularly cognizant of the fact that there was no provision whatsoever for the return of the Valuation Funding (*i.e.*, the "principal sum" extended by Claimant to Respondent) and that - if Respondent did not receive any funds at all for his AVI - Claimant would have no right to the payment of any sum whatsoever under the Facility

---

[17] CL-26.
[18] CL-27.

Agreement. There was no provision for the repayment of the Valuation Funding at all; Claimant would be entitled to receive money from Respondent (the "Repayment Amount") if Respondent received funds from AT&T for his AVI, but the amount of that payment was not linked in any way, or calculated by reference to the Valuation Funding provided. The amount of that payment was linked instead to the amount Respondent received for his AVI from AT&T.

169.   The Tribunal is also persuaded by the fact that the Facility Agreement expressly excludes any entitlement to interest on the Valuation Funding, although it accepts that the provision of interest or otherwise is not conclusive in terms of determining whether the arrangement under consideration constitutes a loan agreement. It is however "usual" for a loan to carry interest and the fact that interest is therefore expressly excluded is, in the Tribunal's view, instructive.

170.   Accordingly, as the Tribunal has found and determined that the Facility Agreement does not provide for or constitute the provision of a loan, section 24 of the MLO does not apply. And so, to answer the first issue Claimant puts before this Tribunal for determination: the Tribunal finds and determines that the Valuation Funding provided under the Facility Agreement was not a "loan" triggering the application of the MLO.

171.   This being so, it follows that the Tribunal can also answer the fourth issue Claimant puts before this Tribunal for determination under this head: the Tribunal determines that the Facility Agreement is not in violation of section 24 of the MLO (because the Valuation Funding provided under the Facility Agreement was not a loan triggering the application of the MLO), and it is therefore valid and enforceable as against Respondent.

172.   Given this determination, it is not strictly necessary for this Tribunal to determine the second and third issues Claimant places before it under this head - these issues would only be engaged if, contrary to the Tribunal's decision, the Facility Agreement were, in fact, a loan. However, the Tribunal does so, shortly, for completeness, noting that Claimant submits that there is in any event still no violation of section 24 of the MLO even if the Facility Agreement is, in fact, a loan.

173.   In relation to the second issue, in the Answer Mr. Galle claimed that the Effective Interest Rate under the Facility Agreement is 150%. Claimant asks the Tribunal to determine whether this is so, and also whether the Effective Interest Rate is more than 60% (the MLO prohibiting any loan at an effective interest rate of interest exceeding 60 per cent per annum).

174.   Claimant notes that the case put forward by Mr. Galle turns on the concept of "Effective Interest Rate", as the Facility Agreement itself expressly excludes the payment of any interest. In this regard, the MLO provides for a mechanism by which to calculate the "Effective Interest Rate" under an agreement. The statutory concept of the "Effective Interest Rate" is intended to determine the true annual percentage rate of interest under an agreement, and is calculated by reference to a "deeming" formula in Schedule 2 to the MLO.

175.   However, as Claimant points out, the "deeming" formula in Schedule 2 of the MLO requires the existence of a principal sum and interest. As the Facility Agreement provides for no repayment of principle and expressly provides that there is no interest payable, it is simply impossible to calculate the "Effective Interest Rate" by reference to the "deeming" formula under Schedule 2. The Tribunal agrees. It is, in the Tribunal's view, not appropriate - or indeed possible - to apply the provisions of Schedule 2 to the MLO to the Facility Agreement.

176.   For the record, the Tribunal notes that Mr. Galle's deemed interest rate of 150% has in any event not been calculated in accordance with the provisions of Schedule 2 of the MLO. It is

instead his own construct, the legal basis for which is unclear. Further, Respondent's own representatives are unable to agree on the interest rate. By contrast to Mr. Galle, Mr. Britt has alleged that the interest rate under the Facility Agreement is "approximately" 47%. The Tribunal notes that Mr. Britt has used a number of somewhat dubious assumptions in coming to this figure - for example, he has suggested that the term of the loan is 6 years, but the monies Claimant extended to Respondent were paid on various dates between 20 December 2011 and 10 February 2014, *i.e.,* the last of the funds were remitted some 6 years and 2 months ago, and the first as long ago as 8 years and 4 months ago: Mr. Britt's assumption of a 6-year term is therefore invalid. But, in any event, perhaps this is of little consequence given that Mr. Britt's interest rate of "approximately" 47% would in any event not be prohibited under the relevant provisions of the MLO. Accordingly, the transaction would not contravene the MLO even on the case put forward on Respondent's behalf by one of his legal advisers.

177.    Accordingly, in relation to the second issue under this head, the Tribunal determines that it is not possible, or appropriate, to calculate an "Effective Interest Rate" pursuant to Schedule 2 of the MLO, and there is no basis for determining that any effective interest rate is either: (a) 150% (as alleged by Mr. Galle in the Answer, which the Tribunal expressly rejects as being an accurate assessment of the interest rate applicable under the Facility Agreement); or (b) more than 60% for the purpose of Section 24 of the MLO.

178.    The Tribunal can deal with the third issue very quickly. In light of Clause 6 of the Facility Agreement (which expressly provides that no interest is payable under the agreement), the Tribunal has no hesitation in finding and determining that the actual interest rate under the Facility Agreement is zero.

179.    In conclusion under this head, therefore, the Tribunal rejects the arguments that the Facility Agreement is invalid or unenforceable pursuant to section 24 of the MLO, primarily because the MLO is not engaged (the Valuation Funding under the Facility Agreement not being a loan triggering the application of the MLO), but in any event because the interest rate under the Facility Agreement did not violate the provisions of section 24 of the MLO, the actual interest rate being zero, and it being neither possible or appropriate to calculate an applicable Effective Interest Rate pursuant to Schedule 2 to the MLO.

**Consequences of Invalidity / Unenforceability**

180.    Under this head, Claimant puts two issues before the Tribunal for determination, as follows:

(a)    Has Respondent challenged the enforceability of the Facility Agreement?

(b)    What are the consequences (if any) of such invalidity / unenforceability?

181.    As Claimant notes, there has been no allegation either by Respondent or by anyone else purporting to act for him that the Facility Agreement was not validly formed.

182.    However, as Claimant admits, Mr. Galle (purportedly acting on behalf of Respondent) has argued that the Facility Agreement is void and/or unenforceable for reasons of Respondent's mental incapacity, for breach of the rules on champerty and maintenance, and for breach of the MLO. These issues were raised in the Answer, submitted by Mr. Galle purportedly acting on behalf of Respondent.

183.    Claimant submits that nevertheless, notwithstanding the matters raised in the Answer, Claimant's claims are in effect uncontested. This the Tribunal determines is so given that, in the Interim Award, the Preliminary Issue Tribunal determined that Mr. Galle was not properly

33

authorised to act for Respondent in this arbitration. This being so, the Answer was not a submission that was duly and properly authorised by and submitted on behalf of Respondent. Whilst, at the Tribunal's express request, Claimant has addressed the issues raised purportedly on Respondent's behalf in the Answer (with the Tribunal finding in Claimant's favour on each of those issues), the fact remains that the Answer is not a valid pleading in this arbitration. Further, Respondent has not appeared in this arbitration either by himself or by a duly authorised representative, he has submitted no Statement of Defence or any other pleading, nor has he made any submissions whatsoever in this arbitration.

184.   Accordingly, the Tribunal agrees that Claimant's claims are in effect uncontested. Therefore, in answer to the first issue Claimant raises under this head the Tribunal finds and determines that Respondent has not challenged the enforceability of the Facility Agreement in this arbitration.

185.   In relation to the second issue, Claimant asks this Tribunal to determine what the consequences are (if any) of the invalidity / unenforceability of the Facility Agreement. This question is moot, as this Tribunal has determined that the Facility Agreement is valid and enforceable. Nevertheless, Claimant suggests that - if the Facility Agreement is invalid and/or unenforceable - it should still be entitled to the return of the Valuation Funding as money had and received on the ground of total failure of consideration or mistake (of fact or law). Claimant also submits that it is also entitled to trace the Valuation Funding to the full AVI Consideration.

186.   To the extent necessary, the Tribunal addresses these issues in the next section of this Final Award, where is considers what, in its List of Issues, Claimant terms its "alternative claim" of unjust enrichment "in the event that the primary claim in contract is unsuccessful".

**Alternative Claim - Unjust Enrichment (in the event that the primary claim in contract is unsuccessful)**

187.   In its List of Issues, Claimant asks this Tribunal to consider what it describes in its List of Issues as its "alternative claim". This claim is said to be based on principles of unjust enrichment (although, on proper analysis, one limb of the alternative claim - that which relies on *Foskett v McKeown* [2001] 1 A.C. 102[19] - is in fact a proprietary claim, and not one based on unjust enrichment).

188.   In any event, in its List of Issues (dated 29 November 2019), Claimant expressly indicates (page 5 of the List of Issues) that its alternative claim is engaged "*in the event that the primary claim in contract is unsuccessful*" (emphasis supplied).

189.   Likewise, in the Statement of Claim (paragraph 127), dated 13 November 2019, Claimant introduces its "further and/or alternate claims" by stating, expressly, "*if, which is denied, the Claimant's claim for payment of the Outstanding Payment ... is invalid, the Claimant claims a further and alternative entitlement to repayment of the sums provided by the Claimant to the Respondent, and to all amounts earned by the Respondent through the use of such sums*" (emphasis supplied). Similarly, in the prayer for relief (paragraph 257), the restitutionary claims for US$500,624.26 (*i.e.,* the aggregate sum of the Valuation Funding supplied) and for US$57.5 million (*i.e.,* the full AVI Consideration) are put as "alternative relief".

190.   Claimant puts the matter forward similarly in its Skeleton Opening Submissions (paragraph 20). Here, Claimant states "*if, which is denied, the [Facility Agreement] is void or invalid the*

---

[19] CL-13 (*Foskett v McKeown*).

*Claimant would be entitled to a return of the monies he paid to the Respondent's agents, in a sum of US$500,624.26"*. And again, in the section entitled "Relief Sought" Claimant seeks the aggregate sum of the Valuation Funding and the full AVI Consideration "[a]lternatively to the primary claim".

191.    As Claimant has succeeded on its primary claim, that might have been the end of the matter. However, during the Substantive Hearing, Claimant's Counsel attempted to put Claimant's claim for relief somewhat differently, suggesting during the Substantive Hearing - for the very first time - that Claimant might be entitled to the full AVI Consideration of US$57.5 million (*i.e.*, the relief it sought in the alternative) even where the Facility Agreement was valid.[20]

192.    Claimant's counsel accepted that he had no legal authority to support this position.[21]

193.    The Tribunal expressly offered Claimant's counsel the opportunity to confirm that, as Claimant's proprietary and restitutionary claims were pleaded in the alternative, if the Tribunal were to find that the Facility Agreement was valid and that Claimant was entitled to its primary claim, then the alternative claim "disappears"[22]. Claimant's counsel was unwilling to make that concession, although he did accept that "*on the Statement of Claim it is an alternative claim*"[23] and that "*if the Tribunal were minded to find that the [Facility Agreement] were valid and therefore it [was] entitled to the 5 million plus costs plus interest, I don't think we would be pushing a claim for the 57.5 million*")[24].

194.    In this regard, the first point to note is that the Tribunal has determined that the Facility Agreement is valid. Accordingly, the Tribunal does not consider that Claimant's alternative claim is engaged. Further, the Tribunal does not consider that Claimant is entitled to deviate so substantially from its pleaded case - which, as the Tribunal has noted, expressly states that the alternative claim is only engaged if the Facility Agreement is invalid - at such a late stage of the proceedings (in fact, halfway through the Substantive Hearing), without notice to either Tribunal or Respondent, and suggest that it is entitled to its alternative "relief" even where its primary claim succeeds. Had Claimant wished to raise a claim for US$57.5 million if its primary claim succeeded, then it ought to have pleaded the case in this way. Claimant did not, and the Tribunal considers for good reason given that Claimant's counsel admitted that he could not point to a single authority to support the position Claimant was now taking in this regard at the Substantive Hearing.

195.    However, for completeness, given that Claimant has placed the issue before it in its List of Issues, the Tribunal would indicate that if it is wrong on this, and the Facility Agreement is, in fact, invalid, for one or more of the reasons advanced by those purporting to represent Respondent in the Answer (discussed above), the Tribunal would have allowed Claimant's claim to an entitlement to repayment of the sums provided by Claimant to Respondent by way of Valuation Funding but it would have denied Claimant's claim to all amounts earned by Respondent through the use of such sums (*i.e.*, the full AVI Consideration). Further, if Claimant is in fact entitled to pursue its claim for the full AVI Consideration notwithstanding that this relief is only sought as a part of its alternative claim, the Tribunal would have denied this claim for relief, for the reasons discussed below.

---

[20] Hearing Transcript, page 50 line 21 - page 53, line 15.
[21] Hearing Transcript, page 52, line 7 and page 53, lines 7-12
[22] Hearing Transcript, page 54, line 21- page 55, line 2, per Mr. Denton, and again at page 55, lines 13 - 17.
[23] Hearing Transcript, page 55, lines 19-20.
[24] Hearing Transcript, page 56, lines 4-8.

196.    More particularly, had the Tribunal determined that the Facility Agreement is void or invalid:

(a)     It would have *allowed* Claimant's alternative claim to the extent of the claim for the
        return of the aggregate sum of the Valuation Funding (*i.e.,* the sum of US$500,624.26)
        on the grounds (i) that Respondent had been unjustly enriched at the expense of
        Claimant (applying the principles expounded in *Shanghai Tongji Science &
        Technology Industrial Co Ltd v Casil Clearing Ltd* FACV 13/2003);[25] or (ii) of money
        had and received on the basis of mistake (of fact or law) that there was mutual
        understanding of both Claimant and Respondent that the Facility Agreement was
        valid (applying the principles espoused in *First Asia Finance Ltd v Tsoi Tin Kwan
        Fanny* HCA 1070/2011).[26]

(b)     It would have *denied* Claimant's alternative claim to the full AVI Consideration of
        US$57.5 million (being its proprietary claim based on the principles outlined in
        *Foskett v McKeown*, as applied in Hong Kong in *CY Foundation Group v Cheng Chee
        Tock* HCMP 680/2011 and *Tang Ying Loi v Tang Ying Ip* HCA 2487/2009).[27]
        Likewise, it would have denied this claim for relief if Claimant had been entitled to
        raise it in this arbitration as relief in the event that its primary claim succeeded.

197.    In this regard, in relation to issues 11 to 15 in Claimant's List of Issues, the Tribunal makes the
        following findings and determinations:

(a)     Respondent was enriched by Claimant's payments of the Valuation Funding to
        Respondent via his agents (issue no. 11) (Respondent using the Valuation Funding
        for the purposes for which it was provided (per Schedule 2 to the Facility Agreement)).

(b)     Such enrichment was at Claimant's expense (the Valuation Funding being paid by
        Claimant) (issue no. 12).

(c)     Such enrichment was unjust on the basis of total failure of consideration (because
        Respondent failed to perform its obligation under the Facility Agreement by paying
        Claimant the amount agreed to be paid under that agreement) and/or mistake of law
        mutual to Claimant and Respondent (on the basis that, if the Facility Agreement is
        invalid, Claimant and Respondent had a mistaken belief at the time they entered into
        the Facility Agreement that the Facility Agreement was valid when in fact it was void
        and/or unenforceable) (issue no. 13). This, in the Tribunal's view triggers a personal
        remedy in favour of Claimant against Respondent enabling Claimant to claim the
        aggregate sum of the Valuation Funding (US$500,624.26) as a liquidated debt from
        Respondent. That is, Claimant is entitled to restitution of the Valuation Funding, it
        being plainly unjust in either of these circumstances to allow Respondent to keep the
        Valuation Funding.

(d)     The Tribunal is not persuaded, however, that this resulted in a constructive trust over
        the Valuation Funding notwithstanding the fact that had Claimant known that
        Respondent would not pay him the return under the Facility Agreement, it would not
        have advanced the Valuation Funding to Respondent. Equally, therefore, the Tribunal
        is not persuaded that Claimant retained an equitable proprietary interest over the
        Valuation Funding paid out mistakenly (issue no. 14).

---

[25] CL-5.
[26] CL-9.
[27] CL-14 and CL-15.

(e)     The principles of equitable tracing therefore do not apply, and Claimant is not able to trace what it terms the "inherent value of its equitable interest in the Valuation Funding into the full AVI Consideration (the "substitute property") (issue no. 15).

198.    Given that (had the Facility Agreement been found to be void or invalid, or had the Tribunal found that Claimant was entitled to pursue its alternative relief even where the Facility Agreement was valid) the Tribunal would have rejected Claimant's proprietary claim to the US$57.5 million based on constructive trust principles, the Tribunal would say a few words in relation to this claim.

199.    First, the Tribunal notes that Claimant bases its claim for a constructive trust on the principles outlined in *Foskett v McKeown*. As noted, this is Claimant's proprietary claim. At the Substantive Hearing, counsel for Claimant conceded that its claim did not fall precisely within the ambit of the passage of Lord Millett's speech on which Claimant placed particular reliance (Judgment, at page 130A-C), but submitted that "*the principle is that the trustee cannot be permitted to keep any profit resulting from his misappropriation [of trust property] for himself*".[28]

200.    Naturally, the Tribunal accepts the validity of the principle described by Lord Millett at page 130A-C of the Judgment. However, the Tribunal rejects the applicability of that principle to this case. The circumstances and background facts of *Foskett v McKeown* are very different, in significant ways, from the circumstances and background facts of this matter. For example:

(a)     *Foskett v McKeown* determined which of two innocent parties should benefit from the activities of a fraudster (Mr. Deasy). By contrast, there is no underlying allegation or suggestion of fraud in this case, which is at its heart (as Claimant has submitted on more than one occasion) a simple breach of contract case - in the very first paragraph of Claimant's Skeleton Opening Submissions, referencing paragraph 5 of its own Statement of Claim, Claimant describes the case as follows: "*In its purest form this is a simple case involving two commercial parties, advised by lawyers, agreeing contractual terms with which one party (the Claimant) complied and the other party (the Respondent) did not*".

(b)     In *Foskett v McKeown* the recipient of the funds (Mr. Deasy) used the funds for his own purposes and not for the purposes for which the claimant purchasers had provided the funds. Here, Claimant accepts that Respondent used the funds for the purpose for which they were provided. Indeed, this forms the basis of Claimant's case: see, for example, paragraph 132 of the Statement of Claim, where Claimant pleads that "*[i]t is not alleged, and the facts do not support, that the Valuation Funding was paid to a third party to settle a pre-existing debt, nor that the Respondent did not use the Valuation Funding for the agreed purpose*". Indeed, it is Claimant's complaint that having done exactly this (*i.e.,* having accepted the Valuation Funding provided under the Facility Agreement and used it for its proper purpose) Respondent has breached the terms of the Parties' agreement by refusing and/or failing to pay Claimant the return to which they had agreed it would be entitled under the Facility Agreement.

(c)     In *Foskett v McKeown*, Mr. Deasy was expressly named as a trustee under a trust deed and he held the moneys provided to him by the purchaser claimants under the express trusts of the purchasers trust deed. There is no trust deed in this case, just the Facility

---

[28] Hearing Transcript, page 151 lines 9-14.

Agreement, a simple contract. There is equally no express trust, and Respondent was not appointed as trustee for the funds provided by Claimant.

(d)     *Foskett v McKeown* is not a case involving resulting or constructive trusts; the only trusts at issue in *Foskett v McKeown* were the express trusts of the purchaser claimants trust deed. It was under those express trusts that the purchasers were entitled to equitable interests in the original monies paid to Mr. Deasy by the purchasers (see Lord Browne-Wilkinson's speech at page 108F-H).

(e)     Further, in this case (unlike in *Foskett v McKeown*), there is no evidence of a mixing of funds. Lord Millet introduces his speech (the leading speech) by saying: "*this is a textbook example of tracing though mixed substitutions*" (Judgment, page 126G) In fact, as Claimant makes a claim for the full amount of the AVI Consideration, Claimant's claim must be predicated on the basis that there was no such mixing of funds. In that case, to the extent that the principles of *Foskett v McKeown* can be applied at all to this case (which this Tribunal doubts), it appears clear that the maximum amount recoverable would be the amount of the sums remitted (*i.e.,* the Valuation Funding) plus interest: see Lord Browne-Wilkinson's speech at pages 109D-1101B.

201.    Accordingly, unlike in the passage from *Foskett v McKeown* relied upon by Claimant, as cited above, in this case there is no express trust deed, Respondent was not trustee for the funds provided by Claimant under the Facility Agreement, and the funds so provided were not misappropriated by Respondent and used for purposes other than those for which they were provided. Rather, this is (as Claimant has submitted elsewhere) a simple claim for breach of contract; it is not a trust claim, there being no fiduciary relationship between Claimant and Respondent. The claim Claimant has against Respondent is personal, not proprietary, in nature. Accordingly, in the Tribunal's view, Claimant does not have a proprietary claim in relation to the Valuation Funding and is not able to trace the "inherent value" of the Valuation Funding "into the full amount of the AVI Consideration" so as to make a claim for US$57.5 million.

202.    Accordingly, the Tribunal agrees with Claimant that, if the Facility Agreement is void or invalid, Claimant would be entitled to a return of the monies it paid to Respondent's agents, in a sum of US$500,624.26. And, if the Tribunal's determination that the Facility Agreement is valid and enforceable is wrong, then the Tribunal would grant Claimant an award for this sum (US$500,624.26) as against Respondent by way of restitution. It would not however grant Claimant an award in the sum of the full AVI Consideration of US$57.5 million for the reasons expressed above.

203.    However, as noted above, this is at present a moot question, as this Tribunal has determined that the Facility Agreement is valid and enforceable, and intends to grant Claimant the primary relief to which it claims to be entitled.

**Relief**

204.    Under this head, Claimant simply asks: is Claimant entitled to the relief claimed?

205.    Given its findings and determinations set out above, the Tribunal finds and determines that Claimant is entitled to the Outstanding Payment of US$5 million plus interest and costs on the ground that Respondent was in material, substantial and/or fundamental breach of contract (the award and quantification of costs is dealt with further below).

206.  The Tribunal rejects Claimant's alternative claim to be entitled to a declaration that Respondent holds the aggregate amount of the Valuation Funding on constructive trust for Claimant.

207.  In respect of Claimant's alternative claim, if (contrary to its determination that it is valid and enforceable) the Facility Agreement were, in fact, void and/or unenforceable, the Tribunal would find and determine that Claimant is entitled to the return of the aggregate amount of the Valuation Funding in the sum of US$500,624.26 in restitution, but it would reject Claimant's claim to be entitled to trace the Valuation Funding to the entire AVI Consideration of US$57.5 million.

## X.    COSTS

208.  Article 33 of the HKIAC Rules provides, in relevant part, the following:

### Article 33 – Costs of the Arbitration

"33.1   The arbitral tribunal shall determine the costs of the arbitration in its award. The term "costs of the arbitration" includes only:

(a)   the fees of the arbitral tribunal, as determined in accordance with Article 10;
(b)   the reasonable travel and other expenses incurred by the arbitral tribunal;
(c)   the reasonable costs of expert advice and of other assistance required by the arbitral tribunal;
(d)   the reasonable travel and other expenses of witnesses and experts;
(e)   the reasonable costs for legal representation and assistance if such costs were claimed during the arbitration;
(f)   the Registration Fee and Administrative Fees payable to HKIAC in accordance with Schedule 1.

33.2   The arbitral tribunal may apportion all or part of the costs of the arbitration referred to in Article 33.1 between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

33.3   With respect to the costs of legal representation and assistance referred to in Article 33.1(e), the arbitral tribunal, taking into account the circumstances of the case, may direct that the recoverable costs of the arbitration, or any part of the arbitration, shall be limited to a specified amount."

209.  The Hong Kong Arbitration Ordinance provides, in relevant part, the following:

### "74. Arbitral tribunal may award costs of arbitral proceedings

(1)   An arbitral tribunal may include in an award directions with respect to the costs of arbitral proceedings (including the fees and expenses of the tribunal).

(2)   The arbitral tribunal may, having regard to all relevant circumstances (including the fact, if appropriate, that a written offer of settlement of the dispute concerned has been made), direct in the award under subsection (1) to whom and by whom and in what manner the costs are to be paid.

(3)     The arbitral tribunal may also, in its discretion, order costs (including the fees and expenses of the tribunal) to be paid by a party in respect of a request made by any of the parties for an order or direction (including an interim measure).

(4)     The arbitral tribunal may direct that the costs ordered under subsection (3) are to be paid forthwith or at the time that the tribunal may otherwise specify.

(5)     Subject to section 75, the arbitral tribunal must—

    (a)     assess the amount of costs to be awarded or ordered to be paid under this section (other than the fees and expenses of the tribunal); and

    (b)     award or order those costs (including the fees and expenses of the tribunal).

(6)     Subject to subsection (7), the arbitral tribunal is not obliged to follow the scales and practices adopted by the court on taxation when assessing the amount of costs (other than the fees and expenses of the tribunal) under subsection (5).

(7)     The arbitral tribunal—

    (a)     must only allow costs that are reasonable having regard to all the circumstances; and

    (b)     unless otherwise agreed by the parties, may allow costs incurred in the preparation of the arbitral proceedings prior to the commencement of the arbitration.

(8)     A provision of an arbitration agreement to the effect that the parties, or any of the parties, must pay their own costs in respect of arbitral proceedings arising under the agreement is void.

(9)     A provision referred to in subsection (8) is not void if it is part of an agreement to submit to arbitration a dispute that had arisen before the agreement was made."

210.   With regard to interest, the Hong Kong Arbitration Ordinance provides, *inter alia*, the following:

**"79. Arbitral tribunal may award interest**

(1)     Unless otherwise agreed by the parties, an arbitral tribunal may, in the arbitral proceedings before it, award simple or compound interest from the dates, at the rates, and with the rests that the tribunal considers appropriate, subject to section 80, for any period ending not later than the date of payment—

    (a)     on money awarded by the tribunal in the arbitral proceedings;

    (b)     on money claimed in, and outstanding at the commencement of, the arbitral proceedings but paid before the award is made; or

    (c)     on costs awarded or ordered by the tribunal in the arbitral proceedings.

...

***80. Interest on money or costs awarded or ordered in arbitral proceedings***

(1)      Interest is payable on money awarded by an arbitral tribunal from the date of the award at the judgment rate, except when the award otherwise provides.

(2)      Interest is payable on costs awarded or ordered by an arbitral tribunal from—

     (a)      the date of the award or order on costs; or

     (b)      the date on which costs ordered are directed to be paid forthwith,

at the judgment rate, except when the award or order on costs otherwise provides.

(3)      In this section, **judgment rate** *(判定利率) means the rate of interest determined by the Chief Justice under section 49(1)(b) (Interest on judgments) of the High Court Ordinance (Cap. 4)."*

211.   In Claimant's Statement of Costs (revised on 2 March 2020), as supplemented by its Updated Submissions on Costs dated 24 April 2020, Claimant claims (on the basis that the Tribunal makes a final award in favour of Claimant in an amount of US$5 million or more, or in an amount equivalent to the Valuation Funding), an award, order and direction that Respondent pay aggregate costs and expenses of HK$3,500,557.95 within 7 days of the Final Award, plus such further sums payable by Claimant in respect of the fees and expenses of the HKIAC and/or the Tribunal (to be notified to Claimant), to be paid by Respondent within 7 days of a request for payment by Claimant.

212.   The above sum of HK$3,500,557.95 is the aggregate of the following items:

| Item | Amount |
|---|---|
| Pre-action legal costs (consisting of legal fees incurred prior to the filing of the Notice of Arbitration) | HK$163,350.00 |
| Legal costs of and related to this arbitration (excluding costs previously claimed) | HK$2,727,825.00 |
| Fees of the HKIAC and Tribunal | HK$550,217.50 |
| Costs of Thai investigation | HK$26,096.50 |
| Costs of real time transcription service | HK$20,972.20 |
| Other expenses (sundry expenses, including photocopying charges and travelling expenses, etc.) | HK$12,096.75 |
| **Total** | **HK$3,500,557.95** |

213. Claimant also seeks interest on any amount of fees, costs or expenses that Respondent fails to pay at the judgment rate applicable in Hong Kong (being 8.084% per annum at the time of Claimant's original costs submissions, but at the time of this Final Award stands at 8% per annum).

214. Claimant submits that the costs claimed should be awarded to it whether it is successful in its primary claim for payment of the US$5,000,000 plus, or on its alternative claim for restitution.

215. In the event Claimant is unsuccessful in its claims, Claimant submits that no costs order should be made on the basis that Respondent has made no appearance and incurred no costs in this arbitration.

216. Respondent has made no submissions on, or claims for, costs in this arbitration.

217. Claimant has prevailed in this arbitration in that, as a result of the Tribunal's determinations, findings and decisions set out above, Respondent has been found to be liable to pay a sum of US$5,000,000 to Claimant on the basis that the Facility Agreement is valid and enforceable, and Respondent breached the terms of that agreement. Further, the Tribunal has determined that, if the Facility Agreement were invalid and/or unenforceable for one or more of the reasons advanced by those purporting to represent Respondent in the Answer, it would have accepted Claimant's claim in the alternative to restitution of the Valuation Funding paid of US$500,624.26.

218. However, Claimant has not been wholly successful in the claims it has raised, having failed to persuade the Tribunal that its alternate claim - to be entitled to trace the Valuation Funding to the entire AVI Consideration of US$57.5 million - should succeed.

219. Given this, in exercising its discretion on costs, the Tribunal is minded to award costs to Claimant, but to reduce the amount of its claim for costs to take account of the fact that Claimant has not been wholly successful in the claims it has raised. The Tribunal considers, however, that Claimant's claim for costs is, on the whole, otherwise both justified and reasonable in terms of the quantum claimed. On balance, therefore, in undertaking its assessment of the appropriate costs to award to Claimant, and having considered the matter carefully, the Tribunal determines that Claimant's claim for costs should be allowed in full, subject to a reduction of 5% as being appropriate to account for the time spent in relation to the matter on which Claimant did not succeed, given that this aspect of the matter, whilst legally complex and requiring the Tribunal to consider a number of authorities, did not, relatively speaking, take up substantial time at the Substantive Hearing or in the preparation for the same, or in the Tribunal's work post-hearing.

220. Accordingly, the Tribunal awards Claimant 95% of its claim for costs, being HK$3,325,530.05, plus 95% of such further sums payable by Claimant in respect of the fees and expenses of the HKIAC and/or the Tribunal beyond those already included in its claims for costs (as to which see further below). In coming to this determination the Tribunal has considered all the facts and matters put to it in this reference, and the determinations, decisions and findings it has made as recorded above.

221. In respect of the sums payable by Claimant in respect of fees and expenses of the HKIAC and the Tribunal (beyond those already included in its claims for costs), the Tribunal notes that the fees and expenses of the HKIAC were claimed for and allocated in the Interim Award on Costs, and that no further sums are due to the HKIAC. As such, the Claimant's residual claim under this head of costs is for the fees and expenses of the Tribunal only. The Tribunal hereby determines that the further sum to be awarded to Claimant in respect of the Tribunal's fees and expenses is HK$475,000 (being the sum of the further deposits paid by Claimant after the date

of Claimant's Statement of Costs (revised on 2 March 2020), less the 5% reduction referred to above). The Tribunal notes that the further fees and expenses of the Tribunal do in fact exceed the sum of the deposits currently held by the HKIAC, but the Tribunal has determined that it will not make any claim for further fees and expenses to the extent that this would require further deposits to be made in respect of fees and expenses.

222.    Accordingly, the Tribunal duly awards Claimant the total sum of HK$3,800,530.05 for costs and expenses (being the aggregate of the sums of HK$3,325,530.05 and HK$475,000 awarded to Claimant in respect of costs, as determined above) and orders and directs that Respondent pay Claimant this sum for costs and expenses in accordance with the Tribunal's Orders below.

223.    The Tribunal notes that the Ordinance also provides that interest is payable on costs awarded or ordered by an arbitral tribunal "*from (a) the date of the award or order on costs; or (b) the date on which costs ordered are directed to be paid forthwith at the judgment rate, except when the award or order on costs otherwise provide*" (Section 80). Since 1 April 2020, the judgment rate has been set at 8% per annum, and this remains the case as at the date of this Final Award.

224.    The Tribunal does not consider there to be any reason in this case to depart from this standard rule to award post-award interest at the judgment rate, and the Tribunal intends to include such interest in this Final Award.

225.    The Tribunal accordingly awards and orders that interest is duly payable on the sum of HK$3,800,530.05 awarded to Claimant for costs in this Final Award at the judgment rate (currently 8% per annum) as from the date of this Final Award, unless Respondent pays the sum of HK$3,800,530.05 to Claimant within 7 days of the date on which Claimant notifies Respondent of the amount due in respect of pre-Final Award interest for the period from 1 September 2017 to the date of this Final Award. That notification will be considered effective and effected by Claimant notifying Respondent through the correspondence addresses noted for Respondent in paragraphs 4 and 5 of this Final Award.

## XI.    TRIBUNAL'S ORDERS

226.    In accordance with the reasons set-out above, the Tribunal hereby:

(A) DECLARES THAT Respondent materially, substantially and/or fundamentally breached the Facility Agreement by, among other things:

(1) agreeing (through Mr. Galle) to accept US$57,500,000 for his AVI without the prior written consent of Claimant; and

(2) failing to pay Claimant US$5,000,000 within five business days of receipt from AT&T of payment for his AVI.

(B) AWARDS, ORDERS AND DIRECTS THAT Respondent pay to Claimant forthwith but in any event within 7 days of the date on which Claimant notifies Respondent of the amount due in respect of interest pursuant to paragraph B(2) below:

(1) the sum of US$5,000,000 due as a debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement;

43

 (2) interest on the sum of US\$5,000,000 at a rate of HSBC Prime Rate + 1%, from 1 September 2017 (being the first day of the month after Respondent received payment from AT&T) to the date of this Final Award; and

 (3) the sum of HK\$3,800,530.05 in respect of Claimant's reasonable costs and expenses incurred in this arbitration (exclusive of costs previously claimed and awarded in this arbitration).

(C) AWARDS, ORDERS AND DIRECTS THAT, if Respondent fails to pay the sums awarded to Claimant that Respondent has been ordered and directed to pay in respect of debt/damages, interest and costs pursuant to the immediately preceding section (B) of this paragraph of the Final Award within the 7 day period following Claimant's notification to Respondent of the sum due in respect of the interest component of these sums, as provided above, interest shall accrue on each and all of these sums from the date of this Final Award until payment at the same rate as the Hong Kong judgment rate (*i.e.,* the rate of interest determined by the Chief Justice under section 49(1)(b) of the High Court Ordinance (Cap. 4)), which is currently 8% per annum.

(D) REJECTS AND DISMISSES all other claims.

*[Remainder of this page left intentionally blank]*

Seat of Arbitration: Hong Kong

Date: 14th May 2020

Signed by Co-Arbitrator

Mr. Gavin Denton

Signature

Signed by Co-Arbitrator

Mr. John P. Bang

Signature

Signed by Presiding Arbitrator

Mr. Simon Powell

Signature

